# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| JEFFERY LEE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 2:25-cv-00680-RAH |
| | ) |
| JOHN Q. HAMM, | ) |
| Commissioner, Alabama | ) |
| Department of Corrections, | ) |
| | ) |
| TERRY RAYBON, Warden, | ) |
| Holman Correctional Facility, | ) |
| | ) |
| and | ) |
| | ) |
| JOHN DOES 1-100, | ) |
| | ) |
| Defendants. | ) |

## <u>DEFENDANTS' MOTION TO DISMISS</u>

Steve Marshall
*Attorney General*

Polly S. Kenny
*Assistant Attorney General*

Lauren A. Simpson
*Deputy Attorney General*

State of Alabama
Office of the Attorney General
501 Washington Avenue
Montgomery, Alabama 36130-0152
(334) 242-7300
Lauren.Simpson@AlabamaAG.gov

October 3, 2025

**TABLE OF CONTENTS**

INTRODUCTION..................................................................................................1

STANDARDS OF REVIEW......................................................................................3

PRISON LITIGATION REFORM ACT........................................................................4

BACKGROUND....................................................................................................5

    I.      Facts....................................................................................................5

    II.     Adoption of nitrogen hypoxia and subsequent litigation. .....................6

          A.     Kenneth Smith.............................................................................7

          B.     Alan Miller ................................................................................8

          C.     Carey Grayson.............................................................................9

          D.     Demetrius Frazier........................................................................10

          E.     Gregory Hunt ............................................................................11

          F.     Geoffrey West ...........................................................................12

          G.     Jessie Hoffman (Louisiana) .......................................................12

ARGUMENT .......................................................................................................13

    I.      Count I (Eighth Amendment) should be dismissed for failure to state a claim. ......................................................................................13

          A.     Law of method-of-execution claims. .........................................14

          B.     Lee does not plausibly allege a substantial risk of severe pain in Count I.........................................................................17

          C.     Defects of Lee's alternative method of execution cause Count I to fail as a matter of law...............................................29

II. Count II (cruel or unusual under state constitution) should be dismissed for failure to state a claim.....................................................31

III. Count III (Alabama legislature's delegation of authority to ADOC) should be dismissed for failure to state a claim......................35

    A. The claim is barred by sovereign immunity and the statute of limitations. ..........................................................................35

    B. The claim is meritless. ..........................................................36

IV. Count IV (unconstitutionally vague state statute) should be dismissed for failure to state a claim.....................................................44

    A. The claim is procedurally barred. .............................................44

    B. The due-process claim is meritless. ..........................................45

CONCLUSION ..............................................................................................47

CERTIFICATE OF SERVICE ............................................................................49

## INTRODUCTION

Plaintiff Jeffery Lee is a death-sentenced inmate at Holman Correctional Facility. In June 2018, Lee timely elected nitrogen hypoxia as his method of execution. The Alabama Department of Corrections (ADOC) did not announce a nitrogen hypoxia execution protocol until late August 2023; the present 42 U.S.C. § 1983 complaints, filed on August 22, 2025, came in just prior to the end of the two-year statute of limitations period for personal injury actions. *See* ALA. CODE § 6-2-38. Seven other death row inmates filed similar § 1983 complaints in the Middle District of Alabama on the same day, alleging similar grounds for relief; one chose to file in state court.

As of this filing, ADOC has carried out six executions by hypoxia: Kenneth Smith, Alan Miller, and Carey Grayson in 2024, and Demetrius Frazier, Gregory Hunt, and Geoffrey West in 2025. A seventh execution, Anthony Boyd, is scheduled for October. Louisiana executed Jessie Hoffman using this method in 2025. The method of execution is fairly simple. The condemned, wearing a full-face respirator and restrained to a gurney, starts by breathing a mix of gases known as "breathing air" that resembles the ordinary atmosphere. To begin the execution, the breathing air is shut off and replaced by nitrogen, and within seconds, the oxygen level within the mask plummets to the point that the condemned loses consciousness and eventually succumbs. Defendants maintain, based upon the best-available science and

1

evidence, that hypoxia is a quick and painless method of execution, and that the reported movements and "gasping" of the condemned, *see* DE1 ¶2, are merely unconscious movements and agonal breathing, respectively—expected and not indicative of pain or consciousness. Indeed, for well over a year now, inmates (and their experts) have pointed to Smith's so-called writhing and struggling to support claims of cruel and unusual "conscious suffocation." They have claimed that nitrogen hypoxia causes unconstitutional emotional distress. And they have pointed to dicta in *Baze v. Rees*, 553 U.S. 35 (2008), to suggest the United States Supreme Court has already decided the issue. But those claims have resoundingly failed in federal court, including in appeals to two different courts of appeals and in the Supreme Court.

Lee argues four claims for relief:

- Nitrogen hypoxia is cruel and unusual under the Eighth and Fourteenth Amendments, DE1 ¶¶59–74,

- Nitrogen hypoxia violates his right to be free from cruel or unusual punishment under Article I, section 15, of the Alabama Constitution, *id.* ¶¶75–81,

- The Alabama legislature has improperly delegated authority in violation of the non-delegation doctrine in Article III, sections 42 and 43 of the Alabama Constitution, *id.* ¶¶842–90, and

- Section 15-18-82.1 of the Code of Alabama is unconstitutionally vague in violation of the Fourteenth Amendment and Article I, section 6, of the Alabama Constitution, *id.* ¶¶91–96.

Lee asks the Court to declare the protocol unconstitutional and to enjoin Defendants from executing him by the present nitrogen hypoxia protocol or by any method other than one of his proposed alternatives. *Id.* at 27.

Lee's complaint is due to be dismissed. ***First***, the Eighth Amendment claim is largely built on media accounts, *see id*. ¶¶42–54, which Chief Judge Marks deemed "unreliable evidence" in another hypoxia § 1983 action, *Frazier v. Hamm*, 2:24-cv-00732, 2025 WL 361172, at *11 n.19 (M.D. Ala. Jan. 31, 2025). The State has ample penological reason to reject Lee's alternative, medical-aid-in-dying (MAID). ***Second***, the two state-law claims are meritless and/or barred by sovereign immunity, and this Court should decline to exercise supplemental jurisdiction. ***Third***, the statutory vagueness claim is meritless; indeed, the Alabama Court of Criminal Appeals (ACCA) recently held that the challenged state statute "is neither vague nor ambiguous and does not render [an inmate's] sentence arbitrary or capricious." *Mulkey v. State*, __ So. 3d __, 2025 WL 1272751, at *18 (Ala. Crim. App. May 2, 2025). For the reasons that follow, this Court should dismiss the complaint.

## STANDARDS OF REVIEW

A Rule 12(b)(6) motion tests the complaint against Rule 8's requirement of a statement "showing that the pleader is entitled to relief," as defined by the Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007). A court accepts only well-pleaded facts as true and

is not bound by a plaintiff's legal assertions. *Iqbal*, 556 U.S. at 678. A "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* The complaint must plead "factual content" sufficient "to draw the reasonable inference that [each] defendant is liable." *Id.* Allegations must be more than "speculative," *Twombly*, 550 U.S. at 555, and raise "more than a sheer possibility" of unlawful action, *Iqbal*, 556 U.S. at 678. There is a "line between possibility and plausibility," and "facts that are merely consistent with a defendant's liability…stop[] short." *Id.* (citation modified).

## PRISON LITIGATION REFORM ACT

Lee seeks prospective injunctive relief in the form of an order enjoining Defendants from executing him using the nitrogen hypoxia protocol. DE1 at 27. The Prison Litigation Reform Act (PLRA) requires that any grant of injunctive relief be "narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means to correct that harm." 18 U.S.C. § 3626(a) (2024). Should it grant injunctive relief, a district court is required to perform this narrowness-necessity-and-non-intrusiveness analysis as to each separate form or basis of injunctive relief and explain its findings. *See Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1279 (11th Cir. 2020) ("[For] 15 separate forms of relief, the court must make—and explain—15 separate PLRA-related findings.").

The Supreme Court has identified the PLRA's "substantive and procedural

4

limitations" as tools "to streamline 1983 actions and protect 'the timely enforcement of a sentence.'" *Nance v. Ward*, 597 U.S. 159, 174 (2022). The PLRA underscores that this Court must give "substantial weight to any adverse impact on public safety or the operation of a criminal justice system" that would be caused by granting Lee the prospective relief he requests. 18 U.S.C. § 3626 (2024).

Another way the PLRA seeks to streamline prisoner litigation is to bar unexhausted claims. "No action shall be brought…until such administrative remedies as are available are exhausted." 42 U.S.C. §1997e(a). The "requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). According to the Supreme Court, the PLRA's "substantive" and "procedural" limitations hold back "the floodgates to all manner of method-of-execution challenges." *Nelson v. Campbell*, 541 U.S. 637, 650 (2004); *see also Nance v. Ward*, 597 U.S. 159, 174 (2022); *see, e.g.*, *White v. Johnson*, 429 F.3d 572, 572 n.1 (5th Cir. 2019) (prisoner had not exhausted complaint about cutdown procedure used in lethal-injection executions).

