**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| JEFFERY LEE, | CASE NO. 2:25-cv-680 ECM |
| Plaintiffs, | CAPITAL CASE |
| v. | |
| JOHN HAMM, Commissioner, Alabama Department of Corrections, *et al.*, | |
| Defendants. | |

**PLAINTIFF'S TRIAL BRIEF**

Pursuant to this Court's April 3, 2026 Order, ECF No. 108, Plaintiff Jeffery Lee respectfully submits this Trial Brief in advance of the April 27, 2026 bench trial.

**I.     INTRODUCTION**

A plurality of the Supreme Court has made clear that execution methods presenting a substantial "risk of suffocation" are "constitutionally unacceptable." *Baze v. Rees*, 553 U.S. 35, 53 (2008).  That is exactly the risk that executions by nitrogen asphyxiation presents.

Execution by nitrogen asphyxiation works through the forced inhalation of nitrogen gas.  As the nitrogen displaces oxygen, the body's demand for air intensifies, triggering escalating distress through well-documented physiological

1

pathways.  Continued attempts to inhale provide no relief, producing a suffocating sensation known as air hunger—the severe and unrelenting perception that air is urgently needed but unavailable.  The medical community recognizes air hunger as "among the most distressing experiences that human beings can endure."  P0055 at 1 [Demoule et al., 2024].  There is a substantial risk that the inmate will feel this suffocating sensation of air hunger not for the seconds that Defendants contend it takes to lose consciousness, but for several minutes.

The Constitution forbids methods of execution that, like nitrogen asphyxiation, superadd terror or pain, or result in a lingering death, beyond what is necessary to carry out a sentence of death when a feasible and readily implemented alternative is available.  *See Glossip v. Gross*, 576 U.S. 863, 877 (2015); *Baze*, 553 U.S. at 49–52; *Bucklew v. Precythe*, 587 U.S. 119, 135–36 (2019).  Mr. Lee has proposed execution by firing squad as a feasible, readily implemented alternative that will significantly reduce the risk of suffering.  Five states have authorized execution by firing squad, and the method has been used for decades.  Defendants concede that there is no reason why ADOC cannot do the same.

This will be the first bench trial in the country examining the constitutionality of execution by nitrogen asphyxiation.  While there have been preliminary injunction hearings in prior cases, none has presented the extensive record developed in this case.  Mr. Lee will present expert testimony by pulmonologists who treat dyspnea

2

(the sensation of breathlessness) and air hunger every day in critical care settings. One of these experts has spent the last four decades researching and contributing to the medical literature on dyspnea and air hunger. These doctors will testify as to the severe distress that air hunger causes. They will explain how, based on medical literature and eyewitness accounts of the prior executions, there is a substantial risk that inmates executed by nitrogen asphyxiation will experience unbearable suffering. Their testimony will, in large part, be uncontradicted by Defendants' evidence.

Mr. Lee respectfully submits that, when the evidence is all in, the Court will conclude that execution by nitrogen asphyxiation presents an unacceptable risk of human suffering that the Constitution forbids.

## II.    STATEMENT OF FACTS[1]

### A.    Authorization and Development of ADOC's Nitrogen Asphyxiation Method of Execution

In June 2018, the Alabama Legislature authorized a new method of execution: "nitrogen hypoxia."[2]  Ala. Code § 15-18-82.1(a).  The statute required inmates to elect this execution method within 30 days.  *Id*. § 15-18-82.1(b)(2).  On June 26,

---

[1] The Statement of Facts describes the evidence that Mr. Lee anticipates coming in during trial.

[2] The statute refers to the new method of execution as "nitrogen hypoxia"—a term first coined by criminal justice professors in 2014.  A medical professional would instead describe Alabama's execution method as "asphyxiation"—*i.e.*, the process of being deprived of oxygen.  This Trial Brief uses the more accurate phrase "nitrogen asphyxiation" rather than "nitrogen hypoxia."

2018—five years before ADOC released the protocol—Mr. Lee opted into execution by nitrogen gas.

In August 2023, ADOC released a redacted protocol for executions by nitrogen gas. *See* Proposed Pretrial Order at 4 (stipulations); P0004 [unredacted protocol]. Lawyers with the Office of the Attorney General ("OAG"), who have no medical training or expertise, drafted the protocol. *See* P0002 at Nos. 10, 16 [Defs.' Interrog. Resps.]. They did not consult with any medical professionals, scientists, or engineers in developing it. *See* P0002 at No. 10 [Defs.' Interrog. Resps.]; P0003 at Nos. 92–105 [Defs.' Resps. to Reqs. for Admis.].

