# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | |
|---|---|
| JEFFERY LEE,<br><br>          Plaintiff,<br><br>      v.<br><br>GREG LOVELACE, Commissioner, Alabama Department of Corrections, *et al.*,<br><br>          Defendants. | CASE NO. 2:25-cv-680 ECM<br><br>CAPITAL CASE |

## PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

A bench trial in the above-captioned case was held on April 27, 28, and 29, 2026, before the Honorable Emily C. Marks. Attorneys Paige Sharpe, Kevin Cline, Jocelyn Wiesner, and Anna Thompson appeared on behalf of Plaintiff Jeffery Lee ("Lee"). Attorneys Polly Kenny, Lauren Simpson, Brenton Thompson, and Talmadge Butts appeared on behalf of Defendants John Hamm and Terry Raybon (collectively, "Defendants"), in their official capacities as Commissioner of the Alabama Department of Corrections ("ADOC") and Warden of William C. Holman Correctional Facility ("Holman").[1]

---

[1] At the time of trial, John Hamm was the Commissioner of the Alabama Department of Corrections. Commissioner Hamm retired as of May 1, 2026, and, pursuant to

1

The Court received documentary evidence, heard and considered testimony, observed the demeanor of the witnesses to evaluate their credibility and candor, and reviewed and considered the written and oral arguments of counsel. Based on that record, the Court hereby makes and enters the following Findings of Fact and Conclusions of Law.[2]

## I. SUMMARY OF THE COURT'S FINDINGS AND CONCLUSIONS

1. Execution by nitrogen asphyxiation causes some of the worst suffering that a human being can experience. The inmate is strapped to a gurney with restraints across his arms, legs, and chest. After ADOC receives the go-ahead to proceed with the execution, the inmate is forced to breathe pure nitrogen gas through a full-face respirator mask. As the nitrogen displaces oxygen, the body's demand for air intensifies, triggering escalating distress through well-documented physiological pathways. Continued attempts to inhale provide no relief, producing a suffocating sensation known as air hunger—the severe and unrelenting perception

---

Fed. R. Civ. P. 25(d), Commissioner Greg Lovelace has now been substituted as a defendant in his official capacity. *See* Order [ECF No. 144].

[2] Citations to the trial transcripts are to the rough drafts, as the finals were not available at the time of this submission. By citing evidence in these Proposed Findings of Fact and Conclusions of Law, Lee does not waive any objections as to admissibility. These Proposed Findings of Fact and Conclusions of Law do not include evidence related to the pulse oximeter data; Lee will provide updated Proposed Findings of Fact and Conclusions of Law to include such evidence after the completion of trial. At that time, Lee will also update citations to the final version of the transcripts from April 27, 28, and 29, 2026.

that air is urgently needed but unavailable.  Eventually, the inmate suffocates to death.

2.  Air hunger "signals an existential threat" to the body.  P0049 at 2 [Banzett et al., 2020].  Patients describe it as "the worst thing that could ever happen to you . . . . like a suffocation."  *Id.* at 1, 3.  The medical community, too, recognizes that air hunger is "among the most distressing experiences that human beings can endure" and is "far worse than pain."  P0055 at 1 [Demoule et al., 2024]; *see also* P0056 at 918, 922 [Demoule et al., 2022] (describing the "traumatic" and "terrifying" experience of air hunger).  Based on the peer-reviewed medical literature, testimony from expert witnesses, and the evidence from prior nitrogen asphyxiation executions conducted by the State of Alabama, the suffering lasts several minutes and continues after the inmate loses apparent consciousness.

3.  Lee's lawsuit alleges that ADOC's nitrogen asphyxiation protocol— and the substantial risk of air hunger it creates—violates the Eighth Amendment's prohibition on cruel and unusual punishment.  The Constitution forbids methods of execution that superadd terror or pain, or result in a lingering death, beyond what is necessary to carry out a sentence of death when a feasible and readily implemented alternative is available.  *See Glossip v. Gross*, 576 U.S. 863, 877 (2015); *Baze v. Rees*, 553 U.S. 35, 49–52 (2008); *Bucklew v. Precythe*, 587 U.S. 119, 134–36 (2019).  In the context of a challenge to lethal injection, a plurality of the Supreme Court

described the "risk of suffocation" as "constitutionally unacceptable." *Baze*, 553 U.S. at 53. This is exactly the substantial risk that executions by nitrogen asphyxiation present.

4. Before trial began, Lee moved to exclude Defendants' expert, Dr. Joseph F. Antognini, who opines that execution by nitrogen asphyxiation is quick and painless. This Court held the motion in abeyance. After hearing the evidence at trial, the Court now grants Lee's motion: Dr. Antognini is not qualified to offer these opinions, nor are his opinions reliable under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Without Dr. Antognini, Defendants cannot rebut the overwhelming evidence that inmates being executed by nitrogen gas face a substantial risk of suffering air hunger.

5. This Court, however, reaches the same result even if it considers Dr. Antognini's opinions. At trial, Dr. Antognini agreed that ADOC's method of executing an inmate by forced inhalation of nitrogen gas falls under the definition of suffocation. He agreed that air hunger is "absolutely" among the most distressing experiences that a human can endure, and that it can be worse than pain. He further conceded that inmates with severely low oxygen levels can suffer air hunger. Dr. Antognini then admitted that he could ***not*** say, to a reasonable degree of medical certainty, whether the seven inmates that ADOC previously executed by nitrogen

gas suffered pain. This Court therefore finds that Lee has met his burden to show that execution by nitrogen asphyxiation superadds pain and terror.

6.    Lee also presented persuasive evidence that his proposed alternative—execution by firing squad—is feasible, can be readily implemented, and carries substantially less risk of suffering than execution by nitrogen asphyxiation. Multiple gunshot wounds to the heart will render the inmate unconscious in 3 to 5 seconds. Defendants did not present admissible evidence to the contrary.

7.    Lee also demonstrated that the brain will not process any pain from the gunshot wounds before the inmate becomes unconscious. Dr. Antognini did not dispute this or cite any contrary evidence at trial. But even if he had, Dr. Antognini conceded that air hunger is ***worse than*** pain. There is, accordingly, no question that death by firing squad will result in substantially less pain and suffering than death by nitrogen asphyxiation.

8.    The Court also concludes that execution by firing squad is feasible and can be readily implemented. Five states have authorized executions by firing squad.[3] Indeed, prior to trial, Defendants submitted a Trial Brief conceding that execution by firing squad is feasible. *See* Defs.' Trial Br. at 11 [ECF No. 133] ("While [firing squad] may be feasible—guns and ammunition are available to ADOC for purchase

---

[3] *See* Utah Code § 77-18-113; Idaho Code § 19-2716; Miss. Code § 99-19-51; Okla. Stat. tit. 22, § 1014; S.C. Code § 24-3-530.

. . . .”).  Former Commissioner Hamm confirmed this at trial:  he testified unequivocally that if the Legislature authorizes execution by firing squad, then ADOC can implement it.

9.      Defendants nonetheless argue that execution by firing squad cannot be readily implemented because the Legislature has yet to authorize the method.  *See* Defs.' Trial Br. at 11 [ECF No. 133].  The Supreme Court's decisions in *Bucklew* and *Nance* foreclose that argument:  "[a]n inmate seeking to identify an alternative method of execution is ***not*** limited to choosing among those presently authorized by a particular State's law."  *Bucklew*, 587 U.S. at 139–40 (emphasis added); *Nance v. Ward*, 597 U.S. 159, 164 (2022) (same).

10.     For these reasons, and as explained further below, Lee has met his burden to establish an Eighth Amendment violation.

## II.   FINDINGS OF FACT

### A.   Authorization and Development of ADOC's Nitrogen Asphyxiation Method of Execution

11.     In June 2018, the Alabama Legislature authorized a new method of execution:  "nitrogen hypoxia."[4]  Ala. Code § 15-18-82.1(a).  The statute required

---

[4] The statute refers to the new method of execution as "nitrogen hypoxia"—a term first coined by criminal justice professors in 2014.  A medical professional would instead describe Alabama's execution method as "asphyxiation," the medical term that includes smothering someone.  *See* 4/27/2026 at 27:12–18 [R. Schwartzstein]; *see also* 4/29/2026 Tr. at 13:15–18 [J. Antognini] (noting that asphyxiation "is probably a little bit more accurate a way from a medical perspective to say that").

inmates already on death row to elect this execution method within 30 days. *Id.* § 15-18-82.1(b)(2).

12. In August 2023, ADOC released a heavily redacted protocol for executions by nitrogen gas. *See* Pretrial Order at 4 (stipulations) [ECF No. 138]; P0005 [redacted protocol]; 4/27/2026 Tr. at 246:9–11 [C. Williams].

13. Lawyers in the Office of the Attorney General ("OAG")—with no medical or scientific training or expertise—drafted the protocol. *See* P0002 at Nos. 10, 16 [Defs.' Interrog. Resps.]; P0003 at Nos. 243–244, 247–252, 255–257 [Defs.' Resps. to Reqs. for Admis.]; 4/27/2026 Tr. at 217:7–9 [J. Hamm]. Nor did they consult with medical professionals, scientists, or engineers in the drafting process. *See* P0002 at No. 10 [Defs.' Interrog. Resps.]; P0003 at Nos. 92–105 [Defs.' Resps. to Reqs. for Admis.]; 4/27/2026 Tr. at 218:4–24 [J. Hamm]; 4/27/2026 Tr. at 246:15–18 [C. Williams].

14. ADOC has never taken any steps—before or after executing inmates by nitrogen asphyxiation—to confirm whether the method would cause pain, suffering, terror, or psychological trauma. 4/27/2026 Tr. at 218:25–219:11 [J. Hamm] (no steps taken before approving the protocol); *id.* at 219:12–19 (no steps to investigate

---

This Court will use the more accurate phrase "nitrogen asphyxiation" rather than "nitrogen hypoxia."

whether the protocol causes pain, suffering, or trauma after inmate-plaintiffs raised such allegations).

15.    To test the nitrogen delivery system, OAG lawyers conducted a series of demonstrations.  *See* P0002 at No. 11 [Defs.' Interrog. Resps.]; 4/27/2026 Tr. at 247:6–9 [C. Williams]; *see, e.g.*, D52–D55 [testing videos].  They did not consult with any medical professionals or scientists in designing or carrying out the demonstrations.  *See* 4/27/2026 Tr. at 247:10–248:9 [C. Williams]; 4/28/2026 at 153:20–22, 154:5–8 [J. Houts]; *see also id.* at 153:23–25 (the assessments were "never submitted to any scientific review board").  For example, to show how quickly the nitrogen system could "purge[] [oxygen] out of the line," an OAG attorney strapped a respirator mask to a "Nitrox tank"—which acted as an "analog for the curvature of the human face"—and then surrounded the mask with "a white towel" as a "barrier [ ] to kind of keep some of that air in."  4/28/2026 Tr. at 142:10–22 [J. Houts]; D55 [testing video].

16.    The OAG's demonstrations were largely focused on protecting the Execution Team from potential nitrogen gas exposure.  *See* P0002 at No. 11 [Defs.' Interrog. Resps.].  None of the tests involved a volunteer inhaling nitrogen gas (as opposed to breathing air).  *See* 4/28/2026 Tr. at 138:22–25, 152:21–24, 155:17–19 [J. Houts].  None of the tests sought to determine when an inmate would lose consciousness or his blood oxygen saturation level.  *See id.* at 152:25–153:6.  And

none of the tests assessed whether the inmate would suffer air hunger or pain during the execution. *See id.* at 154:15–155:16 (trial testimony by former OAG attorney agreeing that, at deposition, he testified that none of the tests assessed whether an inmate "would experience the sensation of air hunger"); *id.* at 156:14–16 ("Q. And sitting here today, you don't know whether or not nitrogen hypoxia executions are painless. Fair? A. Definitively, I don't know.").

**B. ADOC's Nitrogen Asphyxiation Procedure**

17. Under ADOC's nitrogen asphyxiation protocol, the condemned inmate is escorted to the execution chamber and placed on a gurney. *See* Pretrial Order at 4 (stipulations) [ECF No. 138]; P0004 at 15 [redacted protocol].

18. In strapping the inmate to the gurney, ADOC uses "[t]wo sets of restraints on each arm," "[a] four-point breastplate, which can be tightened at each restraint point[,]" "[a] restraint across the legs," and "[a] set of restraints at the feet" to secure the inmate on the gurney. *See* P0002 at No. 12 [Defs.' Interrog. Resp.]; P0003 at Nos. 77–81 [Defs.' Resps. to Reqs. for Admis.]. The restraints "are tightened to the point at which an officer can fit one finger into the restraints." P0002 at No. 12 [Defs.' Interrog. Resps.]; 4/27/2026 Tr. at 248:24–249:7 [C. Williams] ("Q. Would you agree with me that the inmate's movement is very restricted as a result of being restrained? A. Yes."); P0100–P0106, P0108–P0110 [photos of

9

restraints]; P0122 [video of restraints] (demonstrating restricted movements while strapped to the gurney).

