IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JEFFERY LEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:25-cv-680-ECM |
| | ) | [WO] |
| GREG LOVELACE, Commissioner, | ) | |
| Alabama Department of Corrections, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION and ORDER**

In this method of execution case, Plaintiff Jeffery Lee ("Lee") challenges the Alabama Department of Corrections' nitrogen hypoxia protocol (the "Protocol"). (*See* doc. 40).  Prior to trial, Lee moved to exclude the State's expert, Dr. Joseph F. Antognini ("Dr. Antognini"). (Doc. 103).  He argues that Dr. Antognini is not qualified to opine on the pain and suffering purportedly caused by the Protocol or how long it takes for inmates to lose consciousness and die, and that, in any event, his opinions are unreliable. (*Id.* at 12–17). The State opposes Lee's motion. (Doc. 124).  The Court held the motion in abeyance (doc. 142 at 1) and conditionally permitted Dr. Antognini to testify at the bench trial subject to the Court's ultimate ruling on the motion to exclude him. *See United States v. Brown*, 415 F.3d 1257, 1263, 1269–70 (11th Cir. 2005) (discerning no error where the district court reserved ruling on a motion to exclude and determined that, "because it was a bench trial[,] the court would hear all the testimony . . . and determine later whether it should be treated as expert testimony").

Having carefully reviewed the parties' briefing, and having considered Dr. Antognini's testimony, the Court concludes that Dr. Antognini is qualified to discuss the effects of hypoxia, or low oxygen, on the human body and that his opinions are generally admissible. Accordingly, Lee's motion (doc. 103) is due to be denied.

## I. BACKGROUND

The issue in this case is whether the Protocol is unconstitutionally cruel and unusual. Lee claims it is. He argues that the "forced inhalation of nitrogen gas—and the corresponding deprivation of oxygen—causes the condemned prisoner to feel the excruciating and painful sensation of being suffocated to death." (Doc. 40 at 6, para. 23). The State disagrees. It argues that, under the Protocol, the condemned inmate will quickly lose consciousness and that, "[i]f . . . Lee experiences dyspnea[1] during his last moments of consciousness, it will be for only a brief period." (Doc. 148 at 27 (emphasis in original)). So, the central questions are how much, if any, pain does the Protocol cause, and for how long is the condemned inmate conscious to experience that pain? Because these are difficult, technical questions, each of the parties hired experts to defend their positions. The State's is Dr. Antognini.

Dr. Antognini is a medical doctor and board-certified anesthesiologist with significant clinical experience. (Doc. 173-141 at 1, 34–35; *see* doc. 147 at 227:2–5, 229:15–22). His subspecialty is in "neuroanesthesia," which he described as "the practice of anesthesia applied to patients who are having neurological surgery of some sort." (Doc.

---

[1] Dyspnea means breathing difficulty or breathing discomfort. (*See* doc. 146 at 8:12–14).

147 at 227:6–12). He has published extensively, and his research centers "on anesthetic mechanisms, specifically related to where anesthetics produce unconsciousness, amnesia[,] and immobility." (Doc. 173-141 at 2). He has also held multiple teaching positions over the course of his career and was a tenured professor of both anesthesiology and pain medicine as well as neurobiology, physiology, and behavior at the University of California, Davis. (*Id.* at 34–35). Dr. Antognini credibly testified that his field requires extensive knowledge of medicine and a deep understanding of physiology (from respiratory and cardiovascular physiology to neurophysiology) and anatomy (especially neuro- and respiratory anatomy). (Doc. 147 at 227:15–21, 231:16–23). Because he encountered patients with significant heart and lung complications, he required an intimate knowledge of the cardiovascular and respiratory systems in order to understand how the drugs he used to anesthetize them would interact with those complications. (*Id.* at 231:24–232:24).

