# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | |
|---|---|
| JEFFERY LEE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 2:25-cv-00680-ECM |
| | ) |
| GREG LOVELACE, | ) |
| Commissioner, Alabama | ) |
| Department of Corrections, et al., | ) |
| | ) |
| | ) |
| Defendants. | ) |

## DEFENDANTS' OPPOSITION TO MOTION TO STAY EXECUTION AND TO ENTER JUDGEMENT

Steve Marshall
Attorney General of Alabama

Robert Overing
*Principal Deputy Solicitor General*

Lauren A. Simpson
*Deputy Attorney General*

Polly S. Kenny
Talmadge Butts
Brenton Thompson
*Assistant Attorneys General*

June 9, 2026                    Counsel for Defendants

The Court should deny Lee's motion for five reasons.

*First*, the Supreme Court has never invalidated an execution method, including lethal injection, cyanide gas, electrocution, firing squad, or hanging. *See* DE176:23-24 & n.24. That fact is dispositive, just as it was two weeks ago. *Id.* at 52-53. Those methods—whether they involved "several minutes" of "suffocation" (*id.* at 52) or "seven minutes of physical pain…and terror" (*id.* at 24 n.24)—were constitutional *even though the State could have used firing squad*. Both hanging and cyanide gas, for instance, were used in the 1990s, despite the fact that Utah had authorized the firing squad in 1852. The Court should maintain its prior conclusion because Lee still has not proven that the difference between nitrogen hypoxia and firing squad is any greater than the difference between the other constitutional methods and firing squad. If the Court believes on this record that nitrogen hypoxia is at worst "similar" to hanging, DE176:52, then firing squad cannot "significantly reduce a substantial risk of severe pain," *Bucklew v. Precythe*, 587 U.S. 119, 134 (2019), or else the Court would have to hold that hanging is unconstitutional, *contra id.* at 132.

*Second*, at a more granular level, the Court should reach the same conclusion that it did in *Boyd*: While "the firing squad *may* reduce the risk of psychological and emotional pain and physical discomfort" "for some people," it "carries with it a risk of three to five (possibly six) seconds of physical pain and suffering…absent in [a

nitrogen hypoxia] execution." *Boyd v. Hamm*, 2:25-cv-00529, 2025 WL 2884410, at \*21 (M.D. Ala. Oct. 9, 2025). The Eleventh Circuit affirmed that holding even "[a]ssuming that nitrogen hypoxia contains a physical harm component that induces distress." *Boyd v. Comm'r*, 25-14545, 2025 WL 2970017, at \*4 (11th Cir. Oct. 20, 2025); *accord Hoffman v. Westcott*, 131 F.4th 332, 336 (5th Cir. 2025). The difference between the methods is not "clear and considerable." *Bucklew*, 587 U.S. at 143.

*Third*, the State has valid penological reasons to object to adding firing squad as a fourth authorized method of execution. Unlike any other method, Lee's firing squad requires *five* expert marksmen willing and able to serve as executioners. DE147:68 (Dr. Williams) ("[South Carolina is] skirting on the edge of failing" in part because of its lower "number of riflemen."). Among other concerns, the State cannot risk being unable to carry out its sentences because of labor supply issues any more than drug supply issues; *see Bucklew*, 587 U.S. at 134 (citing potential personnel and staffing concerns as one of the "many legitimate reasons why a State might choose, consistent with the Eighth Amendment, not to adopt a prisoner's preferred method of execution"). That is one of the chief advantages of nitrogen, *Price v. Comm'r*, 920 F.3d 1317, 1326-27 (11th Cir. 2019), and it fits comfortably among the "many legitimate reasons" why a State might "not [ ] adopt a prisoner's preferred method of execution," *Bucklew*, 587 U.S. at 134.

***Fourth***, Lee's about-face on nitrogen—culminating in his rejection of *all three methods* available in Alabama—should count against an injunction. He must "give[ ] the State a pathway forward," *Nance v. Ward*, 597 U.S. 169, 170 (2022), but there is no doubt that an injunction to use firing squad would prevent "the execution as scheduled," *Nelson v. Campbell*, 541 U.S. 637, 646 (2004).