## BACKGROUND

### I.     Facts

Jeffery Lee (often spelled "Jeffrey Lee") was convicted of three counts of capital murder for the 1998 murders of Jimmy Ellis and Elaine Thompson, as well

as attempted murder. Lee walked into Jimmy's Pawnshop with a sawed-off shotgun, shot Ellis, shot Thompson in the face, shot another woman, Helen King, and then shot Ellis again. King survived by pretending to be dead. Lee tried to steal the cash register but was unsuccessful because it was secured. He and two codefendants fled, but the store's surveillance video captured the murders, and he confessed after being located in Georgia. The jury recommended life without parole by a 7–5 vote, but the trial court overrode and sentenced Lee to death for the capital convictions, as well as life for the attempted murder conviction. *Lee v. State*, 898 So. 2d 790, 808–09 (Ala. Crim. App. 2001). Lee's conventional appeals were exhausted in 2014 when the United States Supreme Court denied certiorari. *Lee v. Thomas*, 572 U.S. 1015 (2014) (mem.). Since then, he has litigated a successive Rule 32 petition and filed a § 1983 challenge to ADOC's midazolam protocol in the Southern District of Alabama, which was dismissed on the parties' motion in 2018 after Lee elected nitrogen hypoxia. Order, *Lee v. Dunn*, 1:16-cv-00473 (S.D. Ala. July 20, 2018), DE38.

## II.   Adoption of nitrogen hypoxia and subsequent litigation.

In August 2023, ADOC adopted a protocol for carrying out judicial executions by nitrogen hypoxia. The "crux" of the protocol is that it administers "pure nitrogen gas…through an industrial respirator mask" until the inmate dies. *Grayson v. Hamm*, 2:24-cv-376, 2024 WL 4701875, at *2 (M.D. Ala. Nov. 6, 2024). EKG machines and pulse oximeters monitor the inmate's condition. *Id.*

Alabama has successfully used nitrogen hypoxia to carry out the sentences of Kenneth Smith (Supreme Court denied stay), Alan Miller (settled), Carey Grayson (Supreme Court denied stay), Demetrius Frazier (did not appeal denial of preliminary relief), Gregory Hunt (did not challenge the method), and Geoffrey West (did not challenge the method). Louisiana used a similar hypoxia protocol to execute Jessie Hoffman (Supreme Court denied stay after Fifth Circuit vacated preliminary injunction).

### A.    Kenneth Smith

Smith elected nitrogen hypoxia but challenged the method on two grounds. First, Smith and multiple experts asserted that due to Smith's PTSD, he would vomit in the mask during the execution and then choke to death on his vomit before dying of hypoxia. *See, e.g.*, *Smith v. Hamm*, 2:23-cv-00656, 2024 WL 262867, at *1 (M.D. Ala. Jan. 24, 2024). Second, Smith and one of his experts, Dr. Philip Nitschke, asserted that ADOC's mask would not produce a tight seal. *Smith v. Hamm*, 2:23-cv-00656, 2024 WL 116303, at *18 (M.D. Ala. Jan. 10, 2024). Finding each risk highly speculative, the district court denied Smith's motion for preliminary injunction. *Id.* at *20. The Eleventh Circuit affirmed, and the Supreme Court denied certiorari. *Smith v. Comm'r*, 24-10095, 2024 WL 266027 (11th Cir. Jan. 24, 2024); *Smith v. Hamm*, 144 S. Ct. 414 (2024) (mem.). Smith was executed on January 25, 2024.

**B.     Alan Miller**

The State sought Miller's execution warrant on February 21, 2024. Miller, too, challenged nitrogen hypoxia despite having elected it. Among other things, he argued that "a trained medical professional" should place and hold the mask, supervise the flow of nitrogen, and respond if anything "goes awry." Complaint ¶193, *Miller v. Marshall*, 2:24-cv-197 (M.D. Ala. Mar. 29, 2024), DE1. Miller alleged that the mask would not fit his large face, that ADOC should use "medical grade nitrogen," and that a "tranquilizing medication in pill form" would "reduce thrashing." *Id.* In an order dismissing two counts but permitting Miller's Eighth Amendment claim to proceed, the district court found the surviving allegations to be "noticeably lean on factual detail" and "barely…plausible." *Miller v. Marshall*, 2:24-cv-00197, 2024 WL 2946093, at *7 (M.D. Ala. June 11, 2024).

Miller sought preliminary injunctive relief and received copious discovery. He had a team of two major law firms and Dr. Phillip Bickler, an anesthesiologist who conducts hypoxia studies to test pulse oximeters but does not take participants below seventy percent blood oxygen saturation (a far cry from the ADOC protocol). *E.g.*, Hearing Transcript at 192:5–8, *Boyd v. Hamm*, 2:25-cv-00529 (M.D. Ala. Sept. 4, 2025), DE83. Miller received access to ADOC personnel and documents and deposed nearly ten witnesses. He ultimately settled with the State and dismissed his

lawsuit. *See* Joint Stipulation of Dismissal, *Miller v. Marshall*, 2:24-cv-00197 (M.D. Ala. Aug. 5, 2024), DE79. Miller was executed on September 26, 2024.

### C. Carey Grayson

After the State moved for Grayson's execution, he challenged ADOC's hypoxia protocol in June 2024. *See* Complaint, *Grayson v. Hamm*, 2:24-cv-00376 (M.D. Ala. June 28, 2024), DE1. Grayson alleged that with "proper administration," nitrogen hypoxia would cause an inmate to "lose consciousness within seconds" and die within "minutes" without any "pain or discomfort." *Id.* ¶101. But ADOC's protocol would result in "unconstitutional pain," he claimed, because (1) the inmate would not be rendered unconscious prior to the administration of nitrogen gas, causing "anguish," *id.* ¶¶105, 111; (2) excess oxygen might enter the mask and prolong the execution, *id.* ¶119; (3) the protocol does not call for a medical examination to diagnose issues like sleep apnea that could prolong the execution, *id.* ¶125; and (4) the execution team is unqualified to monitor the pulse oximeters and EKGs used during the execution, *id.* ¶¶128, 129. Grayson later amended his complaint, alleging that Smith's autopsy suggested negative pressure pulmonary edema (NPPE). Amended Complaint, *Grayson v. Hamm*, 2:24-cv-376 (M.D. Ala. Aug. 30, 2024), DE42.

Grayson moved for a preliminary injunction and received limited expedited discovery. Motion for Preliminary Injunction, *Grayson v. Hamm*, 2:24-cv-00376

(M.D. Ala. Aug. 20, 2024), DE30; Order, *Grayson v. Hamm*, 2:24-cv-00376 (M.D. Ala. Sept. 18, 2024), DE62. The district court held a comprehensive two-day hearing on Grayson's motion. The court received over fifty exhibits, including numerous case reports and articles on inert gas asphyxiation and media reports describing the Smith and Miller executions. *Grayson*, 2024 WL 4701875, at *3. The court heard live testimony from ten witnesses, including each side's expert, the medical examiner who conducted Smith's autopsy, and multiple State employees who witnessed the Smith and/or Miller executions. *Id.* at *4–6. The court denied Grayson's motion for a preliminary injunction, finding that his claim fell "well short" of the Eighth Amendment standard; Grayson presented "a speculative parade of highly unlikely events," *id.* at *19, and the State's expert, Dr. Joseph Antognini, was deemed "more credible and persuasive" than Grayson's expert Dr. Brian McAlary, *id.* at *22. The Eleventh Circuit affirmed unanimously in a published opinion, *Grayson v. Comm'r, Ala. Dep't of Corr.*, 121 F.4th 894 (11th Cir. 2024), the Supreme Court denied certiorari, *Grayson v. Hamm*, 145 S. Ct. 586 (2024) (mem.), and Grayson was executed on November 21, 2024.

### D.     Demetrius Frazier

Like Grayson, Frazier waited until the State moved for his execution to challenge the hypoxia protocol in November 2024. Complaint, *Frazier v. Hamm*, 2:24-cv-732 (M.D. Ala. Nov. 15, 2024), DE1. His complaint relied heavily on allegations

of what lay witnesses reported about the executions of Smith and Miller. Other than his alternative methods, his complaint was substantially similar to Grayson's.