To test the nitrogen delivery system, ADOC conducted a series of demonstrations designed by the OAG rather than by medical professionals or scientists. *See* P0002 at No. 11 [Defs.' Interrog. Resps.]. These demonstrations were focused on protecting the Execution Team from potential nitrogen gas exposure. *Id.* No testing was performed to assess what the inmate would experience, including whether the inmate would suffer air hunger or distress during the execution. *See* Houts Dep. at 193:18–23, 194:14–19 (**Exhibit A**).

**B.    ADOC's Nitrogen Asphyxiation Procedure**

Under ADOC's nitrogen asphyxiation protocol, the condemned inmate is escorted to the execution chamber and placed on a gurney. *See* Proposed Pretrial Order at 4 (stipulations); P0004 at 15 [unredacted protocol]. ADOC uses "[t]wo sets

of restraints on each arm," "[a] four-point breastplate, which can be tightened at each restraint point[,]" "[a] restraint across the legs," and "[a] set of restraints at the feet" to secure the inmate on the gurney. *See* P0002 at No. 12 [Defs.' Interrog. Resp.]; P0003 at Nos. 77–81 [Defs.' Resps. to Reqs. for Admis.]. The nylon restraints "are tightened to the point at which an officer can fit one finger into the restraints." P0002 at No. 12 [Defs.' Interrog. Resps.]. The chest restraint is tightened such that the inmate cannot lift his chest or upper body from the gurney. *See* P0100–P0106, P0108–P0110 [photos of restraints]; P0122 [video of restraints]; C. Williams Dep. (Vol. 1) at 158:17–159:3 (**Exhibit B**) (explaining that ADOC secures the inmate "enough to where the movement is limited").

An industrial-style respirator mask connected to the nitrogen gas is placed on the condemned inmate's face. *See* Proposed Pretrial Order at 5 (stipulations); P0004 at 16 [unredacted protocol]; Raybon Dep. at 119:23–120:12 (**Exhibit C**).[3] After the execution warrant is read and the condemned inmate speaks any last words, the Warden gives the code to start the execution. The nitrogen gas then begins to flow into the mask without the administration of any sedatives, displacing the oxygen until the inmate dies. *See* Hamm Dep. at 104:21–106:9, 108:13–21 (**Exhibit D**);

---

[3] The arm and leg restraints are secured before the Execution Team places the respirator mask on the inmate. The chest restraint is secured after placement of the mask. *See* Raybon Dep. at 119:23–120:12 (**Exhibit C**).

P0002 at No. 7 [Defs.' Interrog. Resps.]; Proposed Pretrial Order at 4–5 (stipulations).

### C.    Prior Executions by Nitrogen Hypoxia

In January 2024, ADOC conducted the first-ever execution by nitrogen asphyxiation. *See, e.g.*, P0025, P0029, P0031 [media articles on Kenneth Smith execution]. Since then, ADOC has used this method to execute six more inmates. *See, e.g.*, P0021–P0024, P0026–P0028, P0030, P0032–P0034 [media articles on Alan Miller, Carey Grayson, Demetrius Frazier, Gregory Hunt, Geoffrey West, and Anthony Boyd executions]. Eyewitnesses to these executions have described seeing the inmates convulsing and writhing on the gurney, pulling against the restraints, lifting their head and limbs, and gasping for air. *See, e.g.*, P0021–P0034 [media articles]; P0017 [McAlary declaration]; P0019 [Schulz notes].[4] The prior executions lasted anywhere from 22 to 38 minutes, from the time the nitrogen gas began flowing until the inmate was declared dead. *See* P0006–P0012 [execution timelines].

### D.    Medical Evidence Regarding Dyspnea and Air Hunger

Mr. Lee will present testimony from two pulmonologists at trial. Dr. Richard M. Schwartzstein is a pulmonologist at Beth Israel Deaconess Hospital and professor at Harvard Medical School. *See* P0041 ¶ 1 [Schwartzstein Rep.]. He is widely

---

[4] *See also Boyd v. Hamm*, No. 2:25-cv-529-ECM, 2025 WL 2884410, at *10–13 (M.D. Ala. Oct. 9, 2025) (describing the Smith, Miller, Grayson, Frazier, and Hunt executions).

regarded as one of the world's leading experts on dyspnea and air hunger, *id.* ¶ 3, having authored dozens of original research investigations on these topics. *Id.* ¶ 5; *see also* P0036 [Schwartzstein CV]. Dr. Julie Bastarache is a pulmonologist and professor of medicine and of pathology, microbiology and immunology at Vanderbilt University Medical Center. *See* P0039 at 1 [Bastarache Rep.]. Over the last 25-plus years, she has treated thousands of patients with pulmonary issues, including patients suffering from dyspnea and air hunger.