19.     After the Warden reads the execution warrant and the condemned inmate speaks any last words, the Warden gives a code ("Code One") to start the execution.  *See* 4/28/2026 Tr. at 168:15–16 [T. Raybon].  The nitrogen gas is turned on within a matter of seconds.  *Id.* at 168:17–25.  The gas then flows into a full-face respirator mask, displacing the oxygen until the inmate eventually suffocates to death.  P0002 at No. 7 [Defs.' Interrog. Resps.]; Pretrial Order at 4–5 (stipulations) [ECF No. 138]; P0005 at 16 [redacted protocol].  The gas continues to flow for "either 15 minutes or five minutes after flat line on the EKG, whichever is longer." 4/28/2026 Tr. 169:10–13 [T. Raybon].  At that point, the Warden gives a second code ("Code Two") to turn off the gas.  *Id.* at 169:23–170:5.  ADOC does not document the time to flat line.  *Id.* at 169:14–19.

### C.     Lee's Conviction and the Present Action

20.     On April 12, 2000, Jeffery Lee was convicted on three counts of murder and one count of attempted murder.  A sentencing hearing was held that same day, with the jury recommending by a 7-5 vote to sentence Lee to life without the

possibility of parole.  The trial court, however, overrode the jury's recommendation and sentenced Lee to death.[5]

21.     On October 26, 2001, the Alabama Court of Criminal Appeals reversed the trial court's sentencing order, holding that the lower court did not sufficiently explain its decision to override the jury's sentencing recommendation.  *See Lee v. State*, 898 So. 2d 790, 808 (Ala. Crim. App. 2001).  Thereafter, the trial court issued a new order reimposing Lee's death sentence, which the Court of Criminal Appeals affirmed on June 27, 2003.  *Id.* at 874.  Lee filed a petition for a writ of certiorari to the Alabama Supreme Court, which was denied on February 6, 2004.  *See Ex parte Lee*, 898 So. 2d 874 (Ala. 2004).  The U.S. Supreme Court denied certiorari on October 12, 2004.  *See Lee v. Alabama*, 543 U.S. 924 (2004) (mem.).

22.     In February 2005, Lee filed a postconviction petition for relief from his sentence under Rule 32 of the Alabama Rules of Criminal Procedure.  *See Lee v. State*, 44 So. 3d 1145, 1148 (Ala. Crim. App. 2009).  The circuit court denied Lee's petition in August 2007, *id.* at 1149, and the Court of Criminal Appeals affirmed in October 2009.  *See id.* at 1176.  The Alabama Supreme Court denied certiorari in February 2010.  *See id.* at 1145.

---

[5] Alabama abolished judicial override in April 2017, but did not apply the abolition retroactively.  *See* Ala. Act No. 2017-131.

23. In October 2010, Lee filed a petition for writ of habeas corpus. *See Lee v. Thomas*, 2012 WL 3137901, at *1 (S.D. Ala. Aug. 1, 2012). The district court denied the petition, *id.*, and the Eleventh Circuit affirmed. *See Lee v. Comm'r, Ala. Dep't of Corr.*, 726 F.3d 1172 (11th Cir. 2013). On March 24, 2014, the U.S. Supreme Court denied certiorari. *See Lee v. Thomas*, 572 U.S. 1015 (2014) (mem.).

24. Lee has exhausted all conventional appeals.

25. After the Legislature amended the Alabama Code to provide for execution by nitrogen gas, Lee elected that method on June 26, 2018. *See supra* ¶ 11 (describing the statutory requirement on the election of nitrogen hypoxia).

26. On August 22, 2025, Lee filed this lawsuit challenging ADOC's use of nitrogen gas as violating the Eighth Amendment. *See* Compl. [ECF No. 1]. On February 2, 2026, Lee amended his complaint to propose firing squad as an alternative method of execution. *See* Am. Compl. ¶¶ 70–72 [ECF No. 40].

27. On January 14, 2026, Defendants represented that they intended to move the Alabama Supreme Court for Lee's execution date. Based on that representation, this Court set an expedited trial date of April 27, 2026. *See* Order [ECF No. 36].

28. On April 15, 2026, Governor Kay Ivey set a "thirty-hour time frame for the execution [of Lee] to occur beginning at 12:00 a.m. on Thursday, June 11, 2026,

and expiring at 6:00 a.m. on Friday, June 12, 2026." Ltr. from Gov. K. Ivey (Apr. 15, 2026) [ECF No. 127-1].

**D.      Summary of Evidence Presented at Trial**

29.      At trial, the Court heard from five expert witnesses. Lee presented four experts: (1) Dr. Richard M. Schwartzstein, an expert in "pulmonology and critical care medicine, physiology, hypoxia, dyspnea, and air hunger," *see* 4/27/2026 Tr. at 10:18–22, (2) Dr. Julie Bastarache, an expert in "pulmonology, critical care medicine, and pathology," *see* 4/27/2026 Tr. at 129:16–19, (3) Dr. James Williams, an expert in "emergency and family medicine, gunshot wounds, firearms, and ballistics," *see* 4/28/2026 Tr. at 8:6–13, and (4) Dr. Brian McAlary (by prior testimony), an expert in anesthesiology and the only doctor who has observed a nitrogen asphyxiation execution. Defendants offered a single expert: Dr. Joseph Antognini, an expert in anesthesiology. *See* 4/28/2026 at 251:2–22.

30.      The Court also heard from various lay witnesses live, by prior testimony, or by affidavit. Most of the lay witnesses were eyewitnesses to the prior nitrogen asphyxiation executions and/or employees of ADOC.

**i.      Dr. Richard M. Schwartzstein**

31.      Dr. Richard M. Schwartzstein is a pulmonologist and critical care doctor at Beth Israel Deaconess Hospital and professor at Harvard Medical School. *See* P0036 [Schwartzstein CV]; 4/27/2026 Tr. at 7:12–23 [R. Schwartzstein]. He is

widely regarded as one of the world's foremost experts on dyspnea and air hunger, having studied these issues for the last forty years and having treated more than 15,000 dyspneic patients. *See* P0036 [Schwartzstein CV]; 4/27/2026 Tr. at 7:24–8:10, 8:16–19, 9:13–15 [R. Schwartzstein]. Dr. Schwartzstein has been "asked to be a visiting professor at universities around the world" and has given lectures and continuing medical education programs related to dyspnea. *Id*. at 9:13–20. He was on the writing committees for multiple "consensus statements"—the official positions by leading medical organizations—on dyspnea.[6] *Id.* at 23:5–24:9, 24:12–13; 29:18–31:21; P0074 [Parshall et al., 2012]; P0055 [Demoule et al., 2024].

32. Dr. Schwartzstein opines that it is "highly likely that individuals succumbing to [ADOC's nitrogen asphyxiation] protocol will experience severe air hunger. . . . The brain will process that, and they will have that intense suffering, smothering feeling akin to drowning." 4/27/2026 Tr. at 63:2–8 [R. Schwartzstein]; *id*. at 52:22–25 (opining that "somebody who is asphyxiating with nitrogen inhalation is experiencing air hunger, the worst form of shortness of breath, of

_____

[6] Dr. Schwartzstein twice co-chaired the American Thoracic Society's consensus statement on dyspnea (in 1999 and 2012). *See* 4/27/2026 Tr. at 30:9–31:21 [R. Schwartzstein]. He also participated on the writing committee for the European Respiratory Society's consensus statement on dyspnea in mechanically ventilated patients. *Id.* at 23:9–24:9. The American Thoracic Society ("ATS") and European Respiratory Society ("ERS") are two of the leading medical organizations for pulmonologists and critical care doctors in the world. *Id.* at 21:5–12, 23:16–24.

dyspnea, and that this is a form of intense suffering [and] suffocation"); *id.* at 94:7–11 ("I believe we have sufficient data here to indicate that there will be brain suffering here and that there is intense dyspnea, even when he is in the unawake state."); *see also id.* at 10:23–11:1 (all of Dr. Schwartzstein's opinions are "given to a reasonable degree of medical certainty").

33.     Dyspnea is "a sensation of difficulty with your breathing," which can range from "minor to very severe."  4/27/2026 Tr. at 8:13–15, 11:11–13 [R. Schwartzstein].  The most severe form of dyspnea, known as "air hunger," is a primal sensation of "not getting enough air" that "evoke[s] anxiety, panic, frustration, and fear."  P0056 at 922–23 [Demoule et al., 2022]; 4/27/2026 Tr. at 12:5–12 [R. Schwartzstein] ("[T]he most severe forms of dyspnea are characterized by phrases that have become lumped together under the term air hunger:  I need more air.  I can't get a breath.  I can't get air in.  So a number of these phrases that, again, collectively we refer to as air hunger, and that is the most severe form of discomfort."); P0079 at 3 [*Respiratory Physiology*] (describing dyspnea as "one of the most debilitating symptoms in clinical medicine").

34.     In comparing dyspnea and pain, Dr. Schwartzstein explained that "[d]yspnea has features that are similar to pain, but it is different than pain.  Pain is associated with often a particular injury to a portion of the body, whether it's an internal organ or external limbs."  4/27/2026 Tr. at 11:5–8 [R. Schwartzstein].

Dyspnea, on the other hand, "is more a holistic discomfort sensation that you can't point to and say, this is where my dyspnea or shortness of breath is." *Id.* at 11:8–10. At its most severe, the medical literature describes dyspnea as being "far worse than pain." P0055 at 1 [Demoule et al., 2024]; 4/27/2026 Tr. at 28:3–16 [R. Schwartzstein] (describing air hunger as "an intense experience" that "is worse than pain").[7]

35. Researchers, including Dr. Schwartzstein and those in his group, have attempted to better understand dyspnea. Among other things, they developed the "multidimensional dyspnea profile" to "parse out [the] different elements" of dyspnea: how intense is the dyspnea (on a scale of 0 to 10), what is the quality of the dyspnea (*e.g.*, does the chest feel tight or is it a feeling of not getting enough air), and what emotions does the dyspnea evoke? *See* 4/27/2026 Tr. at 12:13–14:6 [R. Schwartzstein].

---

[7] *See also, e.g.*, 4/27/2026 Tr. at 28:21–29:9 [R. Schwartzstein] ("I broke my elbow three years ago in a jogging accident. I got hardware in there with a plate and six screws. And I had terrible pain afterwards, but I could distract myself from it. I wasn't worried I was going to die from that. And when we've done some of these experiments on healthy individuals in the laboratory, I've also been a subject for some. I tried it out on myself before we do it with our subjects. And when I've been subjected to this same kind of air hunger that we're talking about, it is totally different, and it is worse than that fractured elbow that I had. I mean, it just—it's associated with a sense of I've got to escape this, I've got to make this better, that's just different than even really bad pain is.").

36. To answer these questions, researchers provided patients with questionnaires to describe their shortness of breath. *See* 4/27/2026 Tr. at 14:3–6, 14:19–15:17 [R. Schwartzstein]; *e.g.*, P0082 at 120 [Hahler, 2005] (example of the patient questionnaires); P0074 at 439 tbl. 3 [Parshall et al., 2012] (listing common descriptors for air hunger on patient questionnaires).

37. A 2019 article captured some of those patient responses, as quoted below:

- *"Not being able to get air is the worst thing that could ever happen to you."*

- *"Scared. I thought the world was going to end, like in a box . . . . I'm going to die. I might not make it."*

- *"It's like an elephant on your chest in the commercial."*

- *"Feels like a boa constrictor."*

- *"It's the worst situation . . . to lose control of my breathing."*

- *"[W]hen the shortness of breath was at its extreme, I thought I was going to die and saw a coffin beside me."*

- *"[Y]ou don't think you'll get it back again—like a suffocation, frightened the life out of me."*

P0049 at 1–3 [Banzett, et al., 2019] (internal quotation marks omitted). The authors of the article therefore concluded that "[d]yspnoea causes suffering." *Id.* at 1; *see*

*also* 4/27/2026 Tr. at 19:15–18 [R. Schwartzstein] (noting that these descriptions are "[v]ery much consistent with what I've heard [from patients] over many years"); *id.* at 15:11–17 (noting that when he has asked patients about their dyspnea, they have responded with "things like, I can't get enough air. It's the worst feeling I've ever had"); *id.* at 22:20–23:3 (noting the emotional reactions on the patient questionnaires, including the "sense of dread, of suffocation"); *id.* at 32:8–33:5 (discussing patient descriptions for air hunger); P0080 at 167 [Schwartzstein & Sturley, 2023] ("Patients often describe air hunger as akin to suffocation or drowning.").

38. Several conditions can cause air hunger, including hypoxia (low oxygen levels)[8] and hypercapnia (carbon dioxide buildup). *See* 4/27/2026 Tr. at 34:13–24 [R. Schwartzstein] ("[T]hings that provoke [air hunger/unsatisfied inspiration] are things like hypoxia [and] hypercapnia." (citing P0074 at 439 [Parshall et al., 2012])).

39. Studies over the last couple of decades have shown definitively that "hypoxia severe enough to generate a ventilatory drive will elicit air hunger." P0072 at 152 [Moosavi et al., 2003]; *see also* P0074 at 439 [Parshall et al., 2012] (air hunger "is intensified by stimuli that increase spontaneous ventilatory drive, such as

---

[8] Hypoxia is low oxygen levels in the tissues, while hypoxemia is low oxygen levels in the blood. These terms are often used interchangeably. 4/27/2026 Tr. at 8:19–9:4 [R. Schwartzstein]. These Proposed Findings of Fact and Conclusions of Law use the term "hypoxia."

hypoxia"). This is true even in the absence of hypercapnia. *See* 4/27/2026 Tr. at 36:6–9 [R. Schwartzstein] ("Q. [D]oes a person need to have elevations in carbon dioxide to feel short of breath? A. No. In fact, the vast majority of patients who are short of breath have normal or low levels of carbon dioxide."); *id.* at 36:16–18 ("Q. [C]an hypoxemia alone without an elevation in CO2 cause dyspnea and air hunger? A. It absolutely can."); *id.* at 53:2–12 ("[It has] been shown, I think, definitively now by the Moosavi study that you do not need CO2 with hypoxia for hypoxia to cause shortness of breath. The hypoxia alone is sufficient to cause shortness of breath equivalent to CO2 and characterized by air hunger, the most severe form of shortness of breath."); *id.* at 45:14–24 (similar).[9]

40. At trial, Dr. Schwartzstein explained how severe hypoxia provokes air hunger with the following demonstrative. *See* 4/27/2026 Tr. at 38:23–44:24 [R. Schwartzstein] (figures taken from P0079 at 109, 138 [*Respiratory Physiology*]).