In preparing his opinions in this case, Dr. Antognini consulted several sources, including reports of suicides and work-related deaths involving nitrogen and other inert gases, like helium. (Doc. 173-141 at 6–8). The reports of suicides (documented in Harding & Wolf, 2008; Ogden 2010; and Ogden et al., 2010) involved subjects breathing inert gas through a pre-filled bag or mask. (*See* docs. 173-165, 173-166, 173-167). Some of the subjects were instructed to exhale deeply before inhaling the inert gas, with the explanation that doing so would accelerate the dying process. (*See* doc. 173-167 at 3). The reported time to loss of consciousness in these cases was on the order of seconds—from ten seconds (with a pre-filled bag) to fifty-five seconds (using an ill-fitting mask). (*See* doc. 173-166 at 4–5; doc. 173-167 at 1, 4 ("There was wide variation in the time to unconsciousness and

the time to death, probably due to the poor mask fit.")).  Though the industrial accident reports likewise indicate that consciousness was lost in a matter of seconds, Dr. Antognini acknowledged that these deaths were unobserved. (*See* doc. 149 at 58:23–59:4, 77:16–22).

Dr. Antognini also considered other materials.  In one study (Ernsting, 1963), three young, healthy men were instructed to fully exhale (emptying their lungs of oxygen) and then to hyperventilate pure nitrogen. (Doc. 173-132 at 1–2).  The three subjects reportedly lost consciousness in seventeen to twenty seconds. (*Id.* at 4).  Another study (Luft et al., 1951) involved observations of pilots subjected to hypoxic conditions at high altitudes who quickly lost consciousness. (Doc. 173-161).  Dr. Antognini also extrapolates from animal studies, including one that indicates dogs euthanized with nitrogen gas lost consciousness in forty seconds on average. (Doc. 173-141 at 8–9).

At the bench trial, Dr. Antognini conceded that all these materials were, to some extent, distinguishable from an execution setting.  For example, he conceded that condemned inmates are provided with no instructions on how to breathe once the Protocol begins. (Doc. 149 at 79:13–15).  He also acknowledged that executions are not voluntary, unlike suicides and research studies. (*Id.* at 79:16–18).  And he admitted that most of the studies on which he relied involved "small numbers of individuals" and that "barometric pressure directly affects hypoxia" because "oxygen saturation in the blood will decrease at higher altitude." (*Id.* at 80:11–16, 81:14–19).  Nevertheless, he maintained his opinion. (*See, e.g., id.* at 61:14–19 ("I think that[,] especially the way that the [Protocol] is set up . . . , it is such a rapid decline in the oxygen concentration[] that any distress or suffering

or whatever you might want to call it is going to be very, very brief if at all present because of the rapid onset of unconsciousness.")).

## II.  LEGAL STANDARD

Under Federal Rule of Evidence 702, "[t]he court serves as a gatekeeper, charged with screening out experts whose methods are untrustworthy or whose expertise is irrelevant to the issue at hand." *Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1250 (11th Cir. 2007).  Rule 702 permits a witness "who is qualified as an expert by knowledge, skill, experience, training, or education" to "testify in the form of an opinion or otherwise if the proponent demonstrates to the court" that certain conditions are met.  A determination of admissibility under Rule 702 requires the party offering an expert to demonstrate by a preponderance of the evidence that (1) "the expert is qualified to testify competently regarding the matters he intends to address," (2) "the methodology by which [he] reaches his conclusions is sufficiently reliable" under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and (3) "the testimony assists the trier of fact . . . to understand the evidence or to determine a fact in issue." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)).

All the same, the *Daubert* Court did not "set out a definitive checklist or test" and expressly "emphasize[d]" that the Rule 702 inquiry is "a flexible one." 509 U.S. at 593–94.  And the "traditional barriers to opinion testimony" are "relaxed in a bench trial situation, where the judge is serving as factfinder." *Brown*, 415 F.3d at 1268 (quoting

*Daubert*, 509 U.S. at 588); *see also id.* at 1269 ("There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself.").

### III. DISCUSSION

Lee's argument that Dr. Antognini is unqualified to opine on the effects of hypoxia proceeds from the axiom that a white coat does not confer broad expertise in all medical matters. (Doc. 103 at 13 ("That Dr. Antognini is an anesthesiologist does not qualify him to opine on all areas of medicine." (citing *Easter v. UNUM Life Ins. Co. of Am.*, 2024 WL 3755805, at *3 (M.D. Fla. Aug. 12, 2024)))). The Court accepts that axiom. *See Lebron v. Sec'y of Fla. Dep't of Child. & Fams.*, 772 F.3d 1352, 1368–69 (11th Cir. 2014) ("Expertise in one field does not qualify a witness to testify about others." (citations omitted)). But expertise is not exclusively conferred by degrees or specializations in particular specialties or subspecialties, either. *See Frazier*, 387 F.3d at 1260–61 ("[E]xperts may be qualified in various ways. While scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status.").