***Fifth***, despite being subject to the method for nearly eight years as of this filing, Lee caused this judicial emergency by running out the limitations period and failing to request interim relief until just last week. *See Walls v. Sec'y, Dep't of Corr.*, 161 F.4th 1281, 1285 (11th Cir. 2025); *Mills v. Hamm*, 102 F.4th 1245, 1251 (11th Cir. 2024).

## I.  The possibility of firing-squad executions does not cast doubt on nitrogen hypoxia any more than it does other lawful methods.

In its memorandum opinion, the Court compared nitrogen hypoxia to constitutional methods of execution, on the one hand, and cruel and unusual methods, on the other. DE176:52-53. In particular, the Court found that dyspnea is not "physical pain like a broken bone," but according to some patient reports, it "*may feel…even* like 'suffocation.'" *Id.* at 52 (emphasis added). But *even that*, the Court held, would be "similar to…hanging, which has been considered constitutional for over a century." *Id.*

Nothing in the Eleventh Circuit's opinion disturbed that comparison, and it's still the right answer on remand. Firing squad was a known method of execution in

4

"the 17th century if not earlier." DE147:49. Its advantages, whatever they may be, did not render executions by lethal injection, cyanide gas, electrocution, or hanging unconstitutional. If that's true—and if nitrogen hypoxia compares favorably to any one of those methods, as the Court held it did—then there is no basis to conclude that firing squad would "significantly reduce" risk. *Bucklew*, 587 U.S. at 134. Put another way, the difference in cognizable risks between nitrogen hypoxia and firing squad can be no greater than that between, say, hanging and firing squad. If hanging has survived the comparison, then so must nitrogen hypoxia.

Lee does not challenge the Court's analysis on remand. And the Supreme Court found this kind of compare-and-contrast analysis "instructive," *id.* at 132, even though *Bucklew* was ultimately resolved on prong two, *id.* at 149 n.4 (declining to reach prong one). Lee seems forced to endorse (1) an argument that these "traditionally accepted methods of execution" are in fact unconstitutional, *but see id.* at 134; *Glossip v. Gross*, 576 U.S. 863, 880-81 (2015), or (2) an argument that nitrogen hypoxia is somehow worse. But he has not made either argument, either on remand or in his post-hearing brief. The Court's conclusion must stand.

## II.    Lee did not prove that firing squad "significantly reduces" overall risk compared to nitrogen hypoxia.

Even considering the two methods in isolation, firing squad is not "a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain and that the State has refused to adopt without

a legitimate penological reason." *Bucklew*, 587 U.S. at 134. "A minor reduction in risk is insufficient; the difference must be clear and considerable." *Id.* at 143; *see also Baze v. Rees*, 553 U.S. 35, 52 (2008) (plurality) (requiring "documented advantages"); *id.* at 67-69 (Alito, J., concurring) (citing "lack of clear guidance in the currently available scientific literature" as ground to abstain from enjoining protocol based on "the testimony of an expert or two or by judicial findings of fact based on such testimony"). On this record, a firing squad execution would not significantly reduce the overall risk to the inmate.

## A.    Firing squad poses serious physical and psychological risks of its own.

The Eleventh Circuit previously described a firing-squad execution: When four or five "bullets strike the heart, they tear the heart muscles to pieces and blow apart the tissue. Moreover, the inmate would not lose consciousness for three to six seconds, during which time he or she would feel pain and suffering." *Boyd*, 2025 WL 2970017, *4 (citation modified); *accord, e.g.*, *Owens v. Stirling*, 904 S.E.2d 580, 600 (S.C. 2024) (finding that "an inmate executed via the firing squad is likely to feel pain, perhaps excruciating pain[, for]…ten to fifteen seconds" "unless there is a massive botch" like "miss[ing] the inmate's heart"); *Hoffman*, 131 F.4th at 336.