The district court held a hearing on Frazier's motion for preliminary injunction in January 2025, at which the court heard testimony from Dr. McAlary, Dr. Antognini, and Commissioner Hamm. The court denied Frazier's motion for preliminary injunction, finding the lay witness accounts "insufficiently reliable," *Frazier v. Hamm*, 2:24-cv-00732, 2025 WL 361172, at \*11 (M.D. Ala. Jan. 31, 2025) (crediting Dr. Antognini over Dr. McAlary); *id.* at \*11 n.20 (noting that "the State present[ed] credible evidence that Smith held his breath during his execution, thereby prolonging it"); and ultimately finding:

> On this record, Frazier has not established that the Protocol very likely causes needless psychological suffering, superadds psychological pain, or creates a substantial risk of serious psychological harm. While the Court does not doubt that Frazier likely will experience some psychological pain before and during his execution, the Court finds that Frazier has failed to meet his burden to show that the Protocol creates a substantial risk of serious psychological harm over and above what is inherent in any execution. Consequently, Frazier fails to establish a substantial likelihood of success on the merits of his Eighth Amendment claim.

*Id.* at \*12. Frazier did not appeal, and he was executed on February 6, 2025.

**E.    Gregory Hunt**

Gregory Hunt timely elected nitrogen hypoxia, and the State moved to authorize his execution in March 2025. Hunt never challenged hypoxia; he instead filed two "pro se" successive Rule 32 petitions in state circuit court and a stay application

in the United States Supreme Court, which was denied. *Hunt v. Alabama*, No. 24A1192 (U.S. June 10, 2025) (mem.). Hunt was executed on June 10, 2025.

### F. Geoffrey West

Geoffrey West timely elected nitrogen, and the State moved to authorize his execution in April 2025. He never challenged hypoxia, instead limiting his litigation to claims in response to the State's execution motion that Rule 8(d)(1) of the Alabama Rules of Appellate Procedure was unconstitutional and that the Attorney General had no role in the execution authorization process. West was executed on September 25, 2025.

### G. Jessie Hoffman (Louisiana)

Finding that no drug company would sell Louisiana the necessary drugs for lethal injection, that state made nitrogen hypoxia its method of execution in spring 2024. Jessie Hoffman waited until February 2025, after Louisiana issued a death warrant, to bring a new lawsuit challenging nitrogen hypoxia. The parties engaged in expedited discovery, and the district court held an evidentiary hearing, featuring testimony from Dr. Antognini and Dr. Bickler. The district court found that "nitrogen hypoxia does not produce physical pain" and that a person breathing nitrogen would "lose consciousness in less than one minute." *Hoffman v. Westcott*, 3:25-cv-00169, 2025 WL 763945, at *8 (M.D. La. Mar. 11, 2025). The court enjoined Hoffman's execution, however, on its "common sense [belief] that the deprivation of

oxygen to the lungs causes a primal urge to breathe and feelings of intense terror." *Id.* at \*9. That alleged "psychological pain," which the court never compared to the baseline emotional distress of facing execution or the distress posed by any alternatives, was enough to find that Hoffman had "clearly shown" a "substantial likelihood of success on his Eighth Amendment claim. *Id.* at \*10.

The Fifth Circuit swiftly reversed, explaining that the preliminary injunction was "not just wrong" but got "the Constitution backwards, because it's premised on the odd notion that the Eighth Amendment somehow requires Louisiana to use an admittedly *more* painful method of execution." *Hoffman v. Westcott*, 131 F.4th 332 (5th Cir. 2025). The Supreme Court denied Hoffman's stay application. *Hoffman v. Westcott*, 145 S. Ct. 797 (2025) (mem.). Hoffman was executed on March 18, 2025.

## ARGUMENT

Lee's complaint names two defendants—ADOC Commissioner John Q. Hamm and Warden Terry Raybon—as well as one hundred John Does, either ADOC employees or contracted personnel who assist in executions. As to all defendants, Lee fails to state a claim for which relief may be granted.

## I. Count I (Eighth Amendment) should be dismissed for failure to state a claim.

In Count I (DE1 ¶¶59–74), Lee contends that ADOC's nitrogen hypoxia execution protocol is cruel and unusual. He claims that the protocol "causes the condemned prisoner to feel the excruciating and painful sensation of being suffocated

to death, *i.e.*, conscious suffocation.," *id.* ¶24, and that this "is cruel and unusual because it superadds terror and pain during the execution," *id.* ¶64. Lee further claims that the protocol is defective in a variety of ways, *id.* ¶¶40–41, and that it is unusual because of its novelty, *id.* ¶68.

Lee has failed to state an Eighth Amendment claim, and Count I should be dismissed.

### A.    Law of method-of-execution claims.

The Eighth Amendment forbids "cruel and unusual punishments," such as "burning at the stake, crucifixion. breaking on the wheel, or the like." *In re Kemmler*, 136 U.S. 436, 446 (1890). A claim that a method falls in that category must meet an "extremely demanding standard," *Smith*, 144 S. Ct. at 416 (Kagan, J., dissenting), an "exceedingly high bar" that no method-of-execution claim has ever surpassed in the Supreme Court, *Barr v. Lee*, 591 U.S. 979, 980 (2020); *accord Glossip*, 576 U.S. at 869. The inquiry "ask[s] whether the punishment 'superadds' pain well beyond what's needed to effectuate a death sentence." *Bucklew v. Precythe*, 587 U.S. 119, 137 (2019). "States have often sought more nearly the opposite,' developing new methods, such as lethal injection, thought to be less painful and more humane than traditional methods, like hanging, that have been uniformly regarded as constitu-tional for centuries." *Lee*, 591 U.S. at 980 (citation omitted); *accord Barber v. Governor of Ala.*, 73 F.4th 1306, 1318 (11th Cir. 2023).

***First***, Lee must plead that nitrogen hypoxia poses a "substantial risk" of "severe pain over and above death itself." *Nance*, 597 U.S. at 164. That severe pain must be "sure or very likely" to occur. *Glossip*, 576 U.S. at 877; *accord Price v. Comm'r, Ala. Dep't of Corr.*, 920 F.3d 1317, 1325-26 (11th Cir. 2019). The Constitution "does not guarantee a prisoner a painless death" or even a quick one. *Bucklew*, 587 U.S. at 132.

***Second***, Lee must plead "an alternative that is 'feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain.'" *Glossip*, 576 U.S. at 877. A "comparative exercise" is required to "decide whether the State has cruelly 'superadded' pain to the punishment of death." *Nance*, 597 U.S. at 164. Lee's alternative must provide "the State a pathway forward," such as "a veritable blueprint for carrying the death sentence out." *Id.* at 169. Lee also must show "that the State has refused to adopt [an alternative] without a legitimate penological reason"—i.e., the State has cruelly "chosen" to "superadd[] pain to the death sentence." *Bucklew*, 587 U.S. at 134. Among reasons not to adopt an alternative protocol are inability to secure necessary drugs, the necessary involvement of individuals unable to participate in an execution due to professional ethical restrictions, and the state's interest in selecting a method of execution that "preserv[es] the dignity of the procedure." *Id.* at 134-35 (collecting cases).

***Third***, even if Lee's complaint satisfies the test just discussed, he still must plausibly allege that the method was "calculated to superadd terror, pain, or disgrace." *City of Grants Pass v. Johnson*, 603 U.S. 520, 542 (2024) (citation modified).[1] To show the method "cruelly superadds pain," *Bucklew*, 587 U.S. at 133, Lee must plead plausible facts that would prevent "prison officials from pleading that they were 'subjectively blameless,'" *Glossip*, 576 U.S. at 877.

As was noted earlier this year in a similar challenge, Lee's "claim 'faces an exceedingly high bar.'" *Frazier*, 2025 WL 361172, at *9 (quoting *Barr*, 591 U.S. at 980). The opinion continued:

> Frazier's claim cannot succeed unless he establishes that the Protocol "presents a risk that is *sure or very likely* to cause serious illness and needless suffering" and also "gives rise to sufficiently *imminent* dangers." *Grayson*, 121 F.4th at 897 (emphases in original) (quoting *Price*, 920 F.3d at 1325). The Protocol must pose a "'substantial risk of serious harm,' an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'" *Glossip*, 576 U.S. at 877 (quoting *Baze* [*v. Rees*, 553 U.S. 35, 50 (2008)]). To date, the United States Supreme Court "has yet to hold that a State's method of execution qualifies as cruel and unusual." *Bucklew*, 587 U.S. at 133.

*Id.*

---

1. *Grants Pass* was not a method-of-execution case, but it is offered to illustrate the Supreme Court's consistent articulation of the constitutional standard.