Dyspnea is the sensation of breathlessness. *See, e.g.*, P0041 ¶¶ 3, 20 [Schwartzstein Rep.]. At its most extreme, dyspnea presents as air hunger and elicits a primal, profound, and overwhelming feeling of suffocation, panic, and fear. *Id.* ¶ 18(a), (b); P0039 ¶ 1 [Bastarache Rep.]; P0056 at 922–23 [Demoule et al., 2022] ("Air hunger is known to be the most disturbing sensation of dyspnea, characterized by its capacity to evoke anxiety, panic, frustration, and fear."). "Dyspnoea causes suffering," P0049 at 1 [Banzett, et al., 2019], and can be "far worse than pain." P0055 at 1 [Demoule et al., 2024]; *see also* P0041 ¶ 24 [Schwartzstein Rep.]; P0039 ¶ 1 [Bastarache Rep.]. Defendants' expert, Dr. Joseph Antognini, agrees. *See, e.g.*, Antognini Dep. at 78:13–79:1 (**Exhibit E**) (agreeing that dyspnea can be "far worse than pain"); *see also* Mot. to Exclude Dr. Joseph F. Antognini at 3–4 [ECF No. 103] (agreeing with the extensive medical literature that dyspnea causes suffering). Dr. Schwartzstein and Dr. Bastarache will testify, based on their experience and medical

expertise, that there is a substantial risk that inmates will experience severe distress associated with this suffocating sensation of air hunger.

ADOC's use of physical restraints can exacerbate the suffocating feeling of air hunger. Studies have demonstrated a "prompt increase in air hunger when tidal volume [*e.g.*, the ability to expand the chest] is decreased." P0071 at 27 [Manning et al., 1992]; P0045 at 1310 [Bailey et al., 2025] ("[The] chest straps used during executions [ ] impede lung and chest wall expansion despite increased respiratory drive, thereby promoting intense sensations of suffocation."); P0074 at 439 [Parshall et al., 2012] ("Air hunger/unsatisfied inspiration is intensified . . . if ventilatory drive is constrained."); P0041 ¶ 29 [Schwartzstein Rep.].

The autopsy reports of inmates executed by nitrogen asphyxiation provide objective evidence confirming the intense suffering that the prior executed inmates endured. *See* P0013–P0016 [autopsy reports for Miller, Boyd, Grayson, and Smith].[5] All of the autopsy reports showed the presence of pulmonary edema, a condition where fluid builds up in the lungs. P0039 ¶ 5 [Bastarache Rep.]. The presence of pulmonary edema indicates a "sudden, severe rise in blood pressure" just prior to death. *Id.* This rise "suggests a sudden, extreme level of physiologic

---

[5] Autopsies were not done on Frazier, Hunt, or West.

stress as would be expected with suffocation by nitrogen hypoxia." *Id.*; *see also* Bastarache Dep. at 143:18–149:2 (**Exhibit F**).

###### E. Timing and Duration of Air Hunger During Nitrogen Asphyxiation Executions

The evidence will further show that hypoxia—the deprivation of oxygen—causes dyspnea and air hunger. *See* P0041 ¶ 20 [Schwartzstein Rep.] (hypoxia "of sufficient severity predictably leads to dyspnea"); P0042 ¶ 8 [Schwartzstein Rebuttal Rep.]; P0040 ¶ 1 [Bastarache Rebuttal Rep.]; P0072 at 152 [Moosavi et al., 2003] ("[H]ypoxia severe enough to generate a ventilatory drive will elicit air hunger."); P0074 at 439 [Parshall et al., 2012] (air hunger "is intensified by stimuli that increase spontaneous ventilatory drive, such as hypoxia").