---

[9] Scientists previously believed that hypoxia alone, without hypercapnia, could not evoke air hunger. *See* P0072 at 142 [Moosavi et al., 2003] ("There is a commonly held notion, prevalent in the altitude literature, that dyspnea does not accompany hypoxia."); 4/27/2026 Tr. at 38:17–22 [R. Schwartzstein] ("The notion for years has been that hypoxia just isn't that bad. . . . [W]e see patients who are hypoxemic in the hospital, and they don't seem to be . . . that short of breath. And it comes from a fundamental misunderstanding of the physiology of dyspnea and the way we have evolved as human beings to do this.").



**Ventilatory Response to Hypoxia**

[P0079]
Richard M. Schwartzstein & Michael J. Parker,
*Respiratory Physiology: A Clinical Approach* (2005)
pgs. 109, 138

41.    The figure on the left side of the demonstrative represents the ventilatory response to hypoxia.  The y-axis shows minute ventilation, or "how much air is going in and out of your lung[s]."  4/27/2026 Tr. at 41:19–21 [R. Schwartzstein].  The x-axis shows the partial pressure of oxygen ("PO2"), or how much oxygen is on the hemoglobin in the blood.  *Id.* at 41:5–18.

42.    Dr. Schwartzstein explained that "we live around [a PO2 of] 100" mmHg and are breathing 5 or 6 liters of air per minute.  4/27/2026 Tr. at 41:17–24 [R. Schwartzstein].  The need to breathe—the minute ventilation on the y-axis—stays relatively flat between a PO2 of 100 and 60 mmHg.  *Id.* at 42:12–17.  But when an individual becomes severely hypoxic, with a PO2 below 60 mm Hg, the ventilatory drive "takes off and becomes almost a vertical line here.  So this now

20

goes from my five or six liters a minute up to 50 to 60 liters a minute, just going down to partial pressures of about 35 to 40. So now I'm desperate to try to do something to correct the hypoxemia. This is a very strong stimulus to breathing." *Id.* at 43:18–44:7.[10]

43.     Because the goal of execution by nitrogen asphyxiation is to take the inmate's PO2 to 0 mmHg, this necessarily creates "an incredibly strong stimulus" to breathe. 4/27/2026 Tr. at 44:17–24 [R. Schwartzstein]; *id.* at 53:19–54:8 ("[Inmates facing nitrogen asphyxiation are] in the far left-hand part of that figure . . . . Now, they go down to zero ultimately in the protocol, so that—it's not even shown there because nobody has ever [ ] taken them down that level in [a] study, but the ventilation could be 70, 80 liters a minute."). This is the extreme air hunger that an inmate will suffer.[11]

---

[10] The right-hand graph shows the corresponding oxygen saturation ("O2") levels for PO2. The oxygen saturation is the "common measure of the pulse oximeters." 4/27/2026 Tr. at 42:2–5 [R. Schwartzstein]. A PO2 of 60 mmHg, for example, corresponds to an O2 saturation of 90% on a pulse oximeter.

[11] The parties dispute the significance of the chest straps that ADOC uses to secure the inmate to the gurney. Dr. Schwartzstein explained that constrained breathing can exacerbate existing air hunger. *See* 4/27/2026 Tr. at 54:9–17 [R. Schwartzstein; *see also* P0045 at 1310 [Bailey et al., 2025] ("[The] chest straps used during executions [ ] impede lung and chest wall expansion despite increased respiratory drive, thereby promoting intense sensations of suffocation."); P0071 at 27 [Manning et al., 1992] (showing a "prompt increase in air hunger when tidal volume [*e.g.*, the ability to expand the chest] is decreased"); P0074 at 439 [Parshall et al., 2012] ("Air hunger/unsatisfied inspiration is intensified . . . if ventilatory drive is constrained."). Warden McKenzie, Warden Clemons, and Mr. Houts, however, testified that they

44.     Dr. Schwartzstein further opines that the inmate's brain is likely processing air hunger even after apparent loss of consciousness, *e.g.*, even after the inmate is no longer awake.  *See* 4/27/2026 Tr. at 51:16–52:1 [R. Schwartzstein] ("[D]ata show that people who are not awake, in fact, are experiencing things and have sequelae; have complications. . . .  [T]his is part of what the literature is telling us."); *id.* at 45:25–46:4 ("[P]eople can have dyspnea even when they're not awake."); *id.* at 48:19–25 ("[I]f [patients are] not awake, colloquially unconscious—we cannot exclude respiratory-related brain suffering.  You are not awake, you cannot tell me you're short of breath, but I know from other things that are going on with you that you are short of breath.").

45.     Studies, for example, show that patients on mechanical ventilators (who do not appear conscious) develop post-traumatic stress disorder because of the dyspnea they experience while on the ventilator.  *See* P0080 at 162 [Schwartzstein & Sturley, 2023].[12]  As summarized in the ERS consensus statement, these studies

---

have been strapped to the gurney and did not have trouble breathing.  *See, e.g.*, 4/28/2026 Tr. at 149:23–150:13 [J. Houts].

[12] Patients with respiratory failure "often require mechanical ventilation for breathing assistance and lung protection; this intervention can be lifesaving," but because ventilators restrict the size of the breath, they can also "induce or increase dyspnea in patients."  P0080 at 163 [Schwartzstein & Sturley, 2023]; 4/27/2026 Tr. at 25:25–26:13 [R. Schwartzstein] ("[O]ne of the problems that we have with mechanical ventilation is that data has shown if we give people too big a breath with a ventilator, given the disease in their lung, we can overstretch the gas sacs that are called alveoli.  The repetitive overstretching of the gas sacs will lead to lung injury

support the notion that dyspnea occurs "in patients apparently unconscious but who are actually 'minimally conscious.'"  P0055 at 5 [Demoule et al., 2024] (describing "respiratory-related brain suffering"); *id.* at 3 ("The inability to verbally or physically report a symptom does not mean that its source is not present and does not cause suffering."); 4/27/2026 at 88:18–89:5 [R. Schwartzstein] (discussing the ERS consensus statement on "brain suffering where they also delineate throughout that paper this notion of going from wakefulness to unwakefulness and still having activity and processing and experience of the brain that leads to brain suffering").

46.    "[D]ata from brain imaging [provide further support] that adverse experiences are processed by the brain even when the patient is unconscious." P0055 at 5 [Demoule et al., 2024]; P0080 at 175–76 [Schwartzstein & Sturley, 2023] ("Sedative medications, including propofol, may make a patient appear comfortable while brain imaging suggests the patient is experiencing discomfort.").  Dr. Schwartzstein explained that sedated patients have been placed in "an FMRI scanner to see if the brain does anything when I do this, and . . . those brain areas we refer to before light up.  They are processing the pain, even though you look at the patient,

---

. . . So we have to constrain the tidal volume.  The tidal volume is the word for the size of your breath. . . .  If we give people bigger breaths with the ventilator and they have injured lungs, we can further injure the lung.  So we have to give them relatively smaller breaths.  And that makes their shortness of breath worse.").

and they look totally comfortable with sedation." 4/27/2026 at 50:2–12 [R. Schwartzstein].

47. Based on these studies and data, Dr. Schwartzstein estimates that an inmate's brain is very likely processing the air hunger for "at least three to five minutes" after losing wakefulness. *See* 4/27/2026 Tr. at 53:13–18 [R. Schwartzstein].

### ii. Dr. Julie Bastarache

48. Dr. Julie Bastarache is a pulmonologist and professor of medicine and of pathology, microbiology, and immunology at Vanderbilt University Medical Center, who also works in the intensive care unit ("ICU") at the Veterans Affairs hospital in Nashville, Tennessee. *See* P0035 [Bastarache CV]; 4/27/2026 Tr. at 126:24–127:1, 128:2–15 [J. Bastarache]. Over the last two decades, she has treated thousands of patients with pulmonary issues, including patients suffering from dyspnea and air hunger. *See* 4/27/2026 Tr. at 129:7–15 [J. Bastarache].

49. As part of her work on the case, Dr. Bastarache provides a timeline, based on ideal physiological circumstances, of when an inmate loses consciousness. Her analysis includes three steps: (1) the amount of time it takes, after the nitrogen gas is turned on, for oxygen in the face mask to be washed out, (2) the amount of time it takes for the inmate to exchange the oxygen in his lungs with 100% nitrogen, and (3) the amount of time it takes for blood to circulate and deliver oxygen

throughout the body.  *See* 4/27/2026 Tr. at 130:12–25 [J. Bastarache]; *see also id.* at 130:4–6 (all of Dr. Bastarache's opinions are "given to a reasonable degree of medical certainty").

50.     ***First***, Dr. Bastarache opines that it will take "about 33 seconds for the mask to fill with mostly nitrogen."  4/27/2026 Tr. at 131:12–13 [J. Bastarache].

51.     She bases this estimate on Dr. Antognini's testing of ADOC's nitrogen delivery system and her general knowledge that an oxygen concentration of less than 5% is "really where you start to get to critically low oxygen levels of inspired gas."  4/27/2026 Tr. at 131:14–16, 132:16–20 [J. Bastarache].  Dr. Bastarache explained that, as depicted in the chart below, Dr. Antognini conducted a test of ADOC's nitrogen system to determine how long it would take for the oxygen in the respirator mask to be depleted.  *Id.* at 131:19–132:1.  She then found the time associated with an oxygen level of below 5%.  *Id.* at 132:13–20.

| O2 conc | 20% | 18% | 15% | 10% | 5% | 3% | 2% |
|---|---|---|---|---|---|---|---|
| Time (sec) | 0 | 7.8 | 10.1 | 14.6 | 23.8 | 33.5 | 42.5 |

D01 ¶ 19 [Antognini Rep.] (highlighting added).

52.     Using the results of Dr. Antognini's testing, Dr. Bastarache also estimates that sensations of air hunger will begin 10 to 12 seconds after the nitrogen gas is turned on.  *See* 4/27/2026 Tr. at 133:11–14 [J. Bastarache].  She explained that feelings of dyspnea and air hunger begin when the oxygen level in the air is below

15%.  *Id.* at 133:7–10.  Accordingly, Dr. Bastarache looked to see "at what point did the oxygen level get below 15 percent" based on Dr. Antognini's testing.  *Id.*

| O2 conc | 20% | 18% | 15% | 10% | 5% | 3% | 2% |
|---|---|---|---|---|---|---|---|
| Time (sec) | 0 | 7.8 | 10.1 | 14.6 | 23.8 | 33.5 | 42.5 |

D01 ¶ 19 [Antognini Rep.] (highlighting added).

53.     ***Second***, Dr. Bastarache estimates that it will take approximately 45 seconds for the lungs of an older inmate—in his 50s, 60s, or 70s—to completely fill with nitrogen.  She explained that when the nitrogen gas starts to flow, the lungs have residual oxygen in them.  *See* 4/27/2026 Tr. at 133:24–134:5 [J. Bastarache].  It will therefore take approximately 9 to 11 breaths—or 45 seconds—for that residual oxygen to be fully replaced by the nitrogen gas.  *Id.* at 132:23–134:11.  Dr. Bastarache bases this opinion on a peer-reviewed study that measured the number of breaths it took for healthy volunteers to replace gas in the lungs.  *Id.* at 134:12–135:9; P0059 [Fowler et al., 1952].

54.     ***Third***, because oxygen is delivered to the body by blood circulation, Dr. Bastarache estimates that it will take several circulatory cycles—totaling another 60 seconds—for the oxygen in the blood to reach a level where the inmate would lose consciousness.  *See* 4/27/2026 Tr. at 136:9–137:3 [J. Bastarache].

55.     Putting the three steps together, Dr. Bastarache calculates a "theoretical" floor of 2 minutes and 18 seconds for an inmate to lose consciousness.

4/27/2026 Tr. at 138:4–139:10; 151:3–12 [J. Bastarache]. She explained that this is a theoretical number because many factors influence and increase how long it actually takes for an inmate to lose consciousness. For example, the level of oxygen in the mask never reaches 0%, so an inmate will continue to get some very minimal oxygen during the execution, thus extending the time beyond the theoretical estimate. *See* D01 ¶ 19 [Antognini Rep.] (chart never goes below 2% oxygen concentration); 4/27/2026 Tr. at 131:1–7, 151:13–18 [J. Bastarache].[13] ADOC's use of chest restraints can increase the time to unconsciousness if the inmate cannot take full breaths. *Id.* at 151:24–152:17. And there is inherent variability among individuals. *Id.* at 138:15–19, 151:19–23.