Lee argues that this case, which "concerns respiratory physiology" and "the effects on the body of forced inhalation of nitrogen gas," falls outside Dr. Antognini's expertise because he is an anesthesiologist and because he conceded in his deposition that this case does not involve the administration of anesthesia agents and that nitrogen is not an anesthetic gas. (Doc. 103 at 12–13). Lee submits that, because Dr. Antognini is "not a pulmonologist" and lacks "specialized training in hypoxia, hypoxemia, dyspnea, or air hunger," he is not qualified to opine on "the effects of oxygen deprivation." (*Id.*).

6

But the test as to an expert's qualifications "is not stringent." *Hendrix v. Evenflo Co.*, 255 F.R.D. 568, 578 (N.D. Fla. 2009) (citing *Leathers v. Pfizer, Inc.*, 233 F.R.D. 687, 692 (N.D. Ga. 2006)).[2] Dr. Antognini is not a pulmonologist, but he is an anesthesiologist, and he testified at length about the diverse areas of medicine that specialization requires knowledge of, including respiratory physiology. (*See* doc. 147 at 227:13–21, 230:6–231:2; 235:1–241:2; *see also id.* at 233:24–234:25 (Dr. Antognini's testimony that, in the operating room, anesthesiologists must manage most patients' respiratory and cardiovascular functions)).  The breadth of his training is demonstrated by the fact that Dr. Antognini has more than a decade's experience as a professor not just of anesthesiology, but also of pain medicine, neurobiology, and physiology (including cardiovascular, respiratory, and renal physiology). (*Id.* at 249:17–22; doc. 103-1 at 35–36).  Accordingly, the Court disagrees with Lee's position that there is a fundamental mismatch between Dr. Antognini's training and the effects of nitrogen hypoxia generally.  As an experienced anesthesiologist, Dr. Antognini has sufficient foundational knowledge of the relevant medical subject matter involved in this case. *See United States v. Viglia*, 549 F.2d 335, 337 (5th Cir. 1977) ("While Dr. Shirkey had no experience in treating patients for obesity, his knowledge, training, and education in the fields of medicine and pharmacology were a sufficient predicate on which the trial court might accept him as an expert." (citation

---

[2] Here, and elsewhere in this Opinion, the Court cites nonbinding authority.  While the Court acknowledges that these cases are nonprecedential, the Court finds them persuasive.

omitted));[3] *see also Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) ("[C]ourts often find that a physician in general practice is competent to testify about problems that a medical specialist typically treats." (citations omitted)); *Trilink Saw Chain, LLC v. Blount, Inc.*, 583 F. Supp. 2d 1293, 1304 (N.D. Ga. 2008) ("Rule 702 takes a liberal view of expert witness qualifications; thus, 'an expert's training does not always need to be narrowly tailored to match the exact point of dispute in a case.'" (quoting *McGee v. Evenflo Co.*, 2003 WL 23350439, at *3 (M.D. Ga. Dec. 11, 2003))); *Lappe v. Am. Honda Motor Co.*, 857 F. Supp. 222, 227 (N.D.N.Y. 1994) ("An expert must . . . stay within the reasonable confines of his subject area[] and cannot render expert opinion on an entirely different field or discipline." (citation omitted)).[4]

So even if Dr. Antognini's opinions regarding the effects of oxygen deprivation were limited to his general experience as an anesthesiologist, that alone would not furnish a basis for excluding him, especially in a bench trial. But his expertise is not so limited, since he also testified that his anesthesiology practice required an intimate understanding of hypoxia. (Doc. 147 at 243:24–245:7). He explained that, as an anesthesiologist who practiced prior to the advent of specialized equipment that measured hypoxia or hypercapnia (carbon dioxide buildup), he required a thorough knowledge of hypoxia and its symptoms to be able to detect and treat that condition if it manifested in his patients—