Lee says this would be "essentially painless," DE185:11, but there is ample evidence in this record for the Court to find what it did in *Boyd* and what countless other courts have found: that getting shot is not painless. *See, e.g.*, DE149:63

(Dr. Antognini) ("I certainly have experience with patients who have had gunshot wounds, and they are painful."); Def. Ex. 2 ¶ 19 (Dr. Antognini) ("[T]he shattering of bone and tissue destruction is, by its very nature, going to be painful."); Def. Ex. 60 at 30:19-31:15 (Lee) (describing witnessing gunshot wounds, hearing victims "scream or moan," and it seeming "[p]retty painful"); DE148:47-48 (collecting cases). The Court should not find that firing-squad executions are *painless* on "the testimony of [one] expert." *Baze*, 553 U.S. at 69 (Alito, J., concurring).[1]

If the shooters miss the targeted left ventricle—for example, by hitting instead the "right ventricle, which does not pump blood to the brain," DE147:104 (Dr. Williams)—then the physical pain would be even greater, DE149:64-65 (Dr. Antognini). Dr. Williams did not credibly dispel the risks of missing the left ventricle, for he ignored the Mikal Mahdi execution in his report and on direct. Indeed, he largely ignored South Carolina altogether, despite that state having conducted half of the firing squad executions in the modern era. The State is not here arguing that firing-squad executions are unconstitutional—only that South Carolina's experience is relevant to the analysis, that its absence from Dr. Williams's

---

[1] Lee argues that the Court excluded Dr. Antognini's opinion that the time to unconsciousness would be longer than eight to ten seconds, but the Court did not exclude his opinion that bullets obliterating the heart would be painful. And the 1938 Utah execution supports a longer time to unconsciousness even without Dr. Antognini's expert opinion. DE147:47.

methodology is an indictment of his methodologies and ultimate opinions, and that it remains a valid cause for concern.[2]

As to the psychological risks, the Court found that "[e]very method of execution…inevitably includes several steps signaling that death is imminent," such as "having a target affixed to one's chest." DE176:51.[3] Lee does not challenge that finding. His expert Dr. Williams is not a psychologist and could not credibly opine on the potential for discomfort or distress caused by a firing-squad protocol in particular. Still, Dr. Williams inferred that John Deering, executed by firing squad in 1938, "must have had some fear and anxiety," given that his "heartbeat jumped from 72 to 180," according to a newspaper report. DE147:44. Dr. Williams "assum[ed]" this "would [ ] be the same fear or anxiety that an inmate would face

---

[2] If the absence of a "track record of successful use" can be a penological reason to reject a method, *Frazier v. Hamm*, 2:24-cv-00732, 2025 WL 361172, at *13 (M.D. Ala. Jan. 31, 2025), an inconsistent track record should be, too. Lee argues that South Carolina *should* be excluded from the analysis, DE185:6, which contradicts Dr. Williams's repeated reliance on historical examples. And even if the comparison should be limited to Utah alone, its *two* executions in this century are hardly the kind of "track record" the State must accept without objection.

[3] *See also Boyd*, 2025 WL 2884410 at *21 ("And Utah's firing squad protocol also carries with it a risk of psychological and emotional pain, most acutely from the time the inmate is escorted into the execution chamber and restrained in a chair, and continuing when the target is affixed over his heart and the hood is placed over his head. All the while, the inmate knows that four bullets will soon strike his heart, killing him. Much of the psychological and emotional pain caused by either nitrogen hypoxia or the firing squad is pain which the inmate would inevitably experience because he knows he will soon die—an experience which attends every execution and cannot be avoided.").

regardless of the method of execution." *Id.*[4] Notably, Dr. Williams relies on this example to illustrate the Utah protocol, but in 1938, "t[he] heart beat stopped 15.6 seconds after the bullets struck." *Id.* at 47, well beyond the time he would expect. He disputes the report without evidence. *Id.* The Court need not credit his view that being shot would be uniquely "novel" such that it would "overwhelm the conscious thought processes" and an inmate would "not feel pain." *Id.* at 45; *cf. McGehee v. Hutchinson*, 463 F. Supp. 3d 870, 915-16 (E.D. Ark. 2020) (highlighting similar deficiencies in Dr. Williams's testimony in support of plaintiff challenging Arkansas's Midazolam Protocol, concluding that it "f[ell] short of meeting plaintiffs' burden under the second prong of *Baze/Glossip*").