**B. Lee does not plausibly allege a substantial risk of severe pain in Count I.**

Lee claims that the hypoxia protocol, "in particular the accompanying conscious suffocation, is cruel and unusual because it superadds terror and pain during the execution." DE1 ¶64. This allegation is built largely on lay witness observations of the previous hypoxia executions. *See id.* ¶¶ 42–54. He further argues:

- the protocol does not include any provision for a sedative prior to the nitrogen,

- it does not use an "individualized mask" or an "exit-bag hood" to ensure oxygen is kept out,

- it "does not account for residual oxygen in the tubing,"

- it does not "outline procedures" for ensuring that the mask has not become dislodged after the inmate's last words,

- it does not provide a mechanism for removing exhaled carbon dioxide from the mask,

- it does not include a safeguard against the risk of vomiting and aspiration,

- it does not require a physician to be on site and able to stop the execution "based on the risk of vomiting or other complications,"

- it "does not specify the purity of the nitrogen or the minimum amount of nitrogen that will be available for uninterrupted use,"

- it "provides no limits on the time a prisoner being executed may suffer," as the protocol states that the nitrogen will be administered either for fifteen minutes or five minutes after flatline, whichever is longer, and

- the chest strap on the gurney "will undoubtedly impair chest wall and corresponding lung expansion," which will "further compound[] dyspnoea and air hunger."

*Id.* ¶¶40–41. These will be addressed in turn.

### i. "Conscious suffocation."

Turning first to the claim of conscious suffocation, Lee alleges:

> Execution by nitrogen hypoxia, in particular the accompanying conscious suffocation, is cruel and unusual because it superadds terror and pain during the execution. A condemned prisoner remains conscious for several minutes, experiencing the terror and painful sensation of suffocation before he passes. *See Baze v. Rees,* 553 U.S. 35, 53 (2008) (describing the "constitutionally unacceptable risk of suffocation")[.]

*Id.* ¶64. Aside from the fact that Lee is quoting dicta from the plurality opinion of *Baze*, the method of execution at issue in *Baze* was completely different. There, the Supreme Court was discussing (and not evaluating, because they were uncontested) the risks of pancurionium bromide, which "inhibits all muscular-skeletal movements and, by paralyzing the diaphragm, stops respiration." 553 U.S. at 44. That does not happen with nitrogen hypoxia (and Lee has not pleaded that it does). He never explains how the alleged source of his terror and pain could be anything like having one's diaphragm paralyzed. There are more or less painful ways (and even *painless* ways) that one can be deprived of oxygen while conscious, so merely observing that a method of execution involves deprivation of oxygen is not enough to state an Eighth Amendment claim. *See, e.g.*, *In re Ohio Execution Protocol Litig.*, 946 F.3d 287, 290 (6th Cir. 2019).

Lee mainly relies on witness accounts of movement during the previous hypoxia executions to support his allegations that the deprivation of oxygen in those executions was painful. *See* DE1¶¶42–54. But he never confronts more likely causes

18

of movement, including voluntary resistance (in the case of Smith and Grayson) or involuntary movements associated with dying, which can be "misperceived as signs of consciousness or distress." *Baze*, 553 U.S. at 57; *accord Grayson*, 2024 WL 4701875, at *4, 6, 17, 20 (discussing evidence of Smith's resistance, consumption of an illegal drug before his execution, holding his breath, agonal breathing after unconsciousness, that even "brain-dead patients experience movement," etc.). On motion to dismiss, the Court need not credit any of these explanations. But neither must the Court accept allegations that are not "plausible" "given more likely explanations." *Iqbal*, 556 U.S. at 681. Lee has offered a version of events that is no more than "merely consistent," *id.* at 678, with what some (mistaken) journalists said. All of this was litigated in *Grayson v. Hamm*, a case that should not have survived motion to dismiss, either.

Lee restates earlier plaintiffs' observation that the Smith autopsy noted "pulmonary edema," which is a swelling of the lungs. DE1 ¶48. But Lee's inference that there was "negative pressure" on Smith's airway (from what?) or an "upper airway…obstruct[ion]" (from what?) are wholly conclusory and speculative. *Id.* The allegation appears to be that an inmate "experience[ing] panic" (why?) and "attempting to breathe while the upper airway is obstructed" (how?) will have his airway close up entirely. *Id.* Lee offers no allegation that panic-induced airway closure causing painful and prolonged suffocation has ever happened to anyone, and it is not

plausible that it could happen to him. At a certain point, such confusing, elliptical, and hypothetical allegations—even if Lee could find some expert to repeat them—should not proceed.[2]

### ii. Sedation prior to nitrogen.

Lee is correct that the hypoxia protocol does not include a provision for the administration of a sedative before the nitrogen is turned on. *See* DE1 ¶40. But nowhere does he plead facts showing that a sedative is constitutionally necessary, nor does he plead what sedative the constitution mandates that he receive. Indeed, if the sedative Lee requests slows his breathing, it may prolong his execution.

If a mild sedative is therapeutically warranted, then Lee may request such from ADOC's contract medical provider. *See Grayson*, 2024 WL 4701875, at *4, 20.

---

2. Brooks, like Grayson, Frazier, and Boyd before him, claims that Smith's autopsy results specifically establish he suffered from **negative pressure** pulmonary edema ("NPPE"). *Id.* ¶48. As was noted in *Grayson*, Dr. McAlary, asserting signs of NPPE in Smith's autopsy, "finds himself without any real foundational support other than an unsupported opinion—no supporting articles or case studies, reliance upon highly questionable hearsay witness accounts, no support in Smith's autopsy report for an upper airway obstruction that led to negative pressure pulmonary edema, untested reliance on proposed alternatives with their own set of risks and complications, unfounded theories of risks of mask leaks or monitoring device failures, and unfounded theories that the execution team cannot adequately monitor pulse oximeter or EKG devices or make the simple interpretations intended from them." *Grayson*, 2024 WL 4701875, at *22.

### iii. Individualized mask or "exit bag."

Lee alleges that the protocol is defective because it does not require "an individualized mask that is designed to securely affix to the specific prisoner's face" or an "exit-bag hood" instead of a mask. DE1 ¶40.

First, the mask. Putting aside for the moment the fact that conducting an individualized fitting of a mask would require the cooperation of the inmate prior to the execution—hardly a guarantee—Lee has pleaded no facts showing that the full-face respirator used in the previous executions was improperly fitted to any of the previous inmates' faces, from Miller's large face to Grayson's considerably smaller one.[3] He also failed to plead facts showing that mask fit has been a problem in any hypoxia execution or that the flow rate is low enough to make an amount of oxygen sufficient to prolong the execution enter the mask.

Second, if Lee's concern is to "keep[] oxygen out of the nitrogen delivery system," *id.*, then he has failed to plead facts showing how an exit bag would be any

---

3. *Compare, e.g.*, Ivana Hrynkiw, *Alabama Inmate Alan Miller Executed With Nitrogen Gas Thursday for 1999 Shootings*, AL.COM (Sept. 26, 2024, 12:00 PM), https://www.al.com/news/2024/09/alabama-inmate-alan-miller-set-to-be-executed-with-nitrogen-gas-thursday-for-1999-shootings.html (showing Miller) *with* Kent Faulk, *Alabama Executes Carey Dale Grayson by Nitrogen Gas for 1994 Murder*, AL.COM (Nov. 21, 2024, 10:49 AM), https://www.al.com/news/2024/11/live-updates-alabama-set-to-execute-carey-dale-grayson-by-nitrogen-gas-for-1994-murder.html (showing Grayson).

safer than the mask ADOC uses. Lee does not describe an exit bag in his complaint, but as Russel Ogden relayed concerning a Canadian suicide:

> All materials for the suicide apparatus were purchased by the decedent several months in advance. The disposable 8.9 cu. ft. helium party balloon tank was acquired at a local toy store and the decedent joked that when she was walking home with the 7 lb. box containing the helium, someone inquired if she was planning a party, to which she replied, "It's a going away party."

> The decedent assembled her suicide apparatus by securing one end of clear plastic tubing to the tank outlet and she taped the other end inside an 18 X 22 inch plastic bag that served as a hood to receive the helium. An elasticized hair band acted as a collar to secure the hood around her neck.

> […]

> Seated upright on her bed, the decedent placed the hood on top of her head and adjusted it around her forehead, leaving her eyes, nose, and mouth exposed. She opened the valve on the helium tank and the hood inflated on top of her head.… Palpating the hood with her hands, the decedent determined that the hood was inflated.

> To deplete residual oxygen and carbon dioxide the decedent exhaled deeply and then without hesitation pulled the hood down to her neck and adjusted the collar under her chin and jaw line. While still seated in an upright position she said, "I'm going to breathe now," which transmitted in a timbre that indicated she had already inhaled helium.

Russel D. Ogden, *Observation of Two Suicides by Helium Inhalation in a Prefilled Environment*, 31:2 AM. J. FORENSIC MED. & PATHOLOGY 156, 158–59 (2010). Lee fails to allege any facts showing how a plastic bag over the head, held in place by an elastic band around the neck, would be any safer than ADOC's full-face respirator,

which is securely strapped to the condemned's face. Moreover, considering Lee's stated concern about carbon dioxide, he fails to allege any facts showing how carbon dioxide would be removed from the plastic bag. Either the bag is sufficiently loose around the neck that carbon dioxide can escape—and oxygen can enter—or else it is too tight to permit the removal of waste gases.