The distressing sensations begin within seconds after the nitrogen gas is introduced. *See* P0039 ¶ 2 [Bastarache Rep.]. Under normal breathing conditions, from a physiological standpoint, loss of consciousness from oxygen deprivation would occur on average no sooner than approximately 2.5 minutes. *See* Bastarache Dep. at 99:7–102:18 (**Exhibit F** ).[6] ADOC's use of the chest restraint, however, can

---

[6] According to Dr. Antognini, it takes 33.5 second for the oxygen in the mask to drop to less than 3%. D0004 ¶ 19 [Antognini Rep.]. Because the lungs can carry several liters of air, even after being exposed to 100% nitrogen gas, the body still has residual oxygen in the body. *See* P0039 ¶ 2 [Bastarache Rep.]. That oxygen will go from the lungs to the rest of the body and back to the lungs over the course of several circulatory cycles. *Id.* The blood oxygen level therefore does not immediately drop to 0%. In addition, several round trips of red blood cells leaving the heart would have to occur before the brain is exposed to severely low levels of oxygen. *Id.* ¶ 3.

increase the time to unconsciousness by making it difficult for the inmate to take full breaths.[7]  *See supra* p. 8.  In addition, inherent physiological variability among individuals will mean some inmates will remain conscious longer.  *See* Bastarache Dep. at 103:12–105:18 (**Exhibit F**).  Interpreting the observations of inmate movements during the prior executions, Dr. Bastarache will testify that the inmates remained conscious for longer than 2.5 minutes.  *See* P0021–P0034 [media articles]; P0017 [McAlary declaration]; P0019 [Schulz notes].

Dr. Schwartzstein, moreover, will explain that brain is likely processing air hunger even after apparent loss of consciousness.  *See* P0041 ¶¶ 18(c), 31–34 [Schwartzstein Rep.].  Studies, for example, show that up to a third of patients on mechanical ventilators (who do not appear conscious) develop post-traumatic stress disorder because of the dyspnea that the ventilator induces.  P0080 at 162 [Schwartzstein & Sturley, 2023].[8]  These studies support the notion that dyspnea

---

On average, from a physiological standpoint and assuming Dr. Antognini's calculations are correct, it will take at least approximately 2.5 minutes before the blood oxygen levels are sufficiently low to lose consciousness.  *See* Bastarache Dep. at 100:9–102:18 (**Exhibit F**).

[7] Defendants have also testified that there is residual oxygen remains in the mask and tubing when nitrogen flow begins, and that gas leakage from the mask occurs.  *See* Hamm Dep. at 174:4–14 (**Exhibit D**); Raybon Dep. at 245:19–247:4 (**Exhibit C**).

[8] Patients with respiratory failure "often require mechanical ventilation for breathing assistance and lung protection; this intervention can be lifesaving," but because ventilators restrict the size of the breath, they can "induce or increase dyspnea in patients."  P0080 at 163 [Schwartzstein & Sturley, 2023].

10

occurs "in patients apparently unconscious but who are actually 'minimally conscious.'" P0055 at 5 [Demoule et al., 2024]. "[D]ata from brain imaging [provide further support] that adverse experiences are processed by the brain even when the patient is unconscious." *Id*.

### D.   Plaintiff's Proposed Alternative Method of Execution by Firing Squad

Mr. Lee has proposed execution by firing squad as a feasible and readily implemented alternative. At trial, he will call Dr. James Williams, a board-certified emergency medicine physician who has treated more than 1,000 gunshot wound victims and is a recognized expert in firearms and ballistics. *See* P0038 at 2–3 [Williams Rep.]. Dr. Williams' testimony will establish that a firing squad directed at the heart causes rapid disruption of blood flow to the brain, resulting in loss of consciousness within seconds and death shortly thereafter. *See id*. at 8–9. Although the inmate may feel the force of the bullets hitting the body—akin to a tackle in football—he will be rendered unconscious before he can process that force as pain. *See id*. at 10–13.[9]

---

[9] In *Boyd*, the Court interpreted Dr. Williams' report as "support[ing] the inference that the inmate *would* experience physical pain during the three to five seconds before he became unconscious," because his report noted that an inmate would become unconscious in three to five seconds and would not feel pain and suffering "thereafter." 2025 WL 2884410, at *19 (emphasis in original). To avoid any unintended misinterpretation of his opinion, Dr. Williams has deleted the word "thereafter" from his report and will testify at trial that an inmate being executed by

Defendants concede that ADOC could carry out such a method if authorized. *See* P0003 at Nos. 66, 68, 70, 72, 73, 74 [Defs.' Resps. to Reqs. for Admis.]; Hamm Dep. at 178:20–181:12, 188:18–189:4 (**Exhibit D**) ("Q.   And if firing squad execution became legal in the State of Alabama and a protocol was enacted, do you believe that you could modify a space at Holman to carry out firing squad execution? A.   Yeah.   I mean, appropriated the funds, sure."); C. Williams Dep. (Vol. 1) at 286:20–287:6 (**Exhibit B**).