56.     Determining when an inmate actually loses consciousness depends, instead, on a "visual clinical determination"—either a medical professional observing the inmate or reading a report of someone who has observed them. 4/27/2026 Tr. at 140:14–24 [J. Bastarache]; *see also id*. at 128:21–129:6 (explaining her "every day" practice of "interpreting lay witness observations about patients"). Dr. Bastarache then methodically walked through the eyewitness accounts of the

---

[13] Former Commissioner Hamm testified that there will also be some residual oxygen in the mask and tubing when nitrogen flow begins. *See* 4/27/2026 Tr. at 220:16–221:12 [J. Hamm].

prior nitrogen executions to identify signs of inmate consciousness and attempts to relieve air hunger.

57. Specifically, for consciousness, Dr. Bastarache looked for observations describing "purposeful" movements. *See* 4/27/2026 Tr. at 141:3–15 [J. Bastarache]. These included movements such as rolling, attempting to sit up to breathe, legs lifting up, lifting of the head, clenching of the fists, and pulling against the restraints. *See, e.g.*, *id.* at 141:9–11, 144:22–143:1, 146:6–7. After reviewing the eyewitness accounts, Dr. Bastarache concluded that inmates previously executed by nitrogen asphyxiation remained conscious for 3 to 7 minutes. *See id.* at 145:8–9, 146:17–20, 148:22–24, 150:16–20; P0029, P0126, P0127, P0086 [various media articles]; P0017 [McAlary declaration].[14]

58. Reviewing the same eyewitness observations, Dr. Bastarache also concluded that all of the inmates executed to date showed signs that they were suffering from air hunger. *See* 4/27/2026 Tr. at 145:10–14, 147:2–8, 148:25–149:5, 150:21–151:2 [J. Bastarache]. Specifically, she looked for "signs of respiratory distress, dyspnea, or air hunger" like "rapid breathing, trying to take a deep breath, being very fidgety in bed, trying to reposition, struggling, trying to sit up to get more

---

[14] Dr. Bastarache explained that three of the media reports did not include enough information for her to assess consciousness. *See* 4/27/2026 Tr. at 142:3–10 [J. Bastarache].

28

breath, shaking, sweating." *Id.* at 142:18–143:3. Contextualizing the eyewitness descriptions in "the actual circumstances [of] the moment," Dr. Bastarache concluded that each of the inmates had "some of those features of air hunger." *Id.* at 143:8–20.

59. Finally, Dr. Bastarache reviewed the autopsy reports of four inmates executed by nitrogen asphyxiation. *See* P0013–P0016 [autopsy reports for Miller, Boyd, Grayson, and Smith].[15] The autopsy findings describe the presence of pulmonary edema, a condition where fluid builds up in the lungs. *Id.*; 4/27/2026 Tr. at 153:9–22 [J. Bastarache]. Dr. Bastarache explained that the presence of pulmonary edema in these autopsies is "an abnormal finding" and likely reflects a sudden, severe rise in blood pressure just prior to death (called "flash pulmonary edema"). *See id.* at 153:9–14; 153:25–155:16. This flash pulmonary edema "can cause significant dyspnea . . . it's additive to the hypoxia that causes dyspnea." *Id.* at 156:2–3. Dr. Bastarache opines that the flash pulmonary edema likely developed early on in the execution while the inmate was still conscious. *Id.* at 155:17–156:16.

### iii. Dr. Brian McAlary

60. The parties stipulated to the admission of the prior testimony of Dr. Brian McAlary, an anesthesiologist who testified at the *Boyd* and *Frazier*

---

[15] Autopsies were not done on the three other inmates executed by nitrogen asphyxiation in Alabama (Frazier, Hunt, and West).

preliminary injunction hearings. *See* Jt. Stip. Concerning Exhs. [ECF No. 128]; D10 [McAlary testimony in *Boyd*]; D04 [McAlary testimony in *Frazier*].

61.    Dr. McAlary is the only doctor who has witnessed an execution by nitrogen asphyxiation—that of Carey Grayson.[16]  *See* D10 at 106:7–10 [McAlary testimony in *Boyd*]; P0017 [McAlary declaration].  During that execution, Dr. McAlary sat approximately 12 to 14 feet away from the gurney.  *See* D10 at 108:21–22 [McAlary testimony in *Boyd*].  Based on his observations of Grayson's movements, Dr. McAlary opined that Grayson was "conscious for at least four minutes, possibly longer."  *Id.* at 103:16–18.

### iv.    Dr. James Williams

62.    Lee also presented the testimony of Dr. James Williams, a board-certified emergency medicine physician who has treated thousands of gunshot wound victims and chest trauma and is a recognized expert in firearms and ballistics. *See* P0128 [Williams CV]; 4/28/2026 Tr. at 5:22–8:13 [J. Williams].

63.    Dr. Williams opines that an execution by firing squad directed at the cardiac bundle—the area of the body that includes the heart and great vessels—will very likely cause immediate disruption of blood flow to the brain, resulting in loss

---

[16] Matt Schulz, an attorney with the Federal Defenders of the Middle District of Alabama, took contemporaneous notes of the execution to prevent Dr. McAlary from "be[ing] distracted by looking at the clock [and] taking notes."  D10 at 106:16–22 [McAlary testimony in *Boyd*].

of consciousness within 3 to 5 seconds and death following shortly thereafter. *See* 4/28/2026 Tr. at 31:18–32:10, 36:15–37:9 [J. Williams]; *see also id.* at 8:19–23 (all of Dr. Williams' opinions are "given to a reasonable degree of medical certainty").

64. Dr. Williams bases this opinion on the Van Rijn study, which examined the brain function of rats following cessation of all blood flow to the brain by decapitation. *See* P0088 [Van Rijn, 2011]. He explained that "[t]his paper . . . definitively defines that period of unconsciousness [from cutting blood flow to the brain] as being 3.7 seconds, plus or minus." 4/28/2026 Tr. at 36:10–11 [J. Williams].

65. Dr. Williams also relies on human data to support his opinion about the time to unconsciousness. Specifically, he identified a study showing that lateral vascular neck restraints ("LVNR")—colloquially known as "choke holds" and which cut off the carotid circulation to the brain—causes loss of consciousness in "very few seconds." *See* 4/28/2026 Tr. at 37:16–24 [J. Williams]; P0053 [Bozeman, 2022]. Dr. Williams then walked the Court through a video demonstrative of the LVNR maneuver, which, indeed, showed a person subjected to the maneuver losing consciousness within 3 to 4 seconds. *See* 4/28/2026 Tr. at 38:9–41:06 [J. Williams] (explaining the demonstrative).

66. Dr. Williams also opines that, after losing consciousness in an execution by firing squad, the inmate will not feel any pain. *See* 4/28/2026 Tr. at 41:7–16 [J. Williams]. This is because, unlike the unawake inmate suffering from

31

air hunger in a nitrogen asphyxiation execution, an inmate being executed by firing squad will have "*complete* cessation of blood flow" and therefore a "profoundly deeper" level of unconsciousness. *Id.* (emphasis added).

67. Nor, according to Dr. Williams, is an inmate shot in the cardiac bundle likely to feel pain in the 3 to 5 seconds before he loses consciousness. *See* 4/28/2026 Tr. at 42:14, 45:3–5, 48:7–8 [J. Williams]. Dr. Williams bases this opinion on two phenomena: (1) the lag in processing novel stimuli into a subjective experience such as pain; and (2) the effects of "neural stunning." *Id.* at 15:1–26:25.

68. Dr. Williams explained that an inmate will not feel pain in the seconds before losing consciousness because of neurological lags in processing novel stimuli. *See* 4/28/2026 Tr. at 15:1–18:4 [J. Williams]. Pain is not felt instantaneously upon exposure to a noxious stimulus. *Id.* at 16:15–18:4. Rather, Dr. Williams explained that the stimulus must travel from the sensory receptors—in a series of steps—to the cerebral cortex, where the individual perceives the stimulus as pain (or an alternative sensation such as burning, itching, nausea, etc.). *Id.* at 16:15–17:22.

69. When a stimulus is novel—one the brain has never before synthesized and assigned meaning to—the processing lag is substantially longer, potentially "several seconds." 4/28/2026 Tr. at 15:4–21, 18:7–15 [J. Williams]. To illustrate, Dr. Williams described a toddler struck on the head by a falling pan: the child

displays surprise for two to three seconds before beginning to cry, because the brain must learn to recognize the novel sensation as something painful. *Id.* at 15:8–21. The same principle applies to adults confronting massive trauma for the first time. Motor vehicle crash victims, for example, "almost always describe . . . [feeling] stunned, and not really being able to understand what has happened to their body" for several seconds. *Id.* at 15:22–16:5. Because multiple bullets striking the cardiac bundle is also "a novel neurological stimulus," the inmate's brain will not complete the processing required to experience pain before consciousness is lost. *Id.* at 18:7–15, 29:1–3.

70. Even absent any such delay, Dr. Williams explained that neural stunning prevents the inmate from feeling pain during the 3 to 5 seconds of consciousness. In ballistics injuries, there is a "massive transfer of energy." 4/28/2026 Tr. at 19:25–20:10 [J. Williams]. When the bullet enters the body, this energy creates a temporary cavity, *id.* at 22:13–23:6, that disrupts the nerve membranes and prevents the transmission of neural impulses of pain, *id.* at 23:19–24:10. The disruption of neural impulses or "stunning" lasts "several hours if not days." *Id.* at 24:11–17; *see also* P0058 [Fackler, 1996]. Because of neural stunning, an inmate being executed by firing squad will be unconscious and dead long before he can process the pain from the gunshot wounds. *See* 4/28/2026 Tr. at 26:2–26:25 [J. Williams].

71.     Dr. Williams' clinical experience treating gunshot victims in the emergency room and his personal experience of being shot further bolster his opinions.    He explained that he routinely speaks with gunshot victims in the emergency room, and they "have a hard time describing [their pain] because it's such a novel sensation."  4/28/2026 Tr. at 27:16–28:7 [J. Williams].

72.     Similarly, in reflecting on his own experience, Dr. Williams testified that he did not feel pain immediately after being shot:  "[W]hen I was shot[,] the bullet struck me and I fell backward . . . [and] I said out loud, Gord, you just shot me.  My friend who had been holding the pistol that I was shot with.  And it was only as I heard myself say that that I realized, oh, I've been shot.  I still did not experience anything like pain."  *Id.* at 30:1–11.  Dr. Williams testified that he did not feel any pain for another 3 hours.  *Id.* at 30:11–17; *see also id.* at 124:9–14 ("Q. [W]hen you were shot, how did you get to the hospital?  A.  I drove myself.  Q.  And how long after you were shot was it before you received any pain medication?  A. About three hours.").

73.     Finally, Dr. Williams opines that execution by firing squad is feasible and can be readily implemented in Alabama.  *See* 4/28/2026 Tr. at 55:22–56:3 [J. Williams].  In reaching this opinion, Dr. Williams relied on Utah's firing squad protocol, *id.* at 49:9–12, 59:22–60:3, which uses 5 marksmen (4 with bullets and 1

with a blank), standing 21 feet from the inmate, and shooting .30-caliber rifles at a target over the inmate's heart. *See id.* at 50:21–51:7, 51:16–52:2.[17]

74. Based on testimony from former Commissioner Hamm and Deputy Commissioner Williams, Dr. Williams does not see any issues with Alabama being able to procure the materials and being able to train a team to carry out an execution by firing squad. *See* 4/28/2026 Tr. at 50:7–52:22 [J. Williams].

### v. Dr. Joseph F. Antognini

75. Defendants presented a single expert, Dr. Joseph F. Antognini, a non-practicing anesthesiologist and former professor at the University of California, Davis. *See* 4/28/2026 Tr. at 227:2–5, 228:4–22 [J. Antognini]. For more than a decade, Dr. Antognini has served as an expert for the federal government and various state governments. *See* 4/29/2026 Tr. at 94:22–95:8 [J. Antognini]. In each case, he has served as an expert in support of the government's execution method. *Id.* at 95:5–8.

76. Dr. Antognini opines that the nitrogen asphyxiation protocol will "cause rapid onset of unconsciousness"—within 60 to 70 seconds after the nitrogen gas starts flowing. *See* 4/29/2026 Tr. at 3:21–25, 12:24–13:11 [J. Antognini]. He further opines that the inmate will experience "minimal to no suffering or discomfort

---

[17] In contrast with Utah, Dr. Williams was critical of South Carolina's protocol for execution by firing squad. *See* 4/28/2026 Tr. at 53:10–23 [J. Williams].

or pain" during the execution. *Id.* at 3:21–25. Dr. Antognini bases these opinions on: (1) the Ernsting study of three healthy volunteers, (2) case reports of suicides using inert gas, (3) an aviation study of hypoxia, and (4) work-incident reports (and a related white paper) of hypoxia deaths. *See id.* at 30:25–32:1, 34:11–35:20, 36:22–38:4, 38:15–44:23, 44:24–52:17, 58:1–59:9.

77. In Ernsting, "[t]hree healthy men, aged from 33 to 38 years" were instructed the empty their lungs of air, after which nitrogen began to flow. D19 at 292 [Ernsting, 1963]. Thereafter, the participants were instructed the breathe as deeply as possible and to hyperventilate at a "rate of about 20 breaths per minute." *Id.* at 293. The subjects lost consciousness in 17 to 20 seconds. *Id.* at 295.