---

[3] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

[4] Indeed, in rendering her own opinion as to the time to unconsciousness under the Protocol, Dr. Julie Bastarache, Lee's expert, expressly relied on "fundamental physiology" she "learned in medical school, residency, [and during her] fellowship." (Doc. 146 at 137:3–9).

if, for example, an intubation tube was inadvertently run down a patient's esophagus. (*Id.* at 244:6–21). Indeed, because "pretty much all the drugs" he used as an anesthesiologist "depress the respiratory system," a thorough knowledge of the respiratory system and how it is "driven" by the "control centers" that detect imbalances among "carbon dioxide, oxygen, [and] acidosis" is critical. (*Id.* at 240:12–23).

To the extent there is a gap between Dr. Antognini's area of expertise and the subject matter at issue here, that gap goes to the weight of his testimony, not its admissibility. *See Trilink Saw Chain*, 583 F. Supp. 2d at 1304 (quoting *Leathers*, 233 F.R.D. at 692). But any gap (if there even is one) is not so large as to render Dr. Antognini unqualified. *Cf. Brown*, 415 F.3d at 1262–63, 1269 (affirming a district court that excluded an expert whose "academic work and professional experience related more to plant pathology and botany than to chemistry" where the central issue was whether two chemicals were "substantially similar"); *Wright v. Case Corp.*, 2006 WL 278384, at *3 (N.D. Ga. Feb. 1, 2006) (holding an engineering degree was insufficient to qualify an expert "[g]iven his lack of experience—or even familiarity—with the type of machine involved in [the] plaintiff's accident").

Lee also argues that Dr. Antognini's opinions are not reliable because the data he relies on "differ in significant respects from the execution context." (Doc. 103 at 14).[5]

---

[5] The State did not squarely address this argument in its response to Lee's *Daubert* motion. (*See* doc. 124). Lee argues that the State has therefore waived the issue by failing to properly address it. (Doc. 131 at 1–2). But the Court withheld ruling on the *Daubert* motion to permit Dr. Antognini to testify, (*see* doc. 142 at 1), and the State extensively questioned Dr. Antognini regarding his opinions and their bases at trial on direct examination, (*see* doc. 149 at 3:10–68:1). Accordingly, the Court concludes that the State did not waive this issue.

However, "in certain situations, opinions based on extrapolations from available data are permissible." *Arthur v. Comm'r, Ala. Dep't of Corr.*, 840 F.3d 1268, 1311–12 (11th Cir. 2016) (citing *Glossip v. Gross*, 576 U.S. 863, 883–84 (2015)), *abrogated in part by*, *Bucklew v. Precythe*, 587 U.S. 119 (2019), *as recognized in*, *Nance v. Comm'r, Ga. Dep't of Corr.*, 981 F.3d 1201 (2020). Extrapolation will generally be necessary in the execution context given how singular it is—clinicians and scientists rarely have the opportunity (or, frankly, the desire) to study the precise circumstances faced by condemned inmates in their final moments. *See Glossip*, 576 U.S. at 884 ("[B]ecause a 500-milligram dose [of midazolam] is never administered for a therapeutic purpose, extrapolation was reasonable."); *see also Bucklew*, 587 U.S. at 146–47 (discussing data extrapolated from animal studies). But still, "there must be some basis for th[e] extrapolation." *Arthur*, 840 F.3d at 1312. Data gleaned by extrapolation must be excluded if "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (citation omitted).

Lee takes issue with several of the studies on which Dr. Antognini relies: (1) the reports of workplace accidents, because they do not indicate whether the workers who perished "suffered in any way"; (2) the case reports of inert gas suicides, as many of the suicides had "severe underlying medical problems," which Dr. Antognini conceded at deposition could produce "a different physiological response to hypoxia"; (3) the high-altitude "pilot studies," since Dr. Antognini admitted that the difference in barometric pressure is material; (4) the Ernsting study, as the participants in that study, unlike condemned inmates, "were instructed to fully exhale and then hyperventilate nitrogen gas";

and (5) a fifty-year-old study on the euthanasia of dogs with nitrogen gas because it is outdated and the American Veterinary Medical Association now "recommends *against* the use of nitrogen as a method to euthanize dogs." (Doc. 103 at 14–15 (emphasis in original) (citations omitted)).[6]