## B. Firing squad would not clearly and considerably decrease overall risk compared to nitrogen hypoxia.

The Court is left to make the same comparison it made in *Boyd* between a method that risks "emotional terror and physiological distress" for one to three minutes (in the Court's view) and one that typically risks "physical pain [for] three to five seconds." *Boyd*, 2025 WL 2884410 at *16-17, 21. The Court did not find firing squad substantially likely to significantly reduce Boyd's overall risk. So too here. Even if the risk of dyspnea alone could make a method of execution

---

[4] Again, Lee argues that the Court excluded Dr. Antognini's opinion on this point, DE185:5-6, but Dr. Williams made the point well enough for the State, and Lee does not directly challenge the district court's finding or reliance on *Boyd*.

9

unconstitutional, which the State doubts, *see In re Ohio Execution Protocol Litig.*, 881 F.3d 447, 450 (6th Cir. 2018), Lee has not carried his burden because there is no neutral way to compare the alleged "holistic discomfort sensation" of nitrogen hypoxia to the pain of a firing-squad execution, which *is* "physical pain like a broken bone." DE176:54.

Lee's basis drawing the comparison in his favor is a nonstarter. He relies on a few reports of hospital patients, who "often had multiple diseases" and preexisting breathing problems, DE146:17, and who had dyspnea for *days on end*, Def. Ex. 2:7. But a specific patient saying that a specific instance of dyspnea was "worse than pain" in the abstract, DE185:7, is worthless. Worse than *what* pain? Worse than being shot in the heart? Neither Dr. Schwartzstein's study nor his testimony drew that comparison.

This is an occasion for "deference to a State's choice of execution procedures," *Bucklew*, 587 U.S. at 134, because the State is not required by the Eighth Amendment or by any caselaw to inflict some physical pain to avoid some psychological distress, *accord Hoffman*, 131 F.4th at 336 (no Eighth Amendment violation where expert testimony supported that nitrogen hypoxia is physically painless despite finding of "conscious terror…and psychological suffering" for up to minutes); *id.* at 337 (Haynes, J., dissenting)). Here especially, where Lee had the option to elect electrocution—and endure some brief physical pain—but rejected it

in favor of the emotional distress he now alleges, the Court should not delay Lee's execution to force the State to make the same trade in precisely the way Lee prefers.

Second, the Court should adhere to its finding that the prisoner's baseline level of anxiety is already high—a finding Lee does not challenge. The Court acknowledged the testimony that "the anxiety caused by the Protocol" is "unique and separate," but it "remains inextricably intertwined with the fear of dying—and in the execution setting, the *fact* of dying and the inmate's conscious awareness that he *is* dying." DE176:50. Thus, the kind of discomfort alleged to result from hypoxia—even if the Eleventh Circuit thought it qualified as severe—is still the same kind of discomfort "needed to effectuate a death sentence." *Id.* at 51. The kind of pain that results from a firing squad is avoidable.

Third, the Court should adhere to its findings that the length of time to unconsciousness is "variab[le]," *id.* at 38, 45, and so is "sensitivity to hypoxia" more generally, *id.* at 44. In contrast, there is no evidence that the physical pain of being shot in the chest varies greatly depending on a person's biology.

## III.    The State has valid penological reasons to reject firing squad.

### A.    Firing squad requires at least five expert marksmen willing and able to serve as executioners.

ADOC would need to find sufficient volunteers among their personnel willing and capable of serving in a firing squad. DE146:8 (Commissioner Hamm testifying that he could not compel ADOC employees to participate in executions). This is a

problem for the feasibility of the method, and it gives ADOC a penological reason to reject it. A firing squad execution under Utah's protocol would require five state personnel willing and able to serve as executioner. Lee has not proven there are readily available personnel to serve this function, and neither Warden Raybon (DE147:163-164) nor former Commissioner Hamm (DE146:235) could identify five ADOC employees they believe would be skilled and willing to carry out a firing-squad execution. This would make it difficult to use the method "quickly." *Bucklew*, 587 U.S. at 141; *see also id.* at 134 (personnel and staffing concerns are among the "many legitimate reasons why a State might choose, consistent with the Eighth Amendment, not to adopt a prisoner's preferred method of execution"); *cf. Glossip*, 576 U.S. at 878-79 (rejecting alternative where plaintiffs had "not identified any available drug or drugs that could be used"); *Boyd*, 2025 WL 2970017, at *5 (rejecting MAID on ground that obtaining drugs could be "difficult" and "finding the necessary personnel to administer them would be problematic").