### iv. Residual oxygen.

Lee claims that the protocol is defective because it does not contain any provisions for dealing with "residual oxygen in the tubing and other parts of the nitrogen hypoxia execution system," DE1 ¶40, which he claims "carries the same risks as an improperly sealed mask," *id.* Under the protocol, the inmate begins the execution with breathing air, which obviously contains oxygen, flowing into the mask. There will thus be *some* oxygen in the delivery system at the beginning of the execution, but once the breathing air is shut off and the nitrogen is turned on in its stead, it will quickly be flushed. Lee has failed to plead facts showing that this hypothetical residual oxygen has ever prolonged an execution.

### v. Risk of dislodged mask.

Lee contends that the protocol does not "outline procedures to ensure that the mask does not become dislodged or the seal broken as a result of" the inmate's last words. *Id.* The protocol states that after the inmate makes his final statement, the Warden will leave the execution chamber, and "[t]he team members inside the

execution chamber will make a final inspection of the mask," verifying proper placement. Not until this is accomplished does the Warden "activate the nitrogen hypoxia system."[4] Lee fails to plead facts stating that the team members have ever failed to make this final inspection or that the full-face respirator has ever become dislodged through mere speaking, especially as the prior executions have shown that the mask remains in place even when the condemned moves (consciously or unconsciously).

### vi. Mechanism for removing carbon dioxide.

Lee claims that the protocol lacks "a mechanism to remove the carbon dioxide under the mask as the condemned prisoner exhales." *Id.* As was noted in the *Smith* litigation:

> The court's examination of the mask apparatus revealed it to be a NIOSH-approved, industrial grade, continuous flow supplied-air respirator mask with an adjustable five point harness system and a pliable, double flange rubber seal that would tightly fit and hold the mask over the entirety of the wearer's face—including eyes, nose, mouth, and chin—***that also contained a one-way valve near the mouth and nose allowing for the exit of exhaled gases, including carbon dioxide***. Such masks are often used in industrial settings involving confined spaces and chemical processes where external air conditions are or can be dangerous. The mask is very different from those encountered in a medical or hospital setting or used to deliver continuous air pressure to individuals diagnosed with sleep apnea, i.e., CPAP machines.

---

4. ALA. DEP'T OF CORR. EXECUTION PROCS. 17 (Aug. 2023), https://alabamareflector.com/wp-content/uploads/2023/09/Alabama-death-penalty-protocol.pdf.

*Smith v. Hamm*, 2:23-cv-00656, 2024 WL 116303, at \*4 n.3 (M.D. Ala. Jan. 10, 2024) (emphasis added). Lee has not plausibly pleaded any fact that would call these findings into question.

### vii. Risk of vomiting and aspiration.

Lee claims that the protocol is unconstitutional because it contains no provision for the (unlikely) event that the condemned vomits in the mask and aspirates. DE1 ¶40. Here, he offers no plausible facts to show that this has been a problem in previous executions. The potential of vomiting and subsequent aspiration was a claim in the Smith § 1983 litigation, and a representative of ADOC testified "that the execution team would remove and clean the mask and check and clean Smith's airway if Smith vomited *before* nitrogen was introduced into the mask. She also testified that the team would not halt the execution if Smith vomited *after* nitrogen was introduced into the mask." *Smith*, 2024 WL 116303, at \*19. As was noted later that year in *Grayson*, "Smith claimed that "the Protocol…subject[ed] him to a 'substantial risk of asphyxiation on his own vomit," *Smith*, 2024 WL 116303, at \*17 (citation omitted), and his medical expert characterized that as an almost certainty. But that certainty never happened. Nor did it happen with the Miller execution." *Grayson*, 2024 WL 4701875, at \*19 n.20.

If Lee is genuinely concerned about vomiting and aspiration, then, like Smith, he may have his last meal earlier in the day so as to ensure he does not have a full

stomach at the time of execution. *See, e.g.*, Abigail Brooks, Erik Ortiz & Dasha Burns, *Alabama Inmate Kenneth Smith Put to Death in First U.S. Nitrogen Gas Execution*, NBC NEWS (Jan. 25, 2024, 9:43 PM), https://www.nbcnews.com/news/us-news/alabama-prepares-first-us-nitrogen-gas-execution-inmate-kenneth-smith-rcna135568 ("Prison officials said earlier that as a precaution to Smith's vomiting, they gave him his final meal of solid food by 10 a.m. and only clear liquids throughout the day.").

### viii. Lack of a physician.

Lee contends that the protocol is defective because it does not require a physician to be on hand "who could stop the execution based on the risk of vomiting or other complications." DE1 ¶40. But Lee has failed to identify any such physician who would be willing and available to assist in this capacity in an ADOC execution. The AMA Code of Medical Ethics prohibits physician participation in executions, including to the extent that the physician "[w]ould assist, supervise, or contribute to the ability of another individual to directly cause the death of the condemned." Opinion 9.7.3, AMA CODE OF MED. ETHICS, https://code-medical-ethics.ama-assn.org/ethics-opinions/capital-punishment (last visited Sept. 19, 2025).

### ix. Risk of asphyxiation-induced injury.

Lee claims that there are no provisions in the protocol to protect him against being left in a vegetative state due to insufficiently pure nitrogen or "premature

exhaustion of the nitrogen supply." DE1 ¶40. But Lee offers no plausible facts to show that inadequate gas or impure gas have been a problem in previous executions. Moreover, as the State has an interest in carrying out judicial executions, ADOC has every incentive to ensure that the inmate is breathing pure nitrogen[5] and that enough nitrogen is present to kill the condemned. Further, the protocol specifies that there must be at least 500 PSI of nitrogen and breathing air for an execution,[6] and Lee pleads no facts showing that this would be insufficient.

### x. Lack of a time limit.

Lee alleges that the protocol is defective because the condemned may be left to "suffer" for an unspecified length of time, as the protocol specifies that the nitrogen will flow for the longer of fifteen minutes or five minutes past flatline. DE1 ¶40; *see* ALA. DEP'T OF CORR. EXECUTION PROCS. 18. But Lee pleads no facts showing that the condemned "suffers" at all once he is rendered unconscious. Moreover, Lee does not specify how long would be too long for the execution to continue or what metric he uses to reach that conclusion. For example, Lee lists MAID—specifically, the cocktails known as DDMP2 or DDMAPh—as his alternative method. Lee DE1 ¶72. A 2025 survey of various MAID protocols showed that of 432 DDMP2

---

5. Purity analysis certificates for the nitrogen have been submitted in federal litigation. *See, e.g.*, *Grayson*, 2024 WL 4701875, at *3.

6. ALA. DEP'T OF CORR. EXECUTION PROCS. 39.

suicides, the mean time to death was 3.5 hours, with a maximum of 61.8 hours, while of 1,992 DDMAPh suicides, the mean time to death was 1.6 hours, with a maximum of 67.5 hours. Patrick Macmillan et al., *The Pharmacology of Aid in Dying: From Database Analyses to Evidence-Based Best Practices*, 28:4 J. PALLIATIVE MED. 492–98 (2025).

### xi. Chest strap.

Finally, Lee contends that the chest strap used as part of the execution restraints "will undoubtedly impair chest wall and corresponding lung expansion," contributing to the feeling of air hunger. DE1 ¶41 (quoting Damian M. Bailey et al., *Physiology of Nitrogen: A Life or Death Matter*, EXPERIMENTAL PHYSIOLOGY 1, 10 (2025), https://physoc.onlinelibrary.wiley.com/doi/epdf/10.1113/EP092946). His only proof of this claim is "[e]yewitness reports" of "severe respiratory distress including gasping, choking, retching, and moaning as they invariably fought against their restraints." *Id.* (quoting Bailey).[7] Again, this claim is based upon little more than the statements of lay witnesses, who cannot reliably distinguish between voluntary and involuntary movement during a hypoxia execution, and Lee has failed to plead facts showing that the chest plate was ever tightened to the point of causing air hunger in a previous execution.

---

7. There is no indication that Bailey and his coauthors have ever witnessed a hypoxia execution. They also admit that they "vehemently oppose the death penalty[.]" *Id.* at 3.