## III.    LEGAL STANDARD

The Eighth Amendment prohibits punishments that involve the unnecessary and wanton infliction of pain or that present a substantial risk of serious harm.  *See Bucklew*, 587 U.S. at 136–37.  The Supreme Court has explained that "[p]unishments are cruel when they involve torture or a lingering death."  *In re Kemmler*, 136 U.S. 436, 447 (1890); *Baze*, 553 U.S. at 49.  To prevail, a plaintiff must show that the challenged method presents a substantial risk that is "very likely to cause serious illness and needless suffering" that "give[s] rise to sufficiently imminent dangers." *Grayson v. Comm'r, Dep't of Corr.*, 121 F.4th 894, 897 (11th Cir. 2024), *cert. denied sub nom. Grayson v. Hamm*, 145 S. Ct. 586 (2024) (emphases and citation omitted); *Price v. Comm'r, Dep't of Corr.*, 920 F.3d 1317, 1325–26 (11th Cir. 2019).  In

---

firing squad is very unlikely to feel any pain during the three to five seconds before he becomes unconscious.

addition, the plaintiff must show that "a feasible and readily implemented alternative method of execution [exists] that would significantly reduce a substantial risk of severe pain and that the State has refused to adopt [the proposed alternative] without a legitimate penological reason." *Bucklew*, 587 U.S. at 134.

A facial challenge is a claim that the "policy at issue is unconstitutional in all its applications." *Id*. at 138. In evaluating a facial challenge, however, courts must not "speculate about hypotheticals or imaginary cases." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008) (citation and quotation omitted); *see also Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1256 (11th Cir. 2022) (rejecting that a defendant can survive a facial challenge by "conjur[ing] up just one hypothetical factual scenario in which implementation of the state law" is valid) (citation omitted); *Doe v. City of Albuquerque*, 667 F.3d 1111, 1123 (10th Cir. 2012) (rejecting defendants' suggestion that the court must engage in hypotheticals in order to find facial validity). Nor is a plaintiff required to "disprove every possible hypothetical situation in which the [policy] might be validly applied." *Doe*, 667 F.3d at 1122. Rather, a facial challenge to a method of execution requires that a plaintiff show an "objectively intolerable risk of harm." *Baze*, 553 U.S. at 50 (citation and quotation omitted). A showing that a method of execution caused issues in "a series" of executions, for example, "would demonstrate an objectively intolerable risk of harm that" violates the Eighth

13

Amendment. *Id.* (citation and quotation omitted).  Thus, where, as here, none of the executions have gone as the State promised, that is highly probative of facial unconstitutionality.

## IV.    ARGUMENT

### A.    Nitrogen Asphyxiation Creates a Substantial Risk of Prolonged Suffering

The trial evidence will show that nitrogen asphyxiation predictably induces the suffocating feeling of air hunger, and that the medical community—and even Defendants' own expert, Dr. Antognini—recognizes this as suffering.

*The sensation of suffocation associated with air hunger is suffering.*  A plurality of Supreme Court has stated that an execution method that causes the inmate to consciously suffocate would be "unacceptable" under the Eighth Amendment.  *See Baze*, 553 U.S. at 53 (noting the parties' agreement about the "constitutionally unacceptable risk of suffocation").   The medical literature describes the suffocating sensation of air hunger as "among the most distressing experiences that human beings can endure."  P0055 at 1 [Demoule et al., 2024]; *supra* p. 7.  Dr. Antognini, too, agrees.  *See supra* p. 7.

*Hypoxia—induced by ADOC's protocol—causes air hunger.*   Under ADOC's execution protocol, the inmate is forced to breathe pure nitrogen gas, which displaces oxygen.  *See supra* pp. 5–6.  That creates hypoxia or low levels of oxygen in the body.  *See supra* p. 9.  Citing a 2003 controlled study and a consensus

14

statement of the American Thoracic Society ("ATS")—one of the leading medical organizations dedicated to pulmonary and critical care medicine—Dr. Schwartzstein and Dr. Bastarache will explain that hypoxia causes dyspnea, and that as the execution continues, the dyspnea will intensify to air hunger. *See supra* pp. 9–11. Dr. Bastarache, moreover, will explain that the pulmonary edema findings on the autopsies of the inmates executed by nitrogen asphyxiation is consistent with intense suffering. *See supra* pp. 8–9.