78. The suicide case reports involved breathing inert gas through a pre-filled bag or mask. *See* D22 [Harding & Wolf, 2008]; D23 [Ogden 2010]; D24 [Ogden et al., 2010]. The observed subjects were directed to empty their lungs of air and then take a deep breath of an inert gas. *See, e.g.*, D24 at 490 [Ogden et al., 2010]. Time until loss of consciousness ranged from 10 seconds (with the prefilled bags) to 55 seconds (with the masks). *See* D23 at 159 [Ogden, 2010]; D24 at 177 tbl. 3 [Ogden et al., 2010]. Dr. Antognini interpreted the intermittent movements the authors described as similar to the movements of the inmates executed in Alabama by nitrogen gas.

79.     The aviation study examined hypoxia when exposed to altitudes above 50,000 feet.  *See* D18 [Luft, 1951].  The study concluded that "[i]n rapid decompression to altitudes above 52,000 feet breathing oxygen, loss of [useful] consciousness can be avoided only if the total exposure time does not exceed five to six seconds." *Id.* at 122.

80.     A white paper describes loss of useful consciousness in oxygen deficient environments due to the presence of liquefied gases as taking seconds.  *See* D20 [Miller & Mazur, 1983]; 4/29/2026 Tr. at 42:6–14 [J. Antognini].  The Hudnall paper reviews Occupational Safety and Health Administration ("OSHA") reports of accidental exposures to nitrogen gas, and concludes that "any sensation of breathlessness is primarily from the buildup of carbon dioxide when it occurs and not from oxygen deprivation."  4/29/2026 Tr. at 43:22–44:9 [J. Antognini] (describing D21 [Hudnall, 1993]); *but see supra* ¶ 39 & n.9 (explaining why scientists previously believed that hypoxia could not cause dyspnea without hypercapnia and the studies that definitively disproved this).

81.     Taken together, Dr. Antognini concludes that these studies and case reports show that death by nitrogen asphyxiation is quick (with loss of consciousness in just over a minute) and painless.  4/29/2026 Tr. at 61:5–19; 88:11–19 [J. Antognini].  But he retreated from these opinions on cross-examination.  As

explained below, *see infra* ¶¶ 145–148, Dr. Antognini acknowledged that the sources on which he relies are different than the execution context.

82. Moreover, Dr. Antognini agreed with the scientific case that Lee put forth. Dr. Antognini agreed that dyspnea can "cause[] suffering." 4/29/2026 Tr. at 69:5–6 [J. Antognini]; *see also id.* at 69:10–11 (testifying that "[d]yspnea can be distressing"). He agreed that "dyspnea can be far worse than pain," *id.* at 69:14–18, and that "dyspnea ranks among the most distressing experiences that human beings can endure . . . Absolutely." *Id.* at 70:17–19. And he agreed that air hunger can cause distress, terror, and panic. *Id.* at 70:7–12.

83. Notwithstanding the Hudnall paper, Dr. Antognini also agreed that air hunger "***can*** occur with hypoxia at certain levels. If you maintain those low levels of oxygen that maintain consciousness, ***you certainly can have people with air hunger*** as Dr. Schwartzstein said earlier." 4/29/2026 Tr. at 71:7–13 [J. Antognini] (emphases added). In other words, hypercapnia alone is not the only cause of air hunger. *Id.* He then estimates that an inmate subject to nitrogen asphyxiation could have "air hunger . . . [o]n the order of probably 10 to 20 seconds." *Id.* at 109:10–20; *id.* at 73:16–20 ("Q. And you agree with me that there could be a period during which extreme hypoxia and air hunger could occur during a nitrogen hypoxia execution; correct? A. Yes, there could be a few seconds where that might occur. Yes.").

84. Dr. Antognini also backed away from his opinions about the eyewitness observations of prior nitrogen asphyxiation executions. On direct examination, he claimed that the inmate movements observed in the past executions were "unconscious movements" and not indicative of pain. *See* 4/29/2026 Tr. at 19:7–20:16, 52:15–17 [J. Antognini]. But on cross-examination, Dr. Antognini could ***not*** say, to a reasonable degree of medical certainty, when any of the prior inmates lost consciousness, whether there was variability in the time to loss of consciousness, whether any of their movements were no longer voluntary, when their breathing became agonal, or if any inmate felt pain. *See id.* at 87:24–88:3; 89:8–21.

85. Finally, Dr. Antognini attempted to rebut Dr. Williams' opinions on executions by firing squad. Dr. Antognini concludes that execution by firing squad is painful. *See* 4/29/2026 Tr. at 62:22–63:1 [J. Antognini]. In support, he relies on a single source: the botched execution of Mikal Mahdi in South Carolina, a firing squad protocol that Lee does ***not*** propose. *See id.* at 63:11–65:4.[18] Dr. Antognini,

---

[18] Lee has proposed Utah's firing squad protocol as a model for Alabama, not South Carolina's. Dr. Williams, moreover, explained that South Carolina's protocol differs from Utah's, for example, by using a different caliber bullet. Thus, Mahdi's execution has "little probative value for present purposes." *Boyd v. Hamm*, 2025 WL 2884410, at *21 n.44 (M.D. Ala. Oct. 9, 2025) (Marks, J.); *cf. Glossip*, 576 U.S. at 892–93 (rejecting the petitioners' argument that the alleged problems with an Arizona lethal injection execution demonstrated that Oklahoma's lethal injection protocol was "sure or very likely to cause serious pain"); *Baze*, 553 U.S. at 50 ("[A]n isolated mishap alone does not give rise to an Eighth Amendment violation, precisely because such an event, while regrettable, does not suggest cruelty, or that

moreover, acknowledged that the Mahdi execution is not typical of firing squad executions, as Mahdi appeared to live a lot longer than what has been reported with other firing squad executions. *Id.* at 101:5–13.

86.     Dr. Antognini expressed no opinion about the firing squad protocol of Utah, which Lee has proposed as a model.   4/29/2026 Tr. at 101:22–24 [J. Antognini].  He has no admissible opinions about the time to loss of consciousness in an execution by firing squad. *Id.* at 102:18–103:14.  He made no attempt to rebut Dr. Williams' testimony that inmates will not be able to process any pain until well after they are deeply unconscious or even dead.  Nor could he opine that the emotions that an inmate would experience when being executed by nitrogen hypoxia are the same emotions an inmate would experience when being executed by firing squad or any method of execution. *Id.* at 104:7–105:10.

### vi.     Lay Witnesses

87.     Four media witnesses testified live, by affidavit, or by prior testimony.

88.     Sarah Clifton is a reporter with the *Montgomery Advertiser*, who testified live about her observations from the West and Boyd executions. *See generally* 4/27/2026 Tr. at 191:13–215:2 [S. Clifton]. The parties also agreed to incorporate Clifton's prior testimony in the *Boyd* preliminary injunction hearing,

---

the procedure at issue gives rise to a 'substantial risk of serious harm'" (citation omitted)).

which recounts her observations from the Frazier execution.  D08 [Clifton testimony in *Boyd*].

89.     During the trial in this case, Clifton explained that she keeps track of time on the "digital clock that's on the wall of the death chamber" and takes real-time notes during the executions.  4/27/2026 Tr. at 193:16–23, 205:4–7 [S. Clifton]; *see also id.* at 210:23–211:3 (explaining that she keeps track of seconds by counting "[o]ne Mississippi, two Mississippi, three Mississippi").

90.     Clifton writes the article immediately after witnessing the execution: "The process the prison uses is that they have a separate media room on the site.  We witness the executions, we're taken back to the media center, there's a short press conference with John Hamm, and then we have an hour to write in there before it closes.  So it's always right after the execution occurs."  4/27/2026 Tr. at 205:13–17 [S. Clifton].

91.     She further explained that "all of the things that I've documented in [my articles about the prior executions] are things that I've observed.  I don't know the intention behind them or the thought process behind them, but these are all the things I saw with my eyes. . . . These are just literal events that I saw with my eyes, not

41

colored by anything else. Just write what I see." 4/27/2026 Tr. at 214:17–24 [S. Clifton].

92.    The parties agreed to admit the prior testimony of *Montgomery Reflector* reporter Ralph Chapoco (who witnessed the Smith execution) and *Montgomery Advertiser* reporter Marty Roney (who witnessed the Smith, Miller, and Grayson executions). *See* D06 [Chapoco testimony in *Boyd*]; P0031 [Chapoco article]; D07 [Roney testimony in *Boyd*]; P0029, P0032, P0033 [Roney articles]; *see also* 4/27/2026 Tr. at 223:8–11 [J. Hamm] (former Commissioner Hamm believes that Roney is accurate in his reporting).

93.    Kim Chandler of the Associated Press, testified by affidavit relating to her observations from the seven Alabama nitrogen asphyxiation executions. P0020 [Chandler affidavit]; P0021–P0028 [Chandler articles]; *see also* 4/27/2026 Tr. at 222:25–223:4 [J. Hamm] (former Commissioner Hamm believes that Chandler is "fair and accurate" in her reporting).

94.    The parties further agreed to incorporate the prior testimony of Matt Schulz, one of the attorneys who represented Grayson and Frazier and observed those executions. *See* D09 [Schulz testimony in *Boyd*]. He took contemporaneous notes of his observations from those executions. *See* P0019 [Schulz notes].

95.    Five ADOC witnesses testified live:  former Commissioner Hamm, Deputy Commissioner Charles Williams, Warden Raybon, Warden Brandon

McKenzie, and Warden Fitzgerald Clemons. These ADOC officials attended or participated in the prior nitrogen asphyxiation executions in Alabama. They testified that all of the inmates moved during the nitrogen executions, but they believe those movements were "agonal" or involuntary movements related to the dying process.

96. Former Commissioner Hamm viewed all seven of the nitrogen executions from the witness room directly facing the gurney. *See* 4/27/2026 Tr. at 219:20–24, 222:5–9 [J. Hamm]. From that witness room, he can see the inmate, but admitted that media witnesses have a better view of the inmate's face. *Id.* at 222:14–16.

97. Deputy Commissioner Williams viewed the Miller, Grayson, Frazier, Hunt, and Boyd executions—also from the commissioner's witness room. *See* 4/27/2026 Tr. at 249:8–16 [C. Williams].

98. Warden Raybon is the statutory executioner and was present in the control room during all seven of the nitrogen executions. *See* 4/28/2026 Tr. at 168:7–10 [T. Raybon]. Although the control room has a "little window" into the execution chamber, Warden Raybon testified that he did not observe any inmate movements because he was focused on looking at the EKG machine. *See id.* 161:14–18.

99. Warden McKenzie served as the execution team captain for the Smith, Miller, Grayson, Frazier, and Hunt executions. *See* 4/28/2026 Tr. at 171:21–24 [B.

McKenzie]. As the team captain, he was stationed near the inmate's head. *Id.* at 172:10–23. During the execution, his job was to watch the readings on the two pulse oximeters attached to the inmate's ears, *id.* at 171:25–172:8, but he would occasionally see the inmate move. *See id.* at 173:6–16; 193:19–194:6.

100. During the West and Boyd executions, Warden McKenzie was in the control room. *See* 4/28/2026 Tr. at 185:22–186:9, 190:15–20 [B. McKenzie].

101. Warden Clemons served as the execution team captain for the West and Boyd executions. *See* 4/28/2026 Tr. at 212:10–213:18 [F. Clemons]. He was in the viewing room during the Miller execution, and in the execution chamber during the Grayson, Frazier, and Hunt executions. *Id.*

102. Several of the ADOC witnesses also discussed the feasibility of conducting a firing squad execution at Holman. Former Commissioner Hamm and Deputy Commissioner Williams testified that if the Legislature approved execution by firing squad, that ADOC could carry it out. *See* 4/27/2026 Tr. at 229:8–230:15 [J. Hamm]; *see also id.* at 228:22–229:1 (ADOC has an armory with rifles and ammunition); *id.* at 229:5–7 (ADOC could train people to use .30-caliber rifles for firing squad); 4/27/2026 Tr. at 256:1–258:2 [C. Williams] (if the Legislature hypothetically approved execution by firing squad, ADOC could contract with engineers to determine how to modify the chamber, and could staff and train a team to carry out the execution); P0003 at Nos. 66–75 [Defs.' Resps. to Reqs. for Admis.].

103. Testimony from Wardens McKenzie and Clemons was not to the contrary. They simply testified that they did not believe the ***current*** execution chamber could accommodate an execution by firing squad. *See* 4/28/2026 Tr. at 189:17–21 [B. McKenzie]; 4/28/2026 Tr. at 222:17–223:10 [F. Clemons].[19]

**E.     Alabama's Nitrogen Asphyxiation Executions**

104. To date, ADOC has carried out nitrogen asphyxiation executions on seven inmates:  Kenneth Smith, Alan Miller, Carey Grayson, Demetrius Frazier, Gregory Hunt, Geoffrey West, and Anthony Boyd.

**i.     Kenneth Smith**

105. On January 25, 2024, ADOC conducted the first-ever execution by nitrogen asphyxiation. *See, e.g.*, P0025, P0029, P0031 [media articles on Kenneth Smith execution].  The execution log shows that Code One (to start the execution)

---

[19] The Court also heard from James Houts, the former OAG attorney who drafted the nitrogen asphyxiation protocol and tested the nitrogen delivery system.  He testified about the various "assessments" that the OAG conducted.  *See, e.g.*, 4/28/2026 Tr. at 138:11–139:25 [J. Houts].  The Court also accepted the parties' agreement to admit the prior fact testimony of Shante Hill, the medical examiner who performed the autopsy of Kenneth Smith.  *See* D03 [Hill testimony in *Grayson*]. Dr. Hill testified that Smith's autopsy showed pulmonary edema, which she described as common in persons who have overdosed or been asphyxiated.  *Id.* at 244:8–15.

was given at 7:57 p.m. and Code Two (to turn off the gas) was given at 8:15 p.m. P0011 [Smith execution log].