These purported issues do not render Dr. Antognini's opinions wholly unreliable. To take the industrial-accident reports as an example, although it is unclear from those reports whether the workers who succumbed to nitrogen gas suffered, the reports do represent some of the very limited data that exist regarding involuntary inert gas asphyxiations. (*See* docs. 173-186, 173-187).  Likewise, although the literature on inert gas suicides and the studies on pilots are distinguishable—both involve willing participants, and the pilot studies were not conducted at sea level—they involve analysis of data on the central inquiry in this case:  how humans respond to hypoxic environments. (*See* docs. 173-165, 173-166, 173-167 (inert gas suicide reports); *see, e.g.*, doc. 173-161 (pilot study regarding "Latency of Hypoxia on Exposure to Altitude Above 50,000 Feet")).  To be sure, the studies on which Dr. Antognini relies are not perfect matches, but neither are many of the studies on which Lee's experts rely, which are generally taken from the clinical setting. (*Cf.* doc. 146 at 54:4–5 (Dr. Schwartzstein's testimony that "nobody has ever probably taken them [(test subjects)] down [to] that level [(of oxygen saturation)] in [a] study")).  It

---

[6] These were the objections Lee noted in his *Daubert* motion. (Doc. 103 at 14–15).  At trial, Lee raised additional objections to these studies, including the fact that Russell Ogden, who authored one of the inert gas suicide reports and co-authored another, "does not have any clinical training in medicine," and that the pilot studies only included a few participants who were specifically trained to resist the effects of hypoxia. (Doc. 149 at 78:11–17, 80:11–81:10).  The Court considered all of Lee's objections in ruling on his motion to exclude Dr. Antognini.

appears to the undersigned that the parties have attempted to amass the best available data but, given the circumstances with which they are confronted, those data are almost necessarily relevant only by extrapolation.

Ultimately, the issues Lee identifies with Dr. Antognini's studies go to the persuasiveness of his opinions, not their admissibility. *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1345 (11th Cir. 2003) ("[O]bjections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." (quoting *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002))); *see also id.* at 1346 ("[N]ormally, failure to include variables will affect the analysis' probativeness, not its admissibility." (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (Brennan, J., concurring in part))). The proper remedy for purported flaws in an expert's opinion is cross-examination—more information, not less. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). And indeed, that is just what Lee's counsel did at trial. (*See* doc. 149 at 75:2–85:23). The Court, as the factfinder in this case, has duly considered Dr. Antognini's credibility in light of Lee's *Daubert* challenge. But the proper remedy is to view Dr. Antognini's opinions as shaded by Lee, not to toss them out in gross; the bulk of Dr. Antognini's opinions are admissible. *See United States v. Barton*, 909 F.3d 1323, 1333 (11th Cir. 2018) ("[I]t would have gone beyond the gatekeeping function of the trial court to exclude [one expert]'s testimony on the basis of a credibility determination favoring [another]'s."); *Ambrosini v. Labarraque*, 101 F.3d

129, 141 (D.C. Cir. 1996) ("By attempting to evaluate the credibility of opposing experts and the persuasiveness of competing scientific studies, the district court conflated the questions of the admissibility of expert testimony and the weight appropriately to be accorded such testimony by a fact finder.").[7]

## IV.  CONCLUSION

For the reasons stated, and for good cause, it is

ORDERED that Lee's motion to exclude Dr. Antognini (doc. 103) is DENIED.

DONE this 28th day of May, 2026.

_____/s/ Emily C. Marks_____
EMILY C. MARKS
UNITED STATES DISTRICT JUDGE

---

[7] That said, some of Dr. Antognini's specific opinions were properly excluded at the bench trial. Dr. Antognini conceded on the stand that he had no support for his opinion that an inmate condemned to die by firing squad would be conscious for eight to ten seconds after being shot, nor for his opinion that the emotions experienced by an inmate during the Protocol are "the same emotions that the inmate would experience when being executed by any method of execution." (Doc. 149 at 102:3–17; 103:15–104:6). Lee orally moved to exclude those opinions, which the Court granted. (*Id.* at 102:18–103:14; 104:7–105:10).

13