But more than that: even if officials could identify five employees willing and able to shoot an inmate exactly in the left ventricle, the State would have penological reason to reject a method so dependent on particular personnel. Conducting an execution by nitrogen hypoxia involves training, to be sure, but not five executioners with expert marksmanship. *See McGehee v. Hutchinson*, 854 F.3d 488, 493-94 (3d Cir. 2017) ("[Firing squad] requires trained marksmen who are willing to participate

and is allegedly painless only if volleys are targeted precisely. The record comes short of establishing a significant possibility that use of a firing squad is readily implemented and would *significantly reduce* a substantial risk of severe pain."). One of the main reasons to adopt nitrogen hypoxia—aside from it being a quick and humane method—was to address the "supply concerns" that have made lethal-injection drugs unreliable. *See Price*, 920 F.3d at 1327; *Frazier*, 2025 WL 361172, at *13 (crediting State's penological reason of "turned to nitrogen hypoxia in part to 'implement[ ] a method that does not depend so heavily on external variables'"); U.S. Dep't of Just. Office of Legal Policy, Restoring and Strengthening the Federal Death Penalty 28-30 (2026), www.justice.gov/ag/media/1437806/dl?inline (citing supply chain challenges among reasons to explore other methods, such as nitrogen hypoxia). If opponents of capital punishment could pressure major "pharmaceutical companies to refuse to supply the drugs" for lethal injection, *Glossip*, 576 U.S. at 870, it's no stretch of the imagination to think they could pressure individuals not to participate in firing-squad executions.[5]

---

[5] *Cf.* Tr. 58:1-9, *Boyd*, 2:25-cv-00529 (M.D. Ala. Sept. 4, 2025), DE83 (testimony acknowledging that journalist purported to acquire fourteen names of execution team members); Brendan Kirby, *'Thou Shalt Not Suffocate'—Billboard Near Holman Prison Targets Corrections Workers*, FOX10 NEWS (June 5, 2026, 6:38 PM),
www.fox10tv.com/2026/06/05/thou-shalt-not-suffocate-billboard-near-holman-prison-targets-corrections-workers.

This is not an objection to the method's "novelty." *Contra* DE185:9. Finding, training, and maintaining at all times at least *five* executioners—practically speaking, ADOC would need more in case of illness or absence—would add new variables to the process beyond the State's control, which it has ample penological reason to reject. That exactly one other State is currently conducting firing-squad executions does not defeat Alabama's "legitimate reason[s] for declining to adopt the protocol of another." *Bucklew*, 587 U.S. at 140; *accord McGehee*, 854 F.3d at 494 (rejecting alternative method argument in part because *only* one state was using firing squad at the time of plaintiff's claim).

**B.    Firing squad requires more than "incidental" delay, as the development of the nitrogen-hypoxia protocol proves.**

An inmate is "not limited to choosing [an alternative] among those presently authorized" by state law, but he still must propose a method the State could use "easily and reasonably quickly," and "existing state law might be relevant." *Bucklew*, 587 U.S. at 139-41. Here, the state legislature would need not only to authorize firing squad but also to amend the law to permit multiple people, not just the warden of Holman Correctional Facility, to serve as the executioner. *See* ALA. CODE §§ 15-18-82, 15-18-82.1. ADOC would need to research and adopt a protocol. To do so, the State would not take Dr. Williams's word as gospel. It would want "documented advantages" supporting each of its choices, *Baze*, 553 U.S. at 52, such

14

as how to construct a new facility for holding firing-squad executions at Holman,[6] which firearms and ammunition to use, how to ensure everyone's safety, how best to train and qualify the personnel.[7] To say Dr. Williams testified "to a reasonable degree of medical certainty" on all of these subjects, DE185:8, stretches the testimony—and the field of medicine.