**C.** **Defects of Lee's alternative method of execution cause Count I to fail as a matter of law.**

Lee must plead and "prove a known and available alternative," *Glossip*, 576 U.S. at 880, that the State has "refuse[d] to adopt" despite "documented advantages," *Baze*, 553 U.S. at 52. The alternative must allow the State to carry out the sentence "relatively easily and reasonably quickly." *Bucklew*, 587 U.S. at 141. This standard is extraordinarily high. *See Barber*, 73 F.4th at 1318. A plaintiff cannot *force* States to "experiment" with new methods, *Bucklew*, 587 U.S. at 142, or adopt a method to reduce risk "slightly," *Baze*, 553 U.S. at 51. Rather, the Eighth Amendment comes into play only when the state rejects an alternative with "comparative efficacy" so "well established" that "failure to adopt it" makes officials subjectively blameworthy. *Id.* at 57; *accord Bucklew*, 587 U.S. at 142. The standard is not an invitation to toss out a hypothetical method with gaps so large that it is unclear whether or how the state would implement it, leaving room for yet another challenge. *See Bucklew*, 587 U.S. at 141-42; *Nance,* 597 U.S. at 169; *see also Hamm v. Smith*, 143 S. Ct. 1188, 1189 (2023) (Thomas, J., dissenting from denial of certiorari).

Lee's alternative is MAID, specifically DDMP2 (1 g diazepam, 50 mg digoxin, 15 g morphine sulfate, and 2 g propranolol) or DDMAPh (100 mg digoxin, 1 g diazepam, 15 g morphine sulfate, 8 g amitriptyline, and 5 g phenobarbital). DE1 ¶¶71–74. While MAID is authorized for euthanasia in eleven states and Washington,

D.C.,[8] it is not an approved method of execution in any state. MAID is not feasible or readily available to ADOC as a matter of law, nor does Lee offer the Court anything resembling "a veritable blueprint" for its use. *Nance*, 597 U.S. at 169.

***First***, Lee claims that the drugs should be introduced to the inmate by oral injection—that is, he would swallow a cocktail mixed with apple juice. DE1 ¶73. Aside from the obvious problem that this method requires the inmate to ***swallow*** the lethal agents, it does not specify what happens if the inmate chooses not to cooperate. If "ingested orally" is taken to mean a feeding tube, this would require the participation of a doctor, and Lee cannot identify one willing to insert the equipment and push the lethal drugs.

***Second***, Lee has not pleaded facts showing that any of the drugs in the DDMP2 or DDMAPh cocktails are available to ADOC ***for use in an execution***. Even if ADOC's contract provider can procure some or all of the drugs to use for inmate medical purposes, that does not make them available for use as a method of execution. It is no secret that pharmaceutical manufacturers have put pressure on state departments of corrections to not use their products in executions; sodium thiopental was pulled from the U.S. market entirely as a result of pressure from death penalty abolitionists and the Italian government. *Glossip*, 576 U.S. at 869-72

---

8. *States Where Medical Aid in Dying is Authorized*, COMPASSION & CHOICES, https://compassionandchoices.org/states-where-medical-aid-in-dying-is-authorized (last visited Sept. 22, 2025).

(discussing lethal injection progression from sodium thiopental to pentobarbital, then to midazolam). As a matter of law, Alabama has a legitimate penological reason not to adopt such methods that "depend so heavily on external variables," *Frazier*, 2025 WL 361172, at *13, because "the question of capital punishment belongs to the people and their representatives," *Bucklew*, 587 U.S. at 150, not activists and drug companies, *cf. Price*, 920 F.3d at 1327 (noting that no "supply concerns exist for nitrogen," which "is easily purchased").

*Third*, a MAID death is not always quick. As discussed above,  a 2025 survey of various MAID protocols showed that of 432 DDMP2 suicides, the mean time to death was 3.5 hours, with a maximum of 61.8 hours, while of 1,992 DDMAPh suicides, the mean time to death was 1.6 hours, with a maximum of 67.5 hours. Macmillan et al., *The Pharmacology of Aid in Dying: From Database Analyses to Evidence-Based Best Practices*.

As MAID does not satisfy *Baze* and *Glossip*, Lee's claim is due to be dismissed.

## II.     Count II (cruel or unusual under state constitution) should be dismissed for failure to state a claim.

Count II (DE1 ¶¶75–81) is a state-law claim, as Lee contends that the hypoxia protocol is cruel or unusual under Article I, section 15 of the Alabama Constitution for the reasons previously discussed.

First, all Defendants have sovereign immunity in federal court against a "claim of entitlement to relief [that] is based on a violation of state law." *S&M Brands, Inc. v. Georgia ex rel. Carr*, 925 F.3d 1198, 1204 (11th Cir. 2019). Federal courts cannot "instruct[] state officials on how to conform their conduct to state law." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). "And conclusory allegations that the same conduct that violates state law also violates the U.S. Constitution will not boost the claim over the sovereign-immunity bar." *S&M Brands*, 925 F.3d at 1204. Sovereign immunity applies equally to a "prayer for declaratory relief [that] adds nothing to the prayer for injunction." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 646 (2002). As Lee seeks relief against state officers for alleged violations of state law, his claims are due to be dismissed under *Pennhurst* and its progeny for lack of subject-matter jurisdiction. *See Raygor v. Regents of Univ. of Minn.*, 534 U.S. 533, 541 (2002) ("[W]e cannot read § 1367(a) to authorize district courts to exercise jurisdiction over claims against nonconsenting States[.]").

Second, as Lee's corresponding federal claim, Count I, is due to be dismissed, this Court should decline to exercise supplemental jurisdiction over Count II. While this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a),[9] the Court

---

9. "[I]n any civil action in which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims

is not obligated to exercise that jurisdiction, particularly here, where there is minimal guiding state authority and where the federal-law claims are ripe for dismissal.

While Alabama courts have held that "lethal injection is not per se cruel and unusual punishment," *e.g.*, *McNabb v. State*, 991 So. 2d 313, 335 (Ala. Crim. App. 2007) (collecting cases), the appellate courts' only statement on nitrogen hypoxia in this context to date appears in *Smith v. State*, a Rule 32 action in which Kenneth Smith argued that permitting him to be executed after his first execution was called off would be unconstitutional:

> In addition, in Alabama, "[a] death sentence shall be executed by lethal injection, unless the person sentenced elects to be executed by electro-cution or nitrogen hypoxia." § 15-18-82.1(a), Ala. Code 1975. In his reply brief, Smith asserts that the State has "moved to execute [him] using [nitrogen hypoxia]," and in his § 1983 action in federal court, Smith "sufficiently pleaded that nitrogen hypoxia will significantly re-duce his pain." *Smith v. Commissioner, Ala. Dep't of Corr.*, No. 22-13781, November 17, 2022 (11th Cir. 2022) (not reported in Federal Reporter). Accordingly, a second attempt at execution will not be cruel and unusual punishment, and his claim to the contrary is without merit.

396 So. 3d 400, 406 (Ala. Crim. App. 2023) (citation omitted).

Moreover, to the extent that Lee suggests that the Alabama Constitution offers more protection than the United States Constitution—"cruel or unusual" versus "cruel and unusual," *see* DE1 ¶78—this contention has yet to be ruled upon by the appellate bench. It came before ACCA in *Mitchell v. State*, 84 So. 3d 968, 994–95

---

that…form part of the same case or controversy[.]"

(Ala. Crim. App. 2016), but that court declined to decide the question because the claim could be dismissed on other grounds. Assuming arguendo that this claim has merit, this would logically mean that no method of execution could be used in Alabama until it was well established in other jurisdictions. How often a method of execution must be used in order to no longer be "unusual" is not a question Lee answers, so his claims must be dismissed as conclusory.

The better answer here is the one provided in *Bucklew*: that "unusual" punishments should be understood to be those like burning alive and drawing and quartering that had once been used but had long fallen *out* of favor. Moreover, under Alabama law, the punishment is death, not any particular method, *cf.* ALA. CODE § 15-18-82.1(e) ("A change in the method of execution shall not increase the punishment or modify the penalty of death for capital murder."), and as the Alabama Supreme Court held in *Lee v. State*, capital punishment is not unusual:

> "[T]he punishment of death" or imprisonment for life is neither unusual nor cruel, within the meaning of the Constitution, where the crime for which punishment is imposed is malevolent and proximately causes the death of a human being, so long as the death inflicted is speedy, and without undue pain or torture.

150 So. 164, 166 (1933) (quoting *In re Kemmler*, 136 U.S. 436 (1890)). As Lee failed to plead facts showing that execution by nitrogen hypoxia is drawn-out and torturous (beyond an unsupported claim of conscious suffocation, *see* DE1 ¶80), this claim is meritless under Alabama law.

Finally, for the reasons discussed as to Count I, *supra*, this claim is due to be dismissed for failure to state a claim.

## III. Count III (Alabama legislature's delegation of authority to ADOC) should be dismissed for failure to state a claim.

Count III (DE1 ¶¶82–90) is a state-law claim, as Lee contends that the Alabama legislature improperly delegated authority to ADOC in violation of Article III, sections 42 and 43 of the Alabama Constitution.