By contrast, Dr. Antognini opines that carbon dioxide buildup only (as opposed to hypoxia) causes dyspnea. *See* D0004 ¶ 9 n.1 & ¶ 28 [Antognini Rep.]. Because ADOC's nitrogen delivery system supposedly prevents the buildup of carbon dioxide, he believes that inmates will not suffer dyspnea. The only support he cites for this opinion is a 1993 case report related to workplace exposure to nitrogen gas published in an occupational safety (not medical) journal. *See* D0004 ¶ 28 [Antognini Rep.] (citing D0019 at 32 [Hudnal et al., 1993]). But that case report *pre-dates* the 2012 ATS statement and the seminal 2003 controlled study establishing that hypoxia creates equivalent levels of air hunger as hypercapnia. *See supra* pp. 9–10, 14–15. The evidence will show that the scientific community has long rejected the notion that carbon dioxide buildup is necessary to cause dyspnea and air hunger.

***The suffering associated with nitrogen asphyxiation executions is "lingering."*** As this Court previously explained, one relevant Eighth Amendment question is "how long [the inmate] will be capable of feeling pain." *Boyd*, 2025 WL 2884410, at \*17 n.34 (citing *Bucklew*, 587 U.S. at 147). Under normal breathing conditions, an average person would be conscious and experiencing the distress of air hunger for a minimum of a couple of minutes. *See supra* pp. 9–10 & n.6. But the evidence will also show that, among other things, ADOC's use of a chest restraint—restricting the inmate's ability to take breaths full enough to alleviate the air hunger—can increase the time to unconsciousness. *See supra* pp. 5, 9–10 & n.8.

The seven nitrogen asphyxiation executions that ADOC has carried out to date, and resulting autopsy findings, confirm this extended timeline. Reviewing eyewitness descriptions of the inmate movements, Dr. Bastarache will testify that the inmates executed by nitrogen gas were conscious for several minutes. *See supra* p. 10. What is more, the evidence will show a substantial risk that the inmate will continue to feel the profoundly distressing sensation of air hunger for several more minutes after losing apparent consciousness. *See supra* pp. 9–11 (describing a period of minimal consciousness).

Courts have accepted similar lengths of suffering as "surely . . . lingering" in violation of the Eighth Amendment. *See Gray v. Lucas*, 463 U.S. 1237, 1245 (1983) (Marshall, J., dissenting) ("A death that . . . involves extreme pain over a span of 10

16

to 12 minutes surely must be characterized as "lingering." (citation omitted)).  For

example, in *Fierro v. Gomez*, the district court concluded that California's use of the

gas chamber as a method of execution was cruel and unusual:

> [T]he court finds that inmates who are put to death in the gas chamber at San Quentin do not become immediately unconscious upon the first breath of lethal gas.  The court further finds that an inmate probably remains conscious anywhere from 15 seconds to one minute, and that there is a substantial likelihood that consciousness, or a waxing and waning of consciousness, persists for several additional minutes.  During this time, the court finds that inmates suffer intense, visceral pain, primarily as a result of lack of oxygen to the cells.  The experience of "air hunger" is akin to the experience of a major heart attack, or to being held under water.

865 F. Supp. 1387, 1404 (N.D. Cal. 1994), *aff'd* 77 F.3d 301 (9th Cir. 1996), *vacated*

*by* 519 U.S. 918 (1996) (vacating judgment in light of legislative amendment

adopting lethal injection over lethal gas).[10]

   ***The suffering is unique to executions involving asphyxiation.***   Mr. Lee

recognizes that "[e]very person condemned to die [ ] experiences feelings of angst,

anxiety, stress, or panic."  *Boyd*, 2025 WL 2884410, at \*20.  Dr. Schwartzstein and

Dr. Bastarache, however, will explain that the inmate feels the suffocating sensation

of air hunger ***in addition to*** the anxiety and fear that accompanies any execution, and

---

[10] *Cf. Vasquez v. Berks Cnty.*, 279 A.3d 59, 84, 87 (Pa. Cmmw. Ct. 2022) (allegations that placing a hood with pepper spray over an inmates head and "forcing [him] in that position suffocating for several minutes" were sufficient to state a claim of excessive force under the Eighth Amendment (quotation marks omitted)).

that ADOC's use of chest restraints further exacerbates this suffering in ways unique to executions by asphyxiation.