106. Eyewitnesses recounted that around 7:57 or 7:58 p.m., Smith began to "shake and writhe violently." P0025 [Chandler article]; P0029 [Roney article]. For the next four minutes, until 8:01 p.m., Smith took "deep breaths, his body shaking violently with his eyes rolling in the back of his head. . . . Smith clenched his fists, his legs shook. . . . He seemed to be gasping for air. The gurney shook several times." P0029 [Roney article]. Smith's head left the gurney, and his arms appeared to strain against the restraints. P0025 [Chandler article].

107. Members of the execution team observed similar movements. Former Commissioner Hamm testified that Smith "struggle[d] against his restraints" and "shook and moved on the gurney" over a two-minute period of time after the nitrogen began to flow. *See* 4/27/2026 Tr. at 223:12–224:19 [J. Hamm]; P0029 [Roney article]. Warden McKenzie—stationed by Smith's head—testified that it took "a few minutes" for Smith to lose consciousness. *See* 4/28/2026 Tr. at 196:11–16 [B. McKenzie]. Warden McKenzie also saw Smith raise his upper body "not too long before" the consciousness check at 8:07 p.m. *Id.* at 198:17–198:21; *id.* at 200:2–8 (seeing Smith's chest rise once more after that).

108. None of the ADOC witnesses that testified at trial witnessed Smith holding his breath. *See, e.g.*, 4/27/2026 at 225:3–5 [J. Hamm]; 4/28/2026 Tr. at 200:9–11 [B. McKenzie].

**ii. Alan Miller**

109. On September 26, 2024, ADOC executed Alan Miller by nitrogen gas. *See, e.g.*, P0024, P0033, P0126 [media articles on Miller execution]. The execution log shows that Code One was given at 6:16 p.m. and Code Two was given at 6:32 p.m. P0010 [Miller execution log].

110. During the execution, witnesses observed Miller's body shake and tremble on the gurney for approximately two minutes. P0026 [Chandler article]. At around 6:18 p.m., Miller lifted his head off the gurney several times and "struggled against the restraints." P0126 [Bautista article]; P0033 [Roney article]. Miller trembled and shook for "roughly two minutes." P0126 [Bautista article]. His "left hand shoot and clenched into a fist several times." P0033 [Roney article]. At 6:20 p.m., Miller's head again moved on the gurney and he took various gasps and gulps for the next six minutes. P0033 [Roney article].

111. Similarly, Warden McKenzie testified that he saw Miller lift his legs off the gurney "minutes" after the gas was turned on. *See* 4/28/2026 Tr. at 201:20–202:17 [B. McKenzie]. Former Commissioner Hamm and Deputy Commissioner Williams also testified that Miller's "body did move after the nitrogen started

47

flowing." 4/27/2026 Tr. at 225:12–17 [J. Hamm]; 4/27/2026 Tr. at 250:24–251:4 [C. Williams].

### iii. Carey Grayson

112. On November 21, 2024, ADOC executed Carey Grayson by nitrogen gas. *See, e.g.*, P0021, P0032, P0127 [media articles on Grayson execution]. The execution log shows that Code One was given at 6:11 p.m. and Code Two was given at 6:27 p.m. P0008 [Grayson execution log].

113. At 6:12 p.m., Grayson was seen "gasping and raising, shaking his head left to right." P0127 [Faulk article]; P0032 [Roney article]. From 6:12 p.m. to 6:13 p.m., Grayson's hands were "tightly clenched. He took several deep gasps, shaking his head vigorously. He pulled his arms against the restraints. . . . He took several deep gasps, raising his head off the gurney." P0032 [Roney article]. At 6:14 p.m., Grayson's "sheet-wrapped legs lifted off the gurney into the air." P0021 [Chandler article]; P0127 [Faulk article]; P0032 [Roney article]. He continued to have "periodic gasps over the following six minutes." P0127 [Faulk article].

114. In addition to media witnesses, Dr. Brian McAlary, an anesthesiologist, witnessed the executions. Dr. McAlary sat approximately 12 to 14 feet away from the gurney. D10 at 108:21–22. He observed Grayson's legs "both raised up, almost by levitation" in a "measured and consistent manner." *Id.* at 115:8–12. He estimated that Grayson's legs paused in the air for approximately 10 seconds and descended

"[a]t the same rate of speed." *Id.* at 115:11–16. According to Dr. McAlary, this coordinated activity was a conscious movement. *Id.* at 115:4–116:3. Based on his medical expertise, he conclude that Grayson was conscious for "at least four minutes." *Id.* at 117:10–23.

115. The testimony from ADOC witnesses was similar. Former Commissioner Hamm testified that he saw Grayson's body move "for a period of time after the [W]arden asked if he could proceed with the execution." 4/27/2026 Tr. at 226:19–22 [J. Hamm]. He also saw Grayson "shake his head" and "lift both of his legs off the gurney" during the execution. *Id.* at 226:23–227:3. Warden McKenzie testified that he saw Grayson "giv[e] the middle finger" after the nitrogen gas began to flow. 4/28/2026 Tr. at 202:20–203:1 [B. McKenzie]. He estimated that "two to three minutes, a few minutes" passed before Grayson lost consciousness. *Id.* at 203:2–16. Warden Clemons, who was also in the execution chamber at the time, testified that "Grayson was our biggest movement we had had." *Id.* at 220:3 [F. Clemons].

### iv. Demetrius Frazier

116. On February 6, 2025, ADOC executed Demetrius Frazier by nitrogen gas. *See, e.g.*, P0027, P0028 [media articles on Frazier execution]. The execution log shows that Code One was given at 6:10 p.m. and Code Two was given at 6:29 p.m. P0007 [Frazier execution log].

49

117. During the execution, witnesses observed Frazier making circular movements with his hands for the first two minutes, stopping around 6:12 p.m. P0027 [Chandler article]; P0028 [Clifton article]. A minute later, at around 6:13 p.m., he raised both legs off several inches off the gurney. P0027 [Chandler article]; P0028 [Clifton article]. His "loll[ed] to the side. His arms seemed to tighten and fists clenched." P0028 [Clifton article].

118. Members of the execution team observed similar movements. Former Commissioner Hamm saw Frazier "twirling his wrists in a circular motion," "lift[ing] his legs a few inches off the gurney," and other movements over a "seven-to eight-minute period after the nitrogen gas began flowing." 4/27/2026 Tr. at 227:6–19 [J. Hamm]. Deputy Commissioner Williams and Warden McKenzie testified the same. *See* 4/27/2026 Tr. at 253:17–22 [C. Williams] (saw Frazier's legs raise); 4/28/2026 Tr. at 184:5–10 [B. McKenzie] (saw Frazier "rotating his hands in a circular motion early on" in the execution); *id.* at 185:9–10 (saw Frazier's legs raise). Warden McKenzie also observed Frazier's upper body tense up against the restraints for a "few minutes" after the nitrogen gas began to flow. 4/28/2026 Tr. at 184:23–185:2, 203:17–205:13 [B. McKenzie].

### v. Gregory Hunt

119. On June 10, 2025, ADOC executed Gregory Hunt by nitrogen gas. *See, e.g.*, P0022 [media article on Hunt execution]. The execution log shows that Code

One was given at 5:56 p.m. and Code Two was given at 6:19 p.m. P0009 [Hunt execution log].

120. A media witness observed that at 5:57 p.m., "Hunt briefly shook, gasped[,] and raised his head off the gurney." P0022 [Chandler article]. At 5:59 p.m., he "let out a moan" and "raised his feet" from the gurney. *Id.*

121. Former Commissioner Hamm and Deputy Commissioner Williams agreed that Hunt's body moved after the nitrogen gas started to flow. *See* 4/27/2026 Tr. at 227:22–228:2 [J. Hamm]; 4/27/2026 Tr. at 253:23–254:3 [C. Williams]. Warden Clemons, who was present in the execution chamber, saw Hunt's legs raise. 4/28/2026 Tr. at 217:18–218:3 [F. Clemons]

### vi. Geoffrey West

122. On September 25, 2025, ADOC executed Geoffrey West by nitrogen gas. *See, e.g.*, P0024, P0034 [media articles on West execution]. The execution log shows that Code One was given at 5:56 p.m. and Code Two was given at 6:17 p.m. P0012 [West execution log].

123. Media reported that at about 5:56 p.m., West "gave a thumbs-up in the direction of his attorney." P0024 [Chandler article]. For the next two minutes, his eyes were open "as he appeared to gulp and struggle for breath." *Id.* He "rocked from side to side, his left fist curled up . . . [and] foam at the mouth." *Id.* At 5:57 p.m., West "appeared to say something inaudible." P0034 [Clifton article]. A

minute later, at 5:58 p.m., he appeared to "shake his head. His arms appeared to tense against the restraints and his body appeared to shake slightly." *Id.* His head "lolled to the side" around 5:59 p.m., and he slightly foamed around the mouth. *Id.* At 6:01 p.m., he started to "shuddering gulps" and "gasping" breaths until he appeared to stop breathing around 6:07 p.m. *Id.*

124. Warden McKenzie, who was stationed in the control room during the execution, testified that he heard West make a noise like a "small squeal" from a pig after the gas began to flow. *See* 4/28/2026 Tr. at 205:17–22 [B. McKenzie]. Former Commissioner Hamm also saw "movement by Mr. West during his execution." 4/27/2026 Tr. at 228:6–8 [J. Hamm].

### vii. Anthony Boyd

125. On October 23, 2025, ADOC executed Anthony Boyd by nitrogen gas—the longest nitrogen asphyxiation execution to date. *See, e.g.*, P0023, P0030 [media articles on Boyd execution]. The execution log shows that Code One was given at 5:55 p.m. and Code Two was given 32 minutes later at 6:27 p.m. P0006 [Boyd execution log].

126. Media witnesses reported that at 5:57 p.m., Boyd "clenched his fists, raised his head slightly and began shaking. He then raised his legs off the gurney several inches." P0023 [Chandler article]. His "body began to jolt . . . rolling to his side for a few seconds. . . . He appeared to tremble and shudder." P0030 [Clifton

article].  A minute later, at 5:58 p.m., Boyd "appeared to tense, with his legs seemingly raising a few inches off the gurney."  *Id.*  From 5:59 p.m. to 6:17 p.m., Boyd took "shuddering," "hitching," "gasping," and "chest-heaving" gasps of various size and intervals.  *Id.*  At 6:15 p.m., his head again "loll[ed] back and then to the side.  Boyd's legs appeared to tense for a few seconds."  *Id.*

127.  Warden Clemons, who was captain of the execution, agreed that Boyd "did tense up" during the execution.  4/28/2026 Tr. at 219:18–21 [F. Clemons].  Deputy Commissioner Williams saw Boyd's legs lift off the gurney.  4/28/2026 Tr. at 254:1–9 [C. Williams].  And former Commissioner Hamm, too, observed Boyd's body move after the nitrogen gas was turned on.  4/27/2026 Tr. at 228:12–17 [J. Hamm].

## III.   CONCLUSIONS OF LAW

### A.     The Court Must Exclude the Opinions of Dr. Antognini

#### i.      Legal Standard

128.  Under Federal Rule of Evidence 702, the proponent of the expert testimony bears the burden to show:  "[1] that [the] expert is 'qualified to testify competently regarding the matters [he or she is] intended to address; [2] the methodology by which the expert reaches [his or her] conclusions is sufficiently

reliable; and [3] the testimony assists the trier of fact.'" *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (citation omitted).

### ii. Dr. Antognini Is Not Qualified to Opine About Nitrogen Asphyxiation

129. An expert is qualified if he or she has "sufficient 'knowledge, skill, experience, training, or education' to form a reliable opinion about the ***relevant issue***." *Jones v. Novartis Pharms. Corp.*, 235 F. Supp. 3d 1244, 1251 (N.D. Ala. 2017), *aff'd in part*, 720 F. App'x 1006 (11th Cir. 2018) (citation omitted) (emphasis added).

130. This case concerns respiratory physiology, specifically, the effects on the body of forced inhalation of nitrogen gas and the deprivation of oxygen. Dr. Antognini lacks expertise in that field. He is not a pulmonologist, *see* 4/29/2026 Tr. at 96:24–25, 97:7–9 [J. Antognini], and has never published peer-reviewed articles in pulmonary medicine. *Id.* at 97:18–20; *see also* 4/28/2026 Tr. at 242:25–243:3 [J. Antognini] (did not treat severely hypoxic patients "very often"). He has never conducted a study on dyspnea or air hunger. *See* 4/29/206 Tr. at 71:20–22 [J. Antognini]. But for a case report of hypoxia in a single anesthetized patient decades ago, he has never published a paper in the areas of dyspnea, air hunger, or hypoxia. *Id*. at 71:23–72:8.

131. That Dr. Antognini is an anesthesiologist does not qualify him to opine on all areas of medicine. *See Easter v. UNUM Life Ins. Co. of Am.*, 2024 WL

54

3755805, at *3 (M.D. Fla. Aug. 12, 2024) ("'[D]octors are [not] qualified experts on every medical subject merely because they wear white coats.'" (citation omitted)). He admitted that "this case does ***not*** involve administering anesthesia agents." 4/29/2026 Tr. at 96:15–17 (emphasis added). And he conceded that "[p]hysicians do ***not*** use nitrogen to put someone under anesthes[ia]," *id.* at 96:21–23, and that "nitrogen is ***not*** an anesthetic gas." *Id.* at 96:18–20 (emphases added).