This would not be as simple as tweaking the dosage in a three-drug protocol. Each variable would need to be considered and adapted to suit ADOC's needs, and this process would take time; ADOC spent *five years* developing nitrogen hypoxia. The time required for the legislature and relevant agencies to consider and enact the necessary measures should be factored into the "readily available" calculus— especially in a case like this one, where Lee, seeking to avoid execution by lethal injection, elected nitrogen hypoxia in June 2018, then made no move to challenge his chosen method until the very end of the limitations period in 2025, over a decade

---

[6] Former Commissioner Hamm and Warden Raybon testified that the execution chamber at Holman Correctional Facility is not suitable for this purpose, nor are the decommissioned areas of the prison. DE146:238-39; DE147:164-67. Dr. Williams agreed that for a safe firing squad chamber, one would need to install ballistically impermeable barriers between witnesses and the chamber, impermeable ballistic protection for staff inside the chamber, bullet-resistant glass, cinderblock walls filled with concrete (or something comparable), and a means to catch bullets to stop them from ricocheting. DE147:54-55.

[7] While correctional officers undergo APOSTC certification in marksmanship, APOSTC does not demand the high level of proficiency required by the Utah protocol, for example, which requires members of the firing squad to hit a target under execution conditions using all weapons designated to carry out executions. If they miss with any weapon, they are disqualified. DE173-192:55.

since the conclusion of his habeas appeal. *See Boyd*, 856 F.3d at 869 (emphasizing that plaintiff's method-of-execution claim would require the Alabama legislature to "fundamentally re-writ[e] its method-of-execution statute"). Although an alternative method may be cognizable even if adopting it creates some "incidental delay," *Nance v. Ward*, 597 U.S. 159, 170 (2022), Lee has proposed significant expenditures of time and resources by the State. On this record, the many steps required to implement a firing squad execution disqualify it from being a "pathway forward." *Id.* at 169.[8] The Court should not indulge the same wishful thinking that led others to believe an entirely new method could be developed in "two-and-one-half months." *Price*, 920 F.3d at 1329.

## IV. The equities and public interest favor the State.

**A.** The equities disfavor Lee because his present litigation directly contradicts his prior election of nitrogen hypoxia and agreement with the State to avoid lethal injection and electrocution. Joint Motion to Dismiss, *Lee v. Dunn*, 1:16-cv-00473 (S.D. Ala. July 19, 2018), DE37. His present position that nitrogen hypoxia is *facially unconstitutional*—offering no alternative for its lawful implementation— suggests he was and remains "more interested in delaying [his] execution[ ] than in

---

[8] Lee argues that *Nance* blessed a firing-squad alternative, DE185:8-9, but that's not true. The question was whether Nance's claim had to be brought in habeas given that the alternative was unauthorized by state law. 587 U.S. at 167. The Court did not opine on the merits of the Eighth Amendment claim.

avoiding unnecessary pain." *See Middlebrooks v. Parker*, 22 F.4th 621, 628 (6th Cir. 2022) (Thapar, J., statement) (citing *Bucklew*, 587 U.S. at 140). Lee has suggested that something has changed since his election, but nothing has changed that matters for his constitutional claim, which is that "conscious suffocation" (*i.e.*, oxygen deprivation) is "a constitutionally unacceptable risk." *E.g.*, DE149:130. If that assertion were true and applicable to nitrogen hypoxia today, then so it was when Lee first elected the method. His about-face "might" not be grounds for estoppel, but it should "bolster[ ] the Court's conclusion that the equities do not favor injunctive relief." *Frazier*, 2025 WL 361172, at *38-39.

His choice to plead firing squad—a method unauthorized under Alabama law—should bolster the Court's conclusion further still. If Lee were concerned about the chance of distress from nitrogen hypoxia, Lee had two other constitutional methods to choose from: lethal injection or electrocution. But instead, he elected a method he did not want, and he waited to sue. Def. Ex. 60:22 ("I really don't have an answer why because I just knew that I had to have it filed by August."); *cf. Price*, 920 F.3d at 1329 (acknowledging "the potential for abuse in delaying execution that a state's decision to make multiple methods of execution available could present"). Then he chose an unauthorized method, the State submits, precisely because if successful it would *not* be a "pathway forward," *Nance*, 597 U.S. at 169, and the execution could not proceed "as scheduled," *Nelson v. Campbell*, 541 U.S. 637, 646

17

(2004). Even today, he seeks an injunction not against the use of nitrogen hypoxia but against "any method other than firing squad." DE185:2. Why is that?