### A. The claim is barred by sovereign immunity and the statute of limitations.

First, for the reasons stated with respect to Count II, this claim should be dismissed for want of subject-matter jurisdiction. Under black-letter principles of sovereign immunity, federal courts cannot enter injunctive or declaratory relief against a State for alleged violations of state law. *See, e.g.*, *Pennhurst*, 465 U.S. 89; *Verizon Md., Inc.*, 535 U.S. at 646 (no declaratory relief); *Raygor*, 534 U.S. at 541 (no supplemental jurisdiction).

Second, the claim is time barred. This is a constitutional tort, for which the applicable limitations period would be two years—just like any other constitutional tort. *See, e.g.*, *Owens v. Okure*, 488 U.S. 235, 250 (1989); *Brooks v. Warden*, 810 F.3d 812, 823 (11th Cir. 2016) (citing *McNair v. Allen*, 515 F.3d 1168, 1173–74 (11th Cir. 2008); ALA. CODE § 6-2-38). Any delegation occurred in 2018 when the Governor and the Legislature amended the law to permit death row inmates to

"elect[] to be executed by electrocution or nitrogen hypoxia" instead of lethal injection." ALA. CODE § 15-18-82.1. As Lee admits, the section of the Code governing methods of execution does not contain protocols, which are promulgated by ADOC. DE1 ¶97 ("no definition, guidelines, or standards for executions by nitrogen hypoxia"). Lee has not pleaded that he had reason to believe that the adoption of nitrogen hypoxia would be followed by a legislative as opposed to administrative protocol, and he had every reason to believe the opposite.[10] That ADOC was developing the protocol was well known (and on public display in the *Miller* litigation.[11] Accordingly, this claim accrued in 2018 (or at least before August 2013) when the relevant facts became "apparent or should [have] be[en] apparent to a person with a reasonably prudent regard for his rights." *McNair*, 515 F.3d at 1173 (quoting *Mullinax v. McElhenney*, 817 F.2d 711, 716 (11th Cir. 1987)); *see id.* at 1177.

### B. The claim is meritless.

Third, should the Court exercise supplemental jurisdiction and find a live claim, it should be dismissed. Lee contends that Alabama's method-of-execution

---

10. At the time of nitrogen hypoxia's adoption, the Federal Defenders for the Middle District of Alabama, for example, released a statement "urg[ing] the Department [of Corrections] to make any new execution protocol public." Ivana Hrynkiw, *Alabama Death Row Inmates Elect Alternate Method of Execution, Drop Lethal Injection Suit*, AL.COM (July 10, 2018, 8:01 PM), www.al.com/news/birmingham/2018/07/alabama_death_row_inmates_elec.html.
11. *See, e.g.*, Kim Chandler, *Alabama Says It's Not Ready to Execute by Nitrogen Hypoxia*, ABC NEWS (Sept. 16, 2022, 9:59 AM), https://wpde.com/news/nationworld/alabama-says-its-not-ready-to-execute-by-nitrogen-hypoxia.

statutes—sections 15-18-82 and 15-18-82.1 of the Code of Alabama—violate the separation of powers provision of the Alabama Constitution, which mandates:

> In the government of this state, except in the instances in this Constitution hereinafter expressly directed or permitted, the legislative department shall never exercise the executive and judicial powers, or either of them; the executive shall never exercise the legislative and judicial powers, or either of them; the judicial shall never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and not of men.

ALA. CONST. art. III, § 43. According to Lee, the legislature unconstitutionally delegated its decision-making authority to the executive branch (here, ADOC) because the statutes do not "contain[] any standards to guide ADOC in carrying out an execution by nitrogen hypoxia," DE1 ¶87, the term "nitrogen hypoxia" is not defined by statute or "easily understood by a reasonable person," *id.*, and the statutes do not mandate "(a) the purity or concentration of nitrogen gas to use, (b) the flow rate of the nitrogen gas, or (c) the equipment to deliver the nitrogen gas (a standard respirator mask, an individualized respirator mask, a hood, or a chamber)," *id.* ¶88. Lee then catastrophizes, claiming that ADOC's executives may "decrease the flow of the gas, use less than 100% pure nitrogen gas, or use substandard equipment" without oversight. *Id.* ¶89. In other words, the gist of Lee's argument is that to pass constitutional muster, the complained-of statutes should have been written in such a manner that ADOC would be unable to use *any* discretion when engaging its power to carry out the law.

37

Lee's argument fails to state a claim upon which relief can be granted for at least two reasons. First, sections 15-18-82 and 15-18-82.1 do not violate the separation of powers provision of the Alabama Constitution. Second, a key authority on which Lee relies—*Hobbs v. Jones*, 412 S.W.3d 844 (Ark. 2012)—is unpersuasive, has been recognized as an "outlier case," and adopts a rationale that has not been followed by any other state.

### i. Alabama's method-of-execution statutes are not unconstitutional.

Lee's claim fails as a matter of law because Alabama's method-of-execution statutes do not violate the separation of powers provision set forth in article III, section 43 of the Alabama Constitution.

As quoted above, under the separation of powers provision, the legislative branch can exercise neither judicial nor executive power, and the executive branch can exercise neither judicial nor legislative power. "Each branch within our tripartite governmental structure has distinct powers and responsibilities, and our Constitution demands that these powers and responsibilities never be shared." *Monroe v. Harco, Inc.*, 762 So. 2d 828, 831 (Ala. 2000). "[T]he core power of the legislative branch is to declare policy through enacting legislation, and *the core power of the executive branch is to carry out those legislative policies with a certain degree of executive discretion*." *Op. of the Justices*, 892 So. 2d 332, 335 (Ala. 2004) (emphasis added).

The distinction between the legislative power and the executive power:

> is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring authority or discretion as to its execution to be exercised under and in pursuance of the law. The first cannot be done. To the latter, no valid objection can be made.

*Monroe*, 762 So. 2d at 831 (quotation omitted). Indeed, although the legislature cannot delegate to the executive branch the power to make the law, the legislature can "delegate [the] power to determine some fact or state of things upon which the law makes or intends to make its own action depend. To deny this would be to stop the wheels of government." *Norton v. Lusk*, 26 So. 2d 849, 859 (Ala. 1946).

Here, the legislature, in establishing "nitrogen hypoxia" as one of the State's methods of execution, did not delegate to the ADOC the authority to make the law. Rather, the legislature set a clear policy that allows ADOC to exercise its executive discretion in carrying out the legislature's stated policy. ADOC's discretion is not, as Lee contends, unfettered, but rather is limited by the language of the method-of-execution statutes.

The phrase "nitrogen hypoxia," as that term is used in the method-of-execution statutes, is not a vague directive allowing ADOC to carry out an execution by *any* possible means. Rather, the inmate must be executed by nitrogen hypoxia, a term that has appeared in Alabama's state and federal capital case law since 2016. *Arthur v. Comm'r, Ala. Dep't of Corr.*, 840 F.3d 1268, 1317 (11th Cir. 2016) (listing

Oklahoma's methods of execution: lethal injection, nitrogen hypoxia, electrocution, and firing squad). Nitrogen hypoxia was then discussed in *Bucklew*:

> Finally, after the district court gave him "one last opportunity," Mr. Bucklew filed a fourth amended complaint in which he claimed that execution by "lethal gas" was a feasible and available alternative method that would significantly reduce his risk of pain. Mr. Bucklew later clarified that the lethal gas he had in mind was nitrogen, which neither Missouri nor any other State had ever used to carry out an execution.

587 U.S. at 127 (citations omitted). The phrase is commonly known to mean a method of execution by which the condemned breathes nitrogen (instead of oxygen) until he succumbs. Thus, by establishing "nitrogen hypoxia" as a method of execution, the legislature made the law, and that law does not allow the ADOC to carry out a death sentence by any other means.

Additionally, the legislature's decision to set nitrogen hypoxia as a method of execution limits the discretion of ADOC's ability to carry out the death penalty because the executive branch must comply with the Alabama Constitution, the United States Constitution, and the decisions of state and federal courts. Thus, the manner in which ADOC carries out the punishment fixed by the legislature for a capital offense does not allow ADOC to "make the law"; ADOC can only use its discretion in a limited manner to execute the policy that was enacted by the legislature and interpreted by the judiciary.

40

Such discretion conferred upon the executive branch is not only constitution-ally permissible but also encouraged by the Alabama Supreme Court, which has ex-plained that "[t]here are many things upon which wise and useful legislation must depend which cannot be known to the lawmaking power, and must therefore be a subject of inquiry and determination outside of the hall of legislation." *Norton*, 26 So. 2d at 859. The intricacies of carrying out an execution is precisely the type of determination that is better left outside the State House.

Indeed, this area of law, unlike any other, is subject to continuous litigation in both state and federal court and is subject to a barrage of claims raised by condemned inmates and their enterprising lawyers. As a result, there exists the possibility that a decision of either a state or federal court could impact both the methods and proce-dures for carrying out a constitutionally permissible execution. Because of this, the Alabama Constitution confers upon the legislature the power to set a policy and con-fers upon the executive branch the power to use discretion in lawfully carrying out that policy. Preventing either branch from exercising its power in this manner, as Lee would have this Court do, would upset the balance of power in Alabama's tri-partite government.

### ii. *Hobbs v. Jones* is an outlier case.

Turning to the second reason this Court should dismiss Lee's separation of powers claim, the most on-point authority on which he relies—*Hobbs v. Jones*, 412

S.W. 3d 844 (Ark. 2012), *see* DE1 ¶88—is unpersuasive, has been recognized as an "outlier case," and employs a rationale that has not been followed by any other state. In fact, every other state that has considered the argument Lee raises has rejected it. *See Zink v. Lombardi*, 2:12-cv-04209, 2012 WL 12828155 (W.D. Mo. Nov. 16, 2012); *Cook v. State*, 281 P.3d 1053 (Ariz. Ct. App. 2012); *Sims v. Kernan*, 241 Cal. Rptr. 3d 300 (Cal. Ct. App. 2018); *Diaz v. State*, 945 So. 2d 1136 (Fla. 2006); *Sims v. State*, 754 So. 2d 657 (Fla. 2000); *State v. Osborn*, 631 P.2d 187 (Idaho 1981); *State v. Garcia*, 315 Neb. 74 (Neb. 2023); *State v. Ellis*, 799 N.W.2d 267 (Neb. 2011); *Floyd v. Dep't of Corr.*, 536 P.3d 445 (Nev. 2023); *Ex parte Granviel*, 561 S.W. 2d 503 (Tex. Crim. App. 1978).

In *Zink*, for example, the District Court for the Western District of Missouri granted Missouri's motion to dismiss, rejecting a claim that Missouri's lethal-injection statute violates the separation of powers doctrine. The district court recognized *Hobbs* as an "outlier case" and held that Zink's arguments for adopting the *Hobbs* rationale were "insufficient to merit relying on Arkansas' outlier decision, when there is no indication that Arkansas case law carries any special weight in Missouri." 2012 WL 12828155, at *7.

Instead, the court examined the cases that had addressed similar separation of powers claims and articulated from those cases a two-prong test to determine whether a method-of-execution statute violates the doctrine: (1) "Whether the statute

established a general policy to guide administrative action, such that the agency could reasonably fill in the details," and (2) "Whether the agency official is better qualified to make the determination, and requiring the legislature to detail the policy would be impracticable, as where 'the relations to be regulated are highly technical or where regulation requires a course of continuous decision.'" *Id.* (citations omitted).

The test articulated in *Zink* provides this Court with a framework that is both consistent with other states' resolution of similar separation-of-powers claims and properly embodies Alabama's case law as to separation-of-powers claims. Applying the *Zink* test to this case demonstrates that both prongs are satisfied by Alabama's method-of-execution statute. As set out more thoroughly above, Alabama's method-of-execution statute establishes the policy that capital punishment be carried out by, among other methods, nitrogen hypoxia, and that policy allows the ADOC to "reasonably fill in the details." Additionally, as explained above, given the intricacies involved in carrying out an execution, ADOC is in a far better position than the legislature to establish the policies and procedures, and requiring the legislature to set out the details in a statute would be impracticable.

Thus, this Court should reject Lee's suggestion that *Hobbs* should be followed in this case and dismiss Count III.

**IV.** **Count IV (unconstitutionally vague state statute) should be dismissed for failure to state a claim.**

Lee's fourth claim (DE1 ¶¶91–96) is that section 15-18-82.1 of the Code of Alabama is unconstitutionally vague in violation of the Fourteenth Amendment's Due Process clause and/or Article I, section 6, of the Alabama Constitution. He alleges that the statute is vague and violates his right to due process "because it contains no definition, guidelines, or standards for executions by nitrogen hypoxia." *Id.* ¶95.

**A.** **The claim is procedurally barred.**

As an initial matter, this claim is outside the limitations period because it accrued in 2018 when the statute was enacted (ALA. CODE § 15-18-82.1), or at least when Lee elected nitrogen hypoxia. Constitutional torts are subject to a two-year limitations period in Alabama. *See, e.g.*, *McNair*, 515 F.3d at 1173. "There is no doubt" that plaintiffs were "free to challenge" the allegedly vague statute as soon as it was enacted, "by which time the facts which would support a cause of action should have been apparent to any person with a reasonably prudent regard for his rights." *Id.* at 1177. These belated claims should be dismissed.

Second, this claim is unexhausted. If Lee had thought the law specifying nitrogen hypoxia was unconstitutionally vague, he had available a complete administrative remedy: elect electrocution or lethal injection. *See* ALA. CODE § 15-18-82.1. He did not avail himself of this available procedure, so he cannot bring an action

alleging the same under the PLRA. *See supra* § Prison Litigation Reform Act. When the Middle District rejected a different exhaustion argument in *Wilson*, the Court explained that exhaustion would have made no difference; Wilson could not have avoided his alleged injury because he specifically challenged the "*current* nitrogen gas asphyxiation *protocol*." Mem. Op. & Order, *Wilson v. Hamm*, 2:24-cv-111 (M.D. Ala. Mar. 12, 2025). Here, Count IV has nothing to do with the protocol and everything to do with the statute, the application of which Lee could have avoided by electing another method.

### B.     The due-process claim is meritless.

*Federal law:* The Fourteenth Amendment provides in relevant part, "No State shall…deprive any person of life, liberty, or property, without due process of law[.]" "[A]t a minimum, the Due Process Clause requires notice and the opportunity to be heard incident to the deprivation of life, liberty or property at the hands of the government." *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003). "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

*State law:* Any state-law claim seeking injunctive or declaratory relief should be dismissed under bedrock principles of sovereign immunity. *See supra* §§ II, III. Even so, Article I, section 6, of the Alabama Constitution provides in relevant part

"[t]hat in all criminal prosecutions, the accused…shall not…be deprived of life, liberty, or property, except by due process of law[.]" "[P]rocedural due process…requires notice and an opportunity to be heard when one's life, liberty, or property interests are about to be affected by governmental action." *Brown's Ferry Waste Disposal Ctr., Inc. v. Trent*, 611 So. 2d 226, 228 (Ala. 1992).

*Application:* Section 15-18-82.1 of the Code of Alabama sets forth the methods of execution and how they may be elected. In relevant part, it states, "A death sentence shall be executed by lethal injection, unless the person sentenced to death affirmatively elects to be executed by electrocution or nitrogen hypoxia. The sentence shall be executed pursuant to Section 15-18-82." ALA. CODE § 15-18-82.1(a). The statute does not describe a procedure for *any* method of execution, instead leaving the matter of a specific protocol to ADOC. ACCA recently held that the statute "is neither vague nor ambiguous and does not render [an inmate's] sentence arbitrary or capricious." *Mulkey v. State*, __ So. 3d __, 2025 WL 1272751, at *18 (Ala. Crim. App. May 2, 2025).

Even without this clear statement from the state appellate bench that the challenged statute is not unconstitutionally vague, Lee has not been denied due process. A sentence of imprisonment does not include a daily schedule with every detail of that punishment described in advance. The State has gone above and beyond what could be constitutionally required, providing Lee a redacted copy of the new

protocol in late August 2023, shortly after Commissioner Hamm approved it. Lee has known since that time, for instance, that he will be executed via a nitrogen hypoxia system, that he will breathe first breathing air, and then nitrogen, through a mask, that there will be oxygen monitors on the premises, that he will wear a pulse oximeter during his execution, and that the mask's placement will be checked a final time before the nitrogen is activated. *See* ALA. DEP'T OF CORR. EXECUTION PROCS. 16–18. Lee is (and must be, for his claims not to be time barred) challenging Alabama's nitrogen hypoxia *protocol* via § 1983 action, *see, e.g.*, *Hill v. McDonough*, 547 U.S. 573 (2006), or he could have challenged it via a state Rule 32 petition, *see McNabb v. State*, 991 So. 2d 313, 333 (Ala. Crim. App. 2007). Thus, Count IV is meritless and due to be dismissed.

## CONCLUSION

For the above reasons, Lee's complaint is due to be dismissed. Further, Defendants oppose the declaratory and injunctive relief Lee requested.

Respectfully submitted,

Steve Marshall
*Attorney General*

*/s/ Lauren A. Simpson*
Lauren A. Simpson
*Deputy Attorney General*

Polly S. Kenny

*Assistant Attorney General*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 3, 2025, I electronically filed the foregoing with the Clerk of the Court using CM/ECF system, which will send notification of such filing to counsel of record.

/s/ *Lauren A. Simpson*
Lauren A. Simpson
*Deputy Attorney General*

ADDRESS OF COUNSEL:

Office of the Attorney General
Capital Litigation Division
501 Washington Avenue
Montgomery, AL 36130
(334) 242-7300
Lauren.Simpson@AlabamaAG.gov