***None of the case reports and small studies that Dr. Antognini cites can be reliably extrapolated to the execution context.*** Dr. Antognini opines that inmates will lose consciousness in 35 to 40 seconds and not feel pain. *See* D0004 ¶ 50 [Antognini Rep.]. But he admittedly bases his opinion on situations that are inapposite to executions. For example:

- Workplace accidents.[11] In these OSHA case reports, the workers were found dead after accidentally being exposed to nitrogen gas. Dr. Antognini concedes that, "because [these events] were unobserved, we don't know what exactly happened." Antognini Dep. at 272:10–19 (**Exhibit E**). He agrees that "there's no way to tell" when the workers became unconscious, whether they "tried to pull off their masks," or "whether [they] struggled in any way." *Id.* at 272:20–273:9. There is simply "no further information about what [the workers'] experience was about—or what it was like," including whether they "suffered in any way." *Id.* at 274:3–17.

- Suicide case reports.[12] As Dr. Antognini recognizes, many of the subjects in these suicide case reports had "severe underlying medical problems," which he agrees could result in "a different physiological response to hypoxia." *Id.* at 283:20–284:6. He concedes that the subjects in the case reports were voluntarily ending their lives, which differs from the context of executions. *Id.* at 282:17–19. And he admits that, unlike inmates being executed by nitrogen asphyxiation, the

---

[11] *See* D0004 ¶ 12 [Antognini Rep.].

[12] *See* D0004 ¶¶ 10–11 [Antognini Rep.] (citing D0021 [Ogden, 2010]; D0022 [Ogden et al., 2010]; and D0020 [Harding & Wolf, 2008]).

suicide subjects fully exhaled and then fully inhaled the nitrogen gas. *Id.* at 284:12–285:10.

- Pilot studies.[13]  These small studies measured how quickly pilots lost consciousness at high altitudes, where—as Dr. Antognini concedes— low barometric pressures accelerate the hypoxia process. *Id*. at 277:15– 278:14.  Indeed, the study authors themselves noted that the conditions at high altitude are "entirely different from those produced . . . by interruption of oxygen supply ***without*** change in ambient pressure." D0016 at 117 [Luft et al., 1951] (emphasis added).  Dr. Antognini makes no attempt to account for the fact that Holman Correctional Facility is close to sea level.  *See* Antognini Dep. at 278:15–279:1 (**Exhibit E**).

- Ernsting study.[14]  In this 1963 study, three healthy volunteers aged 33 to 38 were instructed to fully exhale and then hyperventilate nitrogen gas.  D0017 at 292 [Ernsting, 1963].  These directives contributed to the rapid loss of consciousness.  *Id.* at 301.  By comparison, as Dr. Antognini recognizes, inmates in the execution context are "not given any instructions, in terms of inhaling or exhaling," and may instinctually (albeit voluntarily) breath hold to avoid inhaling the gas, which will prolong time to unconsciousness.  *See* Antognini Dep. at 214:22–215:8, 217:2–219:14, 220:9–17, 285:4–10 (**Exhibit E**).

## C.    A Feasible and Readily Implemented Alternative Exists

Execution by firing squad directed at the heart is a feasible and readily implemented alternative, which will result in a quick and painless death.  Dr. Williams will testify that execution by firing squad will very likely result in rapid loss of consciousness and death, eliminating any experience of pain or suffering.  *See supra* p. 11–12.  Even assuming (contrary to the evidence) that the inmate can feel

---

[13] *See* D0004 ¶¶ 19, 20, 32 [Antognini Rep.] (citing D0016 [Luft et al., 1951] and D0023 [Ottestad et al., 2017]).

[14] *See* D0005 ¶ 12 [Antognini Rebuttal Rep.] (citing D0017 [Ernsting, 1963]).

pain during the three to five seconds before the bullets cause loss of consciousness, both sides *agree* that the sensation of air hunger is "far worse than pain." *See supra* p. 7 (citing Antognini Dep. at 78:13–79:1 (**Exhibit E**)).

Defendants, moreover, candidly admit that if the Legislature authorizes firing squad, ADOC could carry it out. *See supra* p. 12. Courts likewise have found that firing squad is a constitutionally permissible method of execution. *See, e.g.*, *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106, 118 (D.C. Cir. 2020) (Katsas, J., concurring) ("[T]he [Supreme] Court never retreated from its holdings that the firing squad . . . [is a] constitutional method[] of execution."); *see also Boyd*, 2025 WL 2884410, at *22 (firing squad is feasible and readily available). And ADOC possesses the equipment for execution by firing squad, can train a team in this execution method, and can adapt the execution chamber to accommodate a firing squad. *See supra* p. 12.

The novelty of a proposed method is a paradigmatic legitimate penological reason for refusal—but only where the method is genuinely "untried and untested." *Bucklew*, 587 U.S. at 121 (citations omitted); *Johnson v. Precythe*, 954 F.3d 1098, 1102 (8th Cir. 2020). Here, firing squad is a "traditionally accepted method[] of execution" that the Supreme Court itself has recognized as outside the category of novel or untested methods. *Bucklew*, 587 U.S. at 134; *see also Hoffman v. Westcott*,

131 F.4th 332, 336 (5th Cir. 2025).  Defendants, accordingly, have no legitimate penological reason to refuse Mr. Lee's proposed alternative.

## V.    PRIOR RULINGS ON NITROGEN ASPHYXIATION ARE NOT PERSUASIVE

Mr. Lee acknowledges that district courts have rejected four challenges to ADOC's use of nitrogen asphyxiation as a method of execution.  Those decisions should not control here.  For one thing, none of those cases proceeded through a bench trial; all were preliminary rulings based on a tightly constrained record and limited discovery.  Second, there is now evidence from seven Alabama nitrogen executions—all of which showed suffering and all of which showed inmate consciousness for far longer than ADOC contends—and a consensus in the medical literature that this execution method causes immense suffering.  Finally, Mr. Lee is presenting testimony from experts who see and treat dyspnea and air hunger on a regular basis, and can explain the emotional and physiological sensations that they cause and the circumstances under which they occur.  These leading experts reviewed the eyewitness accounts of the prior executions from the lens of doctors who routinely translate lay observations into medical judgment.  Neither this Court nor any other court addressing executions by nitrogen asphyxiation has heard from experts like this before.

## VI.   EVIDENTIARY ISSUES

Plaintiff has objected to several of Defendants' trial exhibits on the basis of hearsay, relevance, and failure to disclose the document in initial disclosures, discovery, and/or on an expert reliance list.  *See* Pl.'s Objs. [ECF No. 123].  The objections are fully briefed.  *See* Defs.' Resps. to Objs. [ECF No. 129].

Mr. Lee has moved to exclude Dr. Antognini under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  *See* Mot. to Exclude Dr. Joseph F. Antognini [ECF No. 103].  Mr. Lee has raised two arguments for the exclusion:  (1) Dr. Antognini is not qualified to opine about nitrogen asphyxiation, and (2) his opinions on nitrogen asphyxiation do not "fit" the facts here and are not reliable because they are not generally accepted.  The motion is fully briefed.  *See* Defs.' Opp'n [ECF No. 124]; Pl.'s Reply [ECF No. 131].

## VII.   CONCLUSION

For the foregoing reasons, the Court should enter judgment for Plaintiff Jeffery Lee, declaring that ADOC's method of executing inmates by nitrogen asphyxiation is unconstitutional under the Eighth Amendment and enjoining Defendants from using that method to execute Mr. Lee.

22

Dated:  April 20, 2026          Respectfully submitted,

/s/ *Angelique A. Ciliberti*
Angelique A. Ciliberti (ASB-1504T44C)
Paige H. Sharpe (*pro hac vice*)
Anna K. Thompson (*pro hac vice*)
Kevin A. Cline (*pro hac vice*)
Jocelyn A. Wiesner (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
Angelique.Ciliberti@arnoldporter.com
Paige.Sharpe@arnoldporter.com
Anna.Thompson@arnoldporter.com
Kevin.Cline@arnoldporter.com
Jocelyn.Wiesner@arnoldporter.com

Tommy Huynh (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
Three Embarcadero Center
10th Floor
San Francisco, CA 94111
(415) 471-3100
Tommy.Huynh@arnoldporter.com

Caleb Thompson (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
(212) 836-8000
Caleb.Thompson@arnoldporter.com

*Counsel for Plaintiff Jeffery Lee*

23

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was filed, via the CM/ECF system, on April

20, 2026, which will cause Defendants' counsel to receive an electronic copy.

Lauren Simpson
Polly Kenny
Brenton Thompson
Talmadge Butts
Office of the Attorney General
Capital Litigation Division
501 Washington Avenue
Montgomery, AL 36130


*/s/ Angelique A. Ciliberti*
Angelique A. Ciliberti

24