132. Similarly, that Dr. Antognini has testified as an expert in other cases challenging nitrogen asphyxiation is not a sufficient basis to credit his testimony here. Those cases were decided in a preliminary injunction setting, and none involved *Daubert* challenges. *See, e.g.*, *Frazier v. Hamm*, 2025 WL 361172, at *1 (M.D. Ala. Jan. 31, 2025); *Grayson v. Hamm*, 2024 WL 4701875, at *1 (M.D. Ala. Nov. 6, 2024). This Court has an obligation to assess whether Dr. Antognini's opinions meet *Daubert*'s requirements based on the specific record developed in ***this*** case. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999) ("[T]he question before the trial court was specific, not general. The trial court had to decide whether this particular expert had sufficient specialized knowledge to assist the jurors 'in deciding the particular issues in the case.'" (citation omitted)).

133. Because he lacks the requisite qualifications, Dr. Antognini's opinions about the effects of oxygen deprivation—including the time to loss of consciousness, the time to death, and the pain and suffering it causes—must be excluded. *See, e.g.*,

*Chikovsky v. Ortho Pharm. Corp.*, 832 F. Supp. 341, 344–46 (S.D. Fla. 1993) (OB-GYN not qualified to link the drug to birth defects, because he had no expertise in embryology, teratology, or genetics).

      **iii.    Defendants Have Waived Argument Regarding the Reliability of Dr. Antognini's Opinions on Nitrogen Asphyxiation**

134.   In their Opposition to the *Daubert* motion, Defendants failed to respond to Lee's argument that Dr. Antognini's nitrogen asphyxiation opinions are not reliable. They have therefore waived the argument and Lee's motion is due to be granted. *See, e.g.*, *United States v. Ardley*, 242 F.3d 989, 990 (11th Cir. 2001) ("[I]ssues and contentions not timely raised in the briefs are deemed abandoned."); *Jones v. Bank of Am., N.A.*, 564 F. App'x 432, 434 (11th Cir. 2014) (entering summary judgment for defendant on claims to which plaintiffs failed to respond).[20]

135.   Nor did Defendants present evidence at trial that Dr. Antognini's opinions have broader support in the medical community. At the pretrial conference, Defendants argued that two exhibits—statements by Dr. Philip Nitschke in a prior deposition and in a 2023 Twitter post—should not be excluded because they show

---

[20] *See also, e.g.*, *Katzoff v. NCL Bahamas, Ltd.*, 2021 WL 1525517, at *9 (S.D. Fla. Apr. 19, 2021) (finding plaintiff abandoned challenges to her expert's opinions by not responding to defendant's *Daubert* arguments), *rep. & rec. adopted*, 2021 WL 2953182 (S.D. Fla. July 14, 2021); *Stratemeyer v. Northstar Constr. Mgmt. Co., Inc.*, 2024 WL 1637331, at *5 (S.D. Fla. Apr. 16, 2024) (excluding plaintiff's proffered expert on topics where "Plaintiff's Response [was] wholly silent as to why . . . [the expert] should be permitted to testify").

that "Dr. Antognini is not, as [Lee has] alleged in [his] Daubert motion, the only . . . member of the scientific community to have taken this position."  4/23/2026 Tr. at 34:2–5 [B. Thompson]; *see also* D58 [Nitschke deposition in *Smith*]; D59 [Nitschke Twitter post].  Although the Court permitted Defendants to proffer the evidence for that limited purposes, they did not do so at trial.  Nor did Defendants ask for leave to file a belated sur-reply to Lee's motion.  The Court, accordingly, declines to consider Dr. Nitschke's prior statements now.

136.   Even if this Court were to consider them, it is unclear how they support Dr. Antognini's opinions on nitrogen asphyxiation.  First, Dr. Nitschke was an expert for ***the plaintiff-inmate*** in the *Smith* litigation, meaning he ***opposed*** Dr. Antognini's opinions related to the use of nitrogen gas for executions.  *See generally* D58 [Nitschke deposition].

137.   Second, the prior statements—deposition testimony and a Twitter post—are not peer-reviewed medical or scientific articles.

138.   Third, Dr. Nitschke's published his Twitter post ***before*** learning the details of ADOC's nitrogen asphyxiation protocol.  *See* D58 at 53–54:15 [Nitschke deposition].  The post therefore can hardly be read as endorsing ADOC's method of execution or Dr. Antognini's opinions.

139.   Finally, Dr. Nitschke is no longer a licensed doctor.  The medical board in Australia suspended his medical license.  D58 at 11:21–23 [Nitschke deposition].

When the board granted Dr. Nitschke permission to practice again, they placed restrictions on his practice. *Id.* at 12:1–6. Dr. Nitschke did not accept those restrictions and "famously burned [his] medical license." *Id.* at 12:7–18, 13:1–13.

140. Dr. Nitschke's prior testimony and Twitter post simply do not establish "general acceptance" in the medical community for Dr. Antognini's opinions. *See Daubert*, 509 U.S. at 594 ("Widespread acceptance can be an important factor in ruling particular evidence admissible.").

### iv. Dr. Antognini's Opinions on Nitrogen Asphyxiation Are Not Reliable and Must Be Excluded

141. Out of an abundance of caution, the Court nevertheless will proceed to evaluate the reliability of Dr. Antognini's opinions on nitrogen asphyxiation. Those opinions are not reliable and should be excluded.

142. Under *Daubert*, "scientific testimony does not assist the trier of fact unless the testimony has a justified scientific relationship to the pertinent facts." *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004). There is "no fit where a large analytical leap must be made between the facts and the opinion." *Id.* (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

143. While opinions "based on extrapolation [are] allowed, there must be some basis for that extrapolation." *Arthur v. Comm'r, Ala. Dep't of Corr.*, 840 F.3d 1268, 1312 (11th Cir. 2016). The key inquiry is whether the expert has explained *how* the data supports his conclusion and whether he has ***accounted for the factors***

that allow him to make such an extrapolation. *See In re Zantac (Ranitidine) Prods. Liab. Litig.*, 644 F. Supp. 3d 1075, 1187–88 (S.D. Fla. 2022).

144. At trial, Dr. Antognini provided no basis to reliably extrapolate the case reports and small studies to the execution context. *See, e.g.*, *In re Zantac*, 644 F. Supp. 3d at 1179–81 (excluding experts who failed to adequately explain how they could extrapolate from *in vitro* studies on ranitidine to their conclusions about how the drug would interact *in vivo*); *Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1202 (11th Cir. 2002) (finding no basis for "extrapolat[ing] the results of animal studies to humans").

145. <u>Workplace accidents</u>. The white paper on which Dr. Antognini relies is not a peer-reviewed article in the medical literature, and it examined oxygen deficiency hazards associated with liquified gas systems, not nitrogen gas. D0018 [Miller & Mazur, 1983]; *see also* 4/29/2026 Tr. at 111:6–11 [J. Antognini] (noting that the paper concerned, in part liquid nitrogen). In the OSHA case reports, the workers were found dead after accidentally being exposed to nitrogen gas. Dr. Antognini concedes that, "because [these events] were unobserved, we don't know what exactly happened." 4/29/2026 Tr. at 77:16–18 [J. Antognini]. He agrees that "there's no way you can tell" when the workers became unconscious, *id.* at 77:19–22, whether they "tried to pull off their masks," *id.* at 78:1–3, or "whether [they] suffered in any way." *Id.* at 78:4–6. And he conceded that in his practice as an

anesthesiologist, he has ***never*** relied on OSHA case reports for developing opinions or diagnosing patients. *Id.* at 75:6–76:14.

146. <u>Suicide case reports</u>. As Dr. Antognini recognizes, many of the subjects in these suicide case reports had "severe underlying medical problems," which he agrees could result in "a different physiological response to hypoxia." 4/29/2026 Tr. at 79:22–80:4 [J. Antognini]. He concedes that the subjects in the case reports were voluntarily ending their lives, which differs from the context of executions. *Id.* at 79:16–18. And he admits that, unlike inmates being executed by nitrogen asphyxiation, the suicide subjects practiced fully exhaling and then fully inhaling the nitrogen gas. *Id.* at 79:6–21.

147. <u>Pilot studies</u>. These small studies measured how quickly pilots lost consciousness at high altitudes, where—as Dr. Antognini concedes—low barometric pressures accelerate the hypoxia process. 4/29/2026 Tr. at 81:14–19 [J. Antognini]. Indeed, the study authors themselves noted that the conditions at high altitude are "entirely different from those produced . . . by interruption of oxygen supply ***without*** change in ambient pressure." D16 at 117 [Luft et al., 1951] (emphasis added). Dr. Antognini acknowledged that Holman Correctional Facility is "not high altitude," *see* 4/29/2026 Tr. at 81:20–82:1 [J. Antognini], yet made no attempt to account for that fact. And he conceded that none of these studies measured dyspnea in any of the subjects. *Id.* at 81:11–13.

148. <u>Ernsting study</u>. In this 1963 study, three healthy volunteers aged 33 to 38 were instructed to fully exhale and then hyperventilate nitrogen gas. D17 at 292 [Ernsting, 1963]. These directives contributed to the rapid loss of consciousness. *Id.* at 301. By comparison, as Dr. Antognini recognizes, inmates in the execution context are "not given any instructions, in terms of inhaling or exhaling." 4/29/2026 Tr. at 79:10–15 [J. Antognini].

149. What is more, where "no independent scientist . . . has made the analytical leap from the existing data as [the proffered expert]," this is "evidence of an unreliable methodology." *In re Zantac*, 644 F. Supp. 3d at 1234; *Daubert*, 509 U.S. at 594 ("Widespread acceptance can be an important factor in ruling particular evidence admissible."). Dr. Antognini's opinions here ***are contrary to every*** peer-reviewed publication that directly addresses nitrogen asphyxiation as a method of execution. *See* P0045 [Bailey et al., 2025]; P0046 [Bailey et al., 2025]; P0052 [Bickler & Lipnick, 2024]; P0065 [Macefield, 2024]; P0075 [Poole et al., 2024]; P0084 [Singh et al., 2025].

150. In short, Dr. Antognini's opinion that execution by nitrogen asphyxiation will be quick and painless lacks the essential hallmarks of reliability and must be excluded.

**B.    Execution by Nitrogen Asphyxiation Violates the Eighth Amendment**

**i.    Legal Standard**

151. A plaintiff bringing a facial challenge must show "no set of circumstances" under which the act would be valid. *United States v. Rahimi*, 602 U.S. 680, 693 (2024). But in evaluating a facial challenge, the Supreme Court has also instructed that courts must not "speculate about hypotheticals or imaginary cases." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008) (citation and quotation omitted); *see also Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1256 (11th Cir. 2022) (rejecting the suggestion that a defendant can survive a facial challenge by "conjur[ing] up just one hypothetical factual scenario in which implementation of the state law" is valid (citation omitted)). Nor is a plaintiff required to "disprove every possible hypothetical situation in which the [policy] might be validly applied." *Doe v. City of Albuquerque*, 667 F.3d 1111, 1122 (10th Cir. 2012).

152. The Eleventh Circuit has explained that, correctly understood, the no-set-of-circumstances is "not a separate test" at all, but rather "a description of the outcome of a facial challenge in which a statute fails to satisfy the appropriate constitutional framework." *Club Madonna Inc.*, 42 F.4th at 1256 (citation omitted).

153. A plaintiff challenging a method of execution under the Eighth Amendment bears two burdens. First, a plaintiff must show that the challenged

method presents a substantial risk that is "very likely to cause serious illness and needless suffering" that "gives rise to sufficiently imminent dangers." *Grayson v. Comm'r, Ala. Dep't of Corr.*, 121 F.4th 894, 897 (11th Cir. 2024), *cert. denied sub nom. Grayson v. Hamm*, 145 S. Ct. 586 (2024) (mem.) (emphases and citation omitted); *Price v. Comm'r, Dep't of Corr.*, 920 F.3d 1317, 1325–26 (11th Cir. 2019); *see also In re Kemmler*, 136 U.S. 436, 447 (1890) ("Punishments are cruel when they involve torture or a lingering death."); *Baze*, 553 U.S. at 49 (same).

154. Second, the plaintiff must show that "a feasible and readily implemented alternative method of execution [exists] that would significantly reduce a substantial risk of severe pain and that the State has refused to adopt [the proposed alternative] without a legitimate penological reason." *Bucklew*, 587 U.S. at 134.

### ii. Excluding Dr. Antognini Leaves Lee's Eighth Amendment Challenge Unrebutted

155. Without the opinions of Dr. Antognini, Lee's evidence about the substantial and profoundly distressing risk of air hunger that nitrogen asphyxiation causes is unrebutted. *See supra* ¶¶ 32–47, 49–59.

156. As explained below, *infra* ¶¶ 167, 171, the Court also concludes that Lee's proposed alternative—execution by firing squad—is feasible and can be readily implemented. Nor do Defendants have a legitimate penological interest in refusing Lee's proposed alternative. *Infra* ¶ 174.

157. Accordingly, this Court concludes that execution by nitrogen asphyxiation, as adopted by ADOC, violates the Eighth Amendment's prohibition on cruel and unusual punishment.

### iii. Nitrogen Asphyxiation Creates a Substantial Risk of Prolonged Suffering

158. But even if the Court were to consider the opinions of Dr. Antognini, it would reach the same result.

159. At trial, Lee presented evidence showing a substantial risk that an inmate facing execution by nitrogen asphyxiation will suffer the suffocating sensation of air hunger. Dr. Schwartzstein and Dr. Bastarache explained that air hunger is profoundly distressing and causes suffering. *See supra* ¶¶ 33–37. They explained that hypoxia can cause air hunger. *See supra* ¶¶ 38–43. Dr. Bastarache also explained that the pulmonary edema findings on the autopsies of the inmates executed by nitrogen asphyxiation is consistent with intense suffering. *See supra* ¶ 59. Thus, Dr. Schwartzstein and Dr. Bastarache opined to a reasonable degree of medical certainty that an inmate executed by nitrogen asphyxiation will very likely experience extreme suffering. *See supra* ¶¶ 32, 57–59.

160. Dr. Antognini largely agreed. He agreed that the suffocating sensation of air hunger is "among the most distressing experiences that human beings can endure," P0055 at 1 [Demoule et al., 2024], and can be "far worse than pain." *Id.* at 2; *see supra* ¶ 82. He agreed that ADOC's protocol induces hypoxia and that severe

hypoxia can cause air hunger. *See supra* ¶ 83; *see also* 4/29/2026 Tr. at 74:23–75:1 (agreeing that "nitrogen hypoxia falls under this definition of suffocation"). Indeed, he testified that inmates executed by nitrogen gas would experience air hunger under the protocol. *See supra* ¶ 83.

161. Dr. Antognini nevertheless claimed that the air hunger induced by the protocol would be "mild." 4/29/2026 Tr. at 28:16–22 [J. Antognini]; *see also id*. at 70:20–71:6. He provided no basis for this opinion, and this Court affords it little weight. Far from being "mild," the medical literature repeatedly describes air hunger as "***the most distressing*** form of dyspnea." P0090 at 749 [Worsham et al., 2020] (emphasis added); P0089 at 926 [Worsham et al., 2020] (describing air hunger as "***the most uncomfortable*** form of dyspnea" (emphasis added)); P0056 at 922–23 [Demoule et al., 2022] ("Air hunger is known to be ***the most disturbing*** sensation of dyspnea." (emphasis added)); P0055 at 6 [Demoule et al., 2024] (describing air hunger as "one of the ***strongest and most unpleasant*** forms of dyspnea" (emphasis added))

162. Dr. Schwartzstein, moreover, testified that the inmate feels the suffocating sensation of air hunger ***in addition to*** the anxiety and fear that accompanies any execution. He explained:

> We all have anticipatory anxiety of something challenging ahead of us, something bad might happen. We have that kind of anxiety. The anxiety we talk about in the multidisciplinary dyspnea profile [related

> to air hunger] *is different*. It's anxiety evoked by the underlying problem, the shortness of breath, the air hunger that they have.
>
> And I know that this is different because if you're anxious about something you're going to do tomorrow, I can give you benzodiazepines, Valium type drugs, Ativan. That reduces anxiety that we all sort of experience in anticipating something bad. Benzodiazepines have been studied extensively as treatment for dyspnea. They do not work.

4/27/2026 Tr. at 56:22–57:8 [R. Schwartzstein] (emphasis added); *see also* P0089 at 927 [Worsham et al., 2020] ("Evidence shows that benzodiazepines are not effective for dyspnea."). Defendants failed to present any admissible evidence to the contrary. *See* 4/29/2026 Tr. at 103:15–105:10 (striking Dr. Antognini's opinion that the emotions an inmate would experience when being executed by nitrogen asphyxiation are the same emotions that an inmate would experience when being executed by firing squad).

163. The experts disagreed, however, on how long an inmate is likely to suffer air hunger. This Court credits the time estimates of Dr. Bastarache: that an inmate executed by nitrogen gas will likely remain conscious for 3 to 7 minutes. She methodically went through the eyewitness observations of the prior nitrogen asphyxiation executions to identify purposeful (and therefore conscious) inmate movements. *See supra* ¶ 57.

164. Dr. Antognini estimated that an inmate could experience air hunger for 10 to 20 seconds. *See supra* ¶ 82. But he cited nothing in support of these numbers,

and he made no attempt to rebut Dr. Bastarache's opinion that the inmates in the prior executions were consciously suffering for 3 to 7 minutes.  In fact, he testified that he could not say to a reasonable degree of medical certainty when the inmates lost consciousness, whether certain movements were voluntary, or whether the inmates suffered.  *See supra* ¶ 84.

165.   Dr. Schwartzstein then explained that there is a substantial risk that the inmate will continue to feel the profoundly distressing sensation of air hunger for 3 to 5 minutes after losing apparent consciousness.  *See supra* ¶¶ 44–47 (describing a period of minimal consciousness).   Defendants did not present any evidence otherwise.  *See* 4/29/2026 Tr. at 29:24–30:24 (declining to proceed with the line of questioning, because it would constitute an undisclosed expert opinion).

166.  Considering Dr. Bastarache's and Dr. Schwartzstein's opinions together, inmates facing nitrogen asphyxiation are very likely to suffer for between 6 to 12 minutes.  Minutes of air hunger—one of the most distressing experiences that humans can endure—amounts to cruel and unusual punishment.  *See, e.g.,* *Fierro v. Gomez*, 865 F. Supp. 1387, 1404 (N.D. Cal. 1994) (California's use of the gas chamber as a method of execution—which resulted in minutes of air hunger— violated the Eighth Amendment), *aff'd* 77 F.3d 301 (9th Cir. 1996), *vacated*, 519 U.S. 918 (1996) (vacating judgment in light of legislative amendment adopting lethal injection over lethal gas); *see also Gray v. Lucas*, 463 U.S. 1237, 1245 (1983)

(Marshall, J., dissenting) ("A death that . . . involves extreme pain over a span of 10 to 12 minutes surely must be characterized as 'lingering.'" (citation omitted)).[21]

### C. A Feasible and Readily Implemented Alternative Exists

167. Execution by firing squad directed at the cardiac bundle is a feasible alternative, can be readily implemented, and has a substantially lower risk of pain and suffering than execution by nitrogen asphyxiation. Defendants have no legitimate penological interest in refusing Lee's proposed method of execution. *See In re Fed. Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106, 118 (D.C. Cir. 2020) (Katsas, J., concurring) ("[T]he [Supreme] Court never retreated from its holdings that the firing squad . . . [is a] constitutional method[] of execution.").

168. ***First***, the evidence at trial established that execution by firing squad is very likely to result in rapid loss of consciousness and death, eliminating any experience of pain or suffering. *See supra* ¶¶ 63–72. Based on his review of the medical literature and his extensive knowledge about firearms, Dr. Williams testified that multiple gunshot wounds to the cardiac bundle by high-caliber rifles would

---

[21] *Cf. Vasquez v. Berks Cnty.*, 279 A.3d 59, 84, 87 (Pa. Commw. Ct. 2022) (allegations that placing a hood with pepper spray over an inmate's head and "forcing him to remain[] in that position suffocating for several minutes" were sufficient to state a claim of excessive force under the Eighth Amendment (quotation marks omitted)).

render an inmate "deeply" unconscious in 3 to 5 seconds.  *See supra* ¶¶ 63–66.

Defendants did not provide any admissible expert opinion to counter this point.[22]

169.   Dr. Williams also explained that the inmate is not likely to feel pain during these 3 to 5 seconds.   Because of both a delay in neural processing and the phenomenon of neural stunning, the brain will not be able to process pain associated with the gunshot wounds before the inmate loses consciousness.  *See supra* ¶¶ 67–72.  Dr. Antognini made no effort to rebut this opinion.

170.   But even if Dr. Antognini had opined that an inmate being executed by firing squad can feel pain for the first 3 to 5 seconds, Dr. Antognini also testified that an inmate being executed by nitrogen asphyxiation would suffer air hunger for 10 to 20 seconds and that the sensation of air hunger is "far worse than pain."  *See supra* ¶¶ 82–83.

171.   ***Second***, former Commissioner Hamm and Deputy Commissioner Williams candidly admit that if the Legislature authorizes firing squad, ADOC could

---

[22] The Court is skeptical that Dr. Antognini is qualified to provide expert opinions related to executions by firing squad.  He does not have experience with firearms and has never published in this area.  *See* 4/29/2026 Tr. at 99:13–100:2 ("Q.  [Y]ou don't consider yourself an expert in firearm usage; correct?  A.  That is correct.  Q. And you aren't an expert in ballistics; correct?  A.  That is correct.").  His experience treating gunshot wounds is "in his capacity as an anesthesiologist."  *Id*. at 100:3–8. He has never treated a gunshot victim in the first minutes after being shot, and has never talked to gunshot victims "about the pain they felt or didn't feel in the first minute after they were shot."  *Id.* at 100:9–15.

carry it out. *See supra* ¶ 102. ADOC has or could obtain the equipment needed for execution by firing squad, including the rifles and ammunition, *see id.*, and could train a team to carry out an execution by firing squad, *id*.

172. That Warden McKenzie and Warden Clemons believe that an execution by firing squad cannot be carried out in the current execution chamber does not defeat Lee's claim. The evidence demonstrated that ADOC could construct an execution chamber to accommodate a firing squad. *See supra* ¶ 102; *see Boyd*, 2025 WL 2884410, at *22 (firing squad is feasible and readily available).

173. Defendants' suggestion at trial that it would take time for the Legislature to authorize and time for ADOC to implement an execution by firing squad does not defeat Lee's constitutional claim either. The Supreme Court's decision in *Nance* is instructive. There, the death row inmate proposed execution by firing squad (which was not authorized in Georgia) as an alternative to lethal injection. *Nance*, 597 U.S. at 165–66. The Supreme Court held that an inmate is "not confined to proposing a method authorized by the executing State's law; he may instead ask for a method used in other States." *Id.* at 162. The Court went on to explain: "To be sure, amending a statute may require some more time and effort . . . . [But] Georgia has given us no reason to think that the amendment process would be a substantial impediment. The State has legislated changes to its execution

70

method several times before.  Other States have regularly done the same." *Id.* at 170.  The same is true here with Alabama.

174.  ***Third***, Defendants have no legitimate penological reason to refuse Lee's proposed alternative. The novelty of a proposed method is a paradigmatic legitimate penological reason, but only where the method is genuinely "untried and untested."  *Bucklew*, 587 U.S. at 121 (citations omitted); *Johnson v. Precythe*, 954 F.3d 1098, 1102 (8th Cir. 2020).  Firing squad is a "traditionally accepted method[] of execution" that the Supreme Court itself has recognized as outside the category of novel or untested methods.  *Bucklew*, 587 U.S. at 134; *see also Hoffman v. Westcott*, 131 F.4th 332, 336 (5th Cir. 2025).

## IV.   PRIOR RULINGS ON NITROGEN ASPHYXIATION ARE NOT PERSUASIVE

175.  This Court is not bound by prior decisions rejecting challenges to ADOC's use of nitrogen asphyxiation as a method of execution.  None of those cases proceeded through a bench trial; they were preliminary rulings based on a tightly constrained record and limited discovery.

176.  The evidence from this trial also differed from what was presented in the prior proceedings.  There is now evidence from additional Alabama nitrogen executions, which showed suffering and inmate consciousness for far longer than ADOC contends, *see supra* ¶¶ 57–59, 122–127, and a consensus in the medical literature that this execution method causes profound suffering.  *See supra* ¶¶ 149.

71

177. Perhaps more significantly, Lee presented testimony from experts who have not previously opined in these challenges to execution by nitrogen asphyxiation. Lee's new experts include doctors who see and treat dyspnea and air hunger on a regular basis. Dr. Schwartzstein persuasively explained the emotional and physiological sensations that air hunger causes and the circumstances under which it occurs. Dr. Bastarache reviewed the eyewitness accounts of the prior executions from the lens of a doctor who routinely translates lay observations into medical judgment.

178. Dr. Antognini offered concessions that were not part of the record in previous cases, including that (1) dyspnea can cause suffering that is worse than pain; (2) hypoxia alone can cause air hunger; (3) inmates executed by nitrogen asphyxiation can experience air hunger; and (4) the studies and case reports on which he relies differ from the nitrogen asphyxiation setting. Dr. Antognini could not say, to a reasonable degree of medical certainty, whether any inmate has felt pain during execution by nitrogen asphyxiation.

179. Based on the evidence presented in *this* case, this Court concludes that ADOC's nitrogen asphyxiation method of execution violates the Eighth Amendment's prohibition on cruel and unusual punishment.

**<u>ORDER</u>**

For the reasons set forth above, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that judgment be entered in favor of Plaintiff Jeffery Lee, declaring that the Alabama Department of Corrections' method of executing inmates by nitrogen asphyxiation is unconstitutional under the Eighth Amendment.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendants John Hamm and Terry Raybon are enjoined from executing Lee under the August 2023 Execution Protocol for "Nitrogen Hypoxia."

# CERTIFICATE OF SERVICE

I hereby certify that the foregoing was filed, via the CM/ECF system, on May 4, 2026, which will cause Defendants' counsel to receive an electronic copy.

Lauren Simpson
Polly Kenny
Brenton Thompson
Talmadge Butts
Office of the Attorney General
Capital Litigation Division
501 Washington Avenue
Montgomery, AL 36130

*/s/ Angelique A. Ciliberti*
Angelique A. Ciliberti