**B.** There is no reason that Lee could not have initiated his lawsuit in time to pursue normal civil litigation instead of thrusting the State and judiciary into the unfortunately all-too-familiar last-minute emergency execution posture. Lee elected nitrogen hypoxia in June 2018 to avoid lethal injection. Def. Ex. 60:23-24; *see Lee*, 1:16-cv-00473. At that time, he knew or should have known that he would be required to breathe nitrogen gas until he lost consciousness and died. *See Ledford v. Comm'r*, 856 F.3d 1312, 1319-20 (11th Cir. 2017) (four-year span from "existence" of method to filing counts against inmate). Or Lee at least could have brought a challenge in January 2024, after Kenneth Smith's execution. *Cf. Walls v. Sec'y, Dep't of Corr.*, 161 F.4th 1281, 1285 (11th Cir. 2025) (faulting inmate for delay despite availability of post-execution autopsies that allegedly supported his claim); *accord Ledford*, 856 F.3d at 1319-20 (Multi-year delay "leaves little doubt that the real purpose behind [Lee's] claim is to seek a delay of his execution, not merely to effect an alteration of the manner in which it is carried out.") Instead, Lee waited until the very end of the limitations period in August 2025 to file a §1983 action. This was patently dilatory, and Lee has no excuse for it—even if in retrospect we know the Court managed to hold "a full merits trial" on an expedited timetable. *Contra* DE185:11.

18

As the Supreme Court explained in *Hill v. McDonough*, "[a] court considering a stay must also apply a strong equitable presumption against granting relief where the claim could have been brought at such a time as to allow consideration of the merits without requiring a stay." 547 U.S. 573, 574-75 (2006). This is precisely the scenario Lee has created. *Cf. Walls*, 161 F.4th at 1285 ("Walls's admission that his suit could have been filed four months earlier dooms his motion."); *Mills v. Hamm*, 102 F.4th 1245, 1251 (11th Cir. 2024) (similar). "Equity strongly disfavors inexcusable delay," *Woods v. Comm'r*, 951 F.3d 1288, 1293 (11th Cir. 2020), so "last-minute claims arising from long-known facts" may justify "denying equitable relief," *Ramirez v. Collier*, 595 U.S. 411, 434 (2022).

**C.** Neither "death" nor "mooting of a live legal claim" count as irreparable harms. *Contra* Motion 12. If they did, then every inmate with a pending execution would automatically satisfy this element. To the contrary, punishing the guilty fulfills the public's "moral judgment," *Calderon v. Thompson*, 523 U.S. 538, 556 (1998), and carrying out a lawful sentence inflicts no irreparable harm. The State, the public, and the victims have a "legitimate interest in carrying out a sentence of death in a timely manner." *Baze*, 553 U.S. at 61 (counting fourteen years from sentencing against stay of execution).

19

## CONCLUSION

The Court should enter judgment for the State or deny Lee's motion for preliminary injunctive relief.

Respectfully submitted,

STEVE MARSHALL
ATTORNEY GENERAL OF ALABAMA
BY—

Robert Overing
*Principal Deputy Solicitor General*

*/s/ Lauren A. Simpson*
Lauren A. Simpson
*Deputy Attorney General*

Polly S. Kenny
Talmadge Butts
Brenton Thompson
*Assistant Attorneys General*

Counsel for Defendants

20

## CERTIFICATE OF SERVICE

I certify that on June 9, 2026, I served a copy of the foregoing upon counsel for the Plaintiff by filing the same via the Court's CM/ECF system.

Respectfully submitted,

Steve Marshall
*Alabama Attorney General*

*/s/ Lauren A. Simpson*
Lauren A. Simpson
*Deputy Attorney General*
Counsel for Defendants

OF COUNSEL:

Office of the Attorney General
501 Washington Avenue
Montgomery, AL 36130
(334) 242-7300
Lauren.Simpson@AlabamaAG.